UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

BRETT KIMBERLIN,        )
        )
       Plaintiff,       )
        )
     v.        )     Case No. 8:13-cv-03059-PWG
        )
NATIONAL BLOGGERS CLUB, *et al.*,  )
        )
      Defendants.     )

**OPPOSITION TO MOTION FOR LEAVE TO PURSUE DISCOVERY
TO IDENTIFY DEFENDANT ACE OF SPADES**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

FACTS AND PROCEEDINGS BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  Facts of This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    THE FIRST AMENDMENT REQUIRES A SHOWING OF MERIT ON BOTH
    THE LAW AND THE FACTS BEFORE A SUBPOENA TO IDENTIFY AN
    ANONYMOUS SPEAKER IS ENFORCED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    The Constitution Limits Compelled Identification of Anonymous Internet
            Speakers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.    Most Courts Now Require a Detailed Legal and Evidentiary Showing for
            the Identification of John Doe Defendants Sued for Criticizing the Plaintiff. . . . 15

        C.    Kimberlin Has Not Made the Showing Required Before Discovery to
            Identify the Anonymous Speaker Is Permissible. . . . . . . . . . . . . . . . . . . . . . . . 21

            1.    Kimberlin Properly Notified Ace of Spades of His Request
                to Take Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2.    Kimberlin Did Not Plead Verbatim Allegedly Defamatory Words...... 22

3.    Kimberlin Has Not Pleaded Any Valid Claims, for Defamation or
      Otherwise................................................. 23

4.    Kimberlin Presented No Evidence Supporting the Elements of His
      Prima Facie Case on any Claim Against Ace of Spades, of
      Defamation or Otherwise..................................... 25

5.    The *Dendrite/ Brodie* Balancing of Interests Strongly Favors Doe...... 27

CONCLUSION........................................................ 32

# TABLE OF AUTHORITIES

## CASES

*Allen v. Bethlehem Steel Corp.*,
　　76 Md. App. 642, 547 A.2d 1105 (Md. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Alvis Coatings v. Does*,
　　2004 WL 2904405  (W.D.N.C. Dec. 2, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*In Re Anonymous Online Speakers*,
　　661 F.3d 1168 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Art of Living Foundation v. Does 1-10*,
　　2011 WL 5444622 (N.D. Cal. Nov. 9, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 30

*Asay v. Hallmark Cards*,
　　594 F.2d 692 (8th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Baxter*,
　　2001 WL 34806203 (W.D. La. Dec. 20, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Best Western Int'l v Doe*,
　　2006 WL 2091695 (D. Ariz. July 25, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Call of the Wild Movie, LLC v. Does 1-1,062*,
　　770 F. Supp. 2d 332 (D.D.C. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cervantes v. Time*,
　　464 F.2d 986 (8th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Citizens Against Rent Control v. Berkeley*,
　　454 U.S. 290 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Columbia Insurance Co. v. Seescandy.com*,
　　185 F.R.D. 573 (N.D. Cal. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

*Dendrite v. Doe*,
　　775 A.2d 756 (N.J. App. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doe v 2theMart.com*,
　　140 F. Supp. 2d 1088 (W.D. Wash. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Doe v. Cahill*,
    884 A.2d 451 (Del. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*In re Does 1-10*,
    242 S.W.3d 805 (Tex. App. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Doe I and II v. Individuals whose true names are unknown*,
    561 F. Supp.2d 249 (D. Conn. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*In re Drasin*,
    2013 WL 3866777, at 5 (D.Md. July 24, 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fodor v. Doe*,
    2011 WL 1629572 (D. Nev. Apr. 27, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Food Lion v. Capital Cities/ABC*,
    194 F.3d 505 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fuste v. Riverside Healthcare Association*,
    265 Va. 127, 575 S.E.2d 858 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ghanam v. Does*,
    —N.W.2d —, 2014 WL 26075  (Mich. App.  Jan. 2, 2014). . . . . . . . . . . . . . . . . . . . . . 19

*Hickey v. St. Martin's Press*,
    978 F. Supp. 230 (D. Md. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Highfields Capital Management v. Doe*,
    385 F. Supp. 2d 969 (N.D. Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hustler Magazine v. Falwell*,
    485 U.S. 46 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Immunomedics v. Doe*,
    775 A.2d 773 (N.J. App. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Independent Newspapers v. Brodie*,
    407 Md. 415, 966 A.2d 432 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Independent Newspapers v. Brodie,*
   966 A.2d 432 (Md. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 22, 28

*In re Indiana Newspapers,*
   963 N.E.2d 534 (Ind. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Jones v. Flowers,*
   547 U.S. 220 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kimberlin v, DeWalt,*
   12 F. Supp. 2d 487 (D. Md. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Koch Industries v. Doe,*
   2011 WL 1775765 (D. Utah May 9, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Krinsky v. Doe 6,*
   72 Cal. Rptr. 3d 231 (Cal. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*London-Sire Records v. Doe 1,*
   542 F. Supp. 2d 153 (D. Mass. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Maxon v. Ottawa Public Co.,*
   929 N.E.2d 666 (Ill. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McIntyre v. Ohio Elections Committee,*
   514 U.S. 334 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

*Miami Herald Public Co. v. Tornillo,*
   418 U.S. 241 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Mick Haig Productions v. Doe,*
   687 F.3d 649 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Missouri ex rel. Classic III v. Ely,*
   954 S.W.2d 650 (Mo. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mobilisa v. Doe,*
   170 P.3d 712 (Ariz. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 29

*Mortgage Specialists v. Implode-Explode Heavy Industries,*
   999 A.2d 184 (N.H. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*On The Cheap, LLC v. Does 1-5011*,
    280 F.R.D. 500 (N.D. Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Organization for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Patrick Collins v. Doe 1*,
    288 F.R.D. 233 (E.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Petroleum Prods. Antitrust Litigation*,
    680 F.2d 5 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Pilchesky v. Gatelli*,
    12 A.3d 430 (Pa. Super. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 12

*Richards of Rockford v. PGE*,
    71 F.R.D. 388 (N.D. Cal. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ron Paul 2012 Presidential Campaign Committee v. John Does 1-10*,
    No. 3:12-cv-00240-MEJ (N.D. Cal. Mar. 8, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Royal Palace Homes v. Channel 7 of Detroit*,
    495 N.W.2d 392 (Mich. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*SaleHoo Group v. Doe*,
    722 F. Supp. 2d 1210 (W.D. Wash. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Schultz v Reader's Digest*,
    468 F. Supp. 551 (E.D. Mich. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Shelley v. Kraemer*,
    334 U.S. 1 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sinclair v. TubeSockTedD*,
  596 F. Supp. 2d 128 (D.D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Smith v. Esquire, Inc.*,
  494 F. Supp. 967 (D. Md. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Solers v. Doe*,
  977 A.2d 941 (D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sony Music Entertainment v. Does 1-40*,
  326 F. Supp. 2d 556 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Stone v. Paddock Public Co.*,
  961 N.E.2d 380 (Ill. App. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Swiger v. Allegheny Energy*,
  2006 WL 1409622 (E.D. Pa. May 19, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Talley v. California*,
  362 U.S. 60 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Thomas M. Cooley Law School v. John Doe 1*,
  833 N.W.2d 331 (Mich. App. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Kimberlin*,
  483 F. Supp. 350 (S.D. Ind. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Watchtower Bible & Tract Society v. Village of Stratton*,
  536 U.S. 150 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Yelp, Inc. v. Hadeed Carpet Cleaning*,
  62 Va. App. 678, 752 S.E.2d 554 (Va. App. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## CONSTITUTION, STATUTES AND RULES

United States Constitution
  First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 501(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23

Md. Code Ann. [Cts. & Jud. Proc..] § 5-105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Federal Rules of Civil Procedure
Rule 26(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**MISCELLANEOUS**

http://patdollard.com/2012/06/ another-blogger-aaron-worthing-gets-swatted/. . . . . . . . . . . . . . 6

http://en.wikipedia.org/wiki/Blog. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

http://theothermccain.com/2012/06/05/ali-akbar-says-world -war-three/. . . . . . . . . . . . . . . . . . 23

Bennett, *Kimberlin v. Internet: Not a Partisan Issue* (May 31, 2012),
http://blog.bennettandbennett.com/2012/05/kimberlin-v-internet-
not-a-partisan-issue.html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Calabresi,  *The Wizard of Odd*,
TIME Magazine, Jan. 5, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Eisenhofer & Liebesman, *Caught by the Net*,
10 Business Law Today No. 1 (Sept.-Oct.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fischman, *Protecting the Value of Your Goodwill from Online Assault*,
www.fhdlaw.com/html/ bruce_article.htm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fischman, *Your Corporate Reputation Online*,
www.fhdlaw.com/html/corporate_reputation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Gelarden, *Kimberlin case a maze of murder, deceit*,
available at http://archive.indystar .com/assets/pdf/BG164276919.PDF. . . . . . . . . . 4, 30

Greenfield, *Fighting Lawfare and Unintended Consequences* (May 30, 2012),
http://blog.simplejustice.us/2012/05/30/fighting-lawfare-
and-unintended-consequences/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Heyward, *Everybody Blog About Brett Kimberlin Day* (May 25, 2012),
http://www.human events.com/2012/05/25/ everybody-blog-
about-brett-kimberlin-day/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Lessig, *The Law of the Horse: What Cyber Law Might Teach*,
113 Harv. L. Rev. 501, 504-505 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Lidsky & Cotter, *Authorship, Audiences and Anonymous Speech*,
82 Notre Dame L. Rev. 1537 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Pareene, *Brett Kimberlin versus right-wing bloggers* (July 10, 2012),
   http://www.salon.com/2012/ 07/10/brett_kimberlin_versus_right_wing_bloggers/. . . . . . 5

Singer, *Citizen K: The Deeply Weird American Journey of Brett Kinberlin* (1996). . . . . . . 4, 5, 32

Thompson, *On the Net, in the Dark,*
   California Law Week, Volume 1, No. 9, at 16, 18 (1999). . . . . . . . . . . . . . . . . . . . . . . . . 13

Volokh, *Aaron Walker, Brett Kimberlin, and the Fog of Litigation* (May 29, 2012),
   http://www.volokh.com/2012/05/29/aaron-walker-brett-kimberlin-and-
   the-fog-of-litigation/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Werthammer, *RNN Sues Yahoo Over Negative Web Site,*
   Daily Freeman, Nov. 21, 2000,
   www.zwire.com/site/news.cfm?newsid=1098427&BRD=1769&
   PAG=461&dept_id=4969&rfi=8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

White, *Brett Kimberlin and Aaron Worthing- Censorship and Retaliation Through Lawfare,*
   http://www.popehat.com/2012/05/29/brett-kimberlin-and-aaron-worthing
   -censorship-and-retaliation-through-lawfare/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The plaintiff in this case, who served more than fifteen years in prison following convictions for perjury, drug trafficking, and a series of bombings in Speedway, Indiana, seeks leave to pursue discovery to identify an anonymous blogger whom the plaintiff is suing for defamation under Maryland law.   As the motion recognizes, the Maryland Court of Appeals has held that before defamation plaintiffs can identify their critics using government process, thus taking away their First Amendment right to speak anonymously, such plaintiffs must make a legal and an evidentiary showing that the litigation has merit, and that their interest in pursuing the litigation outweighs the First Amendment rights of the Doe defendants.   *Independent Newspapers v. Brodie*, 407 Md. 415 (2009).   Indeed, appellate courts in ten states follow the same approach under the First Amendment, as do many federal courts, and the plaintiff here has not come close to meeting that standard.

## FACTS AND PROCEEDINGS BELOW

### A.  Background

Protection for the right to engage in anonymous communication is fundamental to a free society.   Indeed, as electronic communications have become essential tools for speech, the Internet in all its forms—web pages, email, chat rooms, and the like—has become a democratic institution in the fullest sense.   It is the modern equivalent of Speakers' Corner in England's Hyde Park, where ordinary people may voice their opinions, however silly, profane, or brilliant, to all who choose to listen.   As the Supreme Court explained in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997),

> From a publisher's standpoint, [the Internet] constitutes a vast platform from which to address and hear from a world-wide audience of millions of readers, viewers, researchers and buyers. . . . Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox.   Through the use of web pages, . . . the same individual can

-1-

become a pamphleteer.

*Id.* at 853, 870.

Thus, full First Amendment protection applies to speech on the Internet.

Knowing that people have personal interests in news developments, and that people love to share their views with anyone who will listen, many companies have organized outlets for the expression of opinions.  For example, Yahoo! and Raging Bull host message boards for every publicly traded company where investors, and other members of the public, can post discussions about the company.  Blogspot, WordPress and TypePad give individuals the opportunity to create blogs of their own, on which bloggers can at no cost post discussions of current events, public figures, companies, or other topics while leaving it open for visitors to post their own comments. There are hundreds of millions of blogs available on the Internet.  http://en.wikipedia.org/wiki/Blog.

The individuals who post online often do so under pseudonyms—similar to the old system of truck drivers using "handles" when they speak on their CB's.  Nothing prevents an individual from using his real name, but, as inspection of the forum at issue here will reveal, many people choose nicknames that protect the writer's identity from those who disagree with him or her, and hence encourage the uninhibited exchange of ideas and opinions.

Many Internet sites have a significant feature that makes them very different from almost any other form of published expression.  Subject to requirements of registration and moderation, any member of the public can use the forum to express his point of view; a person who disagrees with something that is said on a message board for any reason—including the belief that a statement contains false or misleading information—can respond to that statement immediately at no cost. Most online forums are thus unlike a newspaper, which cannot be required to print responses to its

criticisms. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974).  By contrast, on many Internet forums, companies and individuals can reply immediately to criticisms, giving facts or opinions to vindicate their positions, and thus, possibly, persuading the audience that they are right and their critics are wrong.  For example, every article posted to the blog at issue here allows any member of the public, including plaintiff Kimberlin, to post comments, and as a review of defendant's blog will reveal, debate often rages within the comment section.  And, because many people regularly revisit web sites, a response is likely to be seen by much the same audience as those who saw the original criticism; hence the response reaches many, if not all, of the original readers.  In this way, the Internet provides the ideal proving ground for the proposition that the marketplace of ideas, rather than the courtroom, provides the best forum for the resolution of disagreements about the truth of disputed propositions of fact and opinion.

### B.  Facts of This Case

In *Kimberlin v, DeWalt,* 12 F. Supp.2d 487 (D. Md. 1998), Judge Williams summarized the federal criminal record of plaintiff Brett Kimberlin:

> On June 11, 1980 petitioner was sentenced to four years following his conviction in the United States District Court for the Southern District of Texas for conspiracy to possess with intent to distribute marijuana.

> On November 3, 1980 petitioner received a consecutive 12 year sentence following his conviction in the United States District Court for the Southern District of Indiana for possession and illegal use of Department of Defense insignia, illegal use of the Seal of the President of the United States, and impersonation of a federal officer.

> On June 4, 1981 petitioner received a consecutive five year sentence following his conviction in the United States District Court for the Southern District of Indiana for receipt of explosives by a convicted felon.

> On December 30, 1981 petitioner received a 50–year concurrent sentence

from the United States District Court for the Southern District of Indiana for possession of an unregistered destructive device, unlawful manufacturing of a destructive device, malicious damage by means of explosives, and malicious damage by means of explosives involving personal injury. As set forth in his presentence report, during a six day period in September, 1978 eight bombs made of Tovex 200 dynamite were detonated in the Speedway, Indiana area. One bomb, placed in a gym bag in the Speedway High School parking lot, detonated on September 6, 1978, when it was picked up by Carl and Sandra DeLong after a high school football game. Sandra DeLong received permanent nerve damage caused by bomb fragments in her leg. Her husband Carl lost his right leg and two fingers. Carl DeLong received additional injuries to his inner ear, stomach, chest, neck and arm due to bomb fragments, and endured a series of operations. . . . On February 23, 1983 Carl DeLong committed suicide at the age of 44.

*Id.* at 489-490 (citations and footnote omitted).

Even this account of plaintiff's federal criminal convictions understates the totality of plaintiff's conduct.  For example, the felony that formed the basis for his first 1981 conviction (for possession of explosives as a felon) was for perjury in testimony before a grand jury.  *United States v. Kimberlin*, 483 F.Supp. 350, 351 (S.D. Ind. 1979).  A chilling article in the Indianapolis Star about the police investigation leading to Kimberlin's bombing convictions recounts Kimberlin's efforts to recruit a fellow inmate to murder the federal prosecutor who handled the bombing case against him, and Kimberlin's possible role in the murder of an Indianapolis grandmother who was trying to protect her teenage grand-daughter from Kimberlin's improper attentions.  Gelarden, *Kimberlin case a maze of murder, deceit,* available at http://archive.indystar .com/assets/pdf/BG164276919.PDF.  And a Kimberlin biography, Singer, *Citizen K: The Deeply Weird American Journey of Brett Kinberlin* (1996), quotes Kimberlin as having bragged about having continued his crime spree in prison, such as by forging release papers to try to get out of jail, *id.* at 125-126, and by deliberately sabotaging the electronic military equipment on which he was assigned to conduct quality control

on his prison job.  *Id.* at 184.[1]

Since being released from prison, Kimberlin has tried to reinvent himself by directing two non-profit groups, "Justice Through Music" and "Velvet Revolution."  Calabresi, *The Wizard of Odd*, TIME Magazine, Jan. 5, 2007; Complaint ¶ 9.  The liberal politics espoused by these groups made him a target of conservative bloggers and news sites, who pointed to his criminal past. Pareene, *Brett Kimberlin versus right-wing bloggers* (July 10, 2012), http://www.salon.com/2012/07/10/brett_kimberlin_versus_right_wing_bloggers/.  Kimberlin, in turn, responded by using judicial process to attack his critics.  Not only his conservative adversaries but other bloggers attentive to free speech issues have taken Kimberlin to task for improperly using the courts as a weapon against his critics, a technique that they call "lawfare."  *E.g.*, White, *Brett Kimberlin and Aaron Worthing- Censorship and Retaliation Through Lawfare,* http://www.popehat.com/2012/05/29/brett-kimberlin -and-aaron-worthing-censorship-and-retaliation-through-lawfare/;  Volokh,  *Aaron  Walker,  Brett Kimberlin, and the Fog of Litigation* (May 29, 2012), http://www.volokh.com/2012/05/29/aaron -walker-brett-kimberlin-and-the-fog-of-litigation/; Bennett, *Kimberlin v. Internet: Not a Partisan Issue*  (May  31,  2012),   http://blog.bennettandbennett.com/2012/05/kimberlin-v-internet-not-a- partisan-issue.html.  For example, several bloggers have taken Kimberlin to task for using a subpoena to identify one Aaron Walker, which resulted in Walker's being terminated from his

---

[1]While he was in prison, Kimberlin came to national attention when, less than a month before the  1988  presidential  election,  he  told  reporters  that,  during  the  course  of  his  career  in  drug trafficking, one of his customers was Dan Quayle, a candidate for vice-president in the 1988 election, and  when  he  was  put  in  solitary  confinement  to  prevent  him  from  communicating  with  more reporters.   Undersigned counsel Mr. Levy represented Kimberlin in seeking documents under the Freedom of Information Act pertaining to that confinement.   Mr. Levy also consulted with the lawyers  who  later  represented  Kimberlin  in  a  *Bivens*  action  against  the  responsible  Justice Department officials.  Mr. Levy has not represented Kimberlin since then.  Levy Affidavit ¶ 2.

employment, and then pursuing a series of peace orders in Maryland state court which led to Walker's arrest because a state trial judge believed that Walker's having blogged about Kimberlin was a violation of a previous peace order.   Greenfield, *Fighting Lawfare and Unintended Consequences* (May 30, 2012), http://blog.simplejustice.us/2012/05/30/fighting-lawfare-and-unintended-consequences/.  Moreover, several bloggers have alleged a pattern in which Kimberlin critics have been subjected to "SWATtings" after criticizing Kimberlin—that is, an unknown person calls the police, reports that a serious crime is in progress at the home address of the critic, and then hopes that a SWAT team will descend on the home, causing havoc on the part of the unsuspecting residents. *E.g.*, http://patdollard.com/2012/06/another-blogger-aaron-worthing-gets-swatted/.  The right-wing criticism of Kimberlin included a "Blog about Kimberlin" day in 2012.  Heyward, *Everybody Blog About Brett Kimberlin Day* (May 25, 2012), http://www.humanevents.com/2012/05/25/everybody-blog-about-brett-kimberlin-day/.

Defendant Ace of Spades is one of the bloggers who has criticized Kimberlin on a number of occasions, and who participated in the "Blog About Kimberlin" day.  On June 4, 2012, she called for a "National Day of Blogger Silence," suggesting that this is what would happen if "Kimberlin and his stalker crew" had their way, and called on Congress to enact legislation to prevent "a crime in progress against the First Amendment (and people's safety)."[2]  In other posts, Ace had called for the enactment legislation providing for awards of attorney fees against losing litigants, providing for special remedies against lawsuits against free speech (anti-SLAPP legislation), and barring tax-deductible status for groups employing Kimberlin.  The blog post warned, "They are literally going

---

[2]This brief refers to Ace of Spades using the generic female pronoun, without intending to specify whether this defendant is, in fact, female.

to get someone killed. That is their endgame here." But she also urged bloggers not to make intemperate statements about Kimberlin, because, she suggested, it let him portray himself as a victim. She concluded, "The way this gets won is by law—starting with Congress."

On October 15, 2013, Kimberlin filed a pro se complaint against more than twenty defendants who had criticized him on the Internet, alleging a variety of theories including a RICO conspiracy, various civil rights claims, and the state-law torts of defamation, false light invasion of privacy, intentional infliction of emotional distress, and "fraudulent representation." Docket Entry No. ("DN") 1. On October 17, 2013, he filed an amended complaint, DN 2, alleging the same theories, all of which turned on two basic contentions – first, that his critics had defamed him in various ways, and second that "defendants" had falsely represented that donations to one of the defendants, National Bloggers Club, were deductible under section 501(c)(3).

The amended complaint included only two allegations specific to defendant Ace of Spades. Paragraph 23 alleges that Ace of Spades was a blog "created by Michelle Kerr . . . located at 3131 Homestead Road, 3E Santa Clara, California". Paragraph 66 alleges,

> On June 8 [sic] 2012, Defendant Ace of Spades published "National Day of Blogger Silence" to focus attention on the false narrative that Plaintiff was responsible for swattings. In the article, Defendant Ace of Spades imputed [sic] that Plaintiff was involved with the "crime" of swatting: "They are literally going to *get someone killed*. That is their endgame here."

On January 31, 2014, Kimberlin moved the Court for leave to serve a discovery request on a Virginia company which he believed could provided identifying information about Ace of Spades. DN 51. The motion represented, without any supporting evidence, that Ace had "gone to great lengths to evade service," and acknowledged that the Maryland Court of Appeals had set forth procedural and substantive requirements for subpoenas seeking to identify anonymous defendants who have been

sued for allegedly tortious speech. *Id.* at 2, citing *Independent Newspapers v. Brodie*, 407 Md. 415 (2009).

## SUMMARY OF ARGUMENT

The Internet has the potential to be an equalizing force within our democracy, giving ordinary citizens the opportunity to communicate, at minimal cost, their views on issues of public concern to all who will listen. Full First Amendment protection applies to communications on the Internet, and longstanding precedent recognizes that speakers have a First Amendment right to communicate anonymously, so long as they do not violate the law in doing so. Thus, when a complaint is brought against an anonymous speaker, the courts must balance the right to obtain redress from the perpetrators of civil wrongs against the right of those who have done no wrong to remain anonymous. In cases such as this one, these rights come into conflict when a plaintiff complains about the content of material posted online and seeks relief against its author, including an order compelling disclosure of a speaker's identity, which, if successful, would irreparably destroy the defendant's First Amendment right to remain anonymous.

Moreover, suits against anonymous speakers are unlike most tort cases, where identifying an unknown defendant at the outset of the case is merely the first step toward establishing liability for damages. In a suit against an anonymous speaker, identifying the speaker gives an important measure of relief to the plaintiff because it enables him or his supporters to employ extra-judicial self-help measures to counteract both the speech and the speaker; identification creates a substantial risk of harm to the speaker, who not only loses the right to speak anonymously, but may be exposed to efforts to restrain or punish her speech. For example, an employer might discharge a whistleblower, and a public official might use his powers to retaliate against the speaker, or might

use knowledge of the critic's identity in the political arena.  There is evidence that access to identifying information to enable extra-judicial action may be the only reason some plaintiffs bring such suits (infra 13-14).

Whatever the reason for speaking anonymously, a rule that makes it too easy to remove the cloak of anonymity will deprive the marketplace of ideas of valuable contributions.  Moreover, our legal system ordinarily does not give substantial relief of this sort, even on a preliminary basis, absent proof that the relief is justified because success is likely and the balance of hardships favors granting the relief. The challenge for the courts is to develop a test for the identification of anonymous speakers that makes it neither too easy for deliberate defamers to hide behind pseudonyms, nor too easy for a company or a public figure to unmask critics simply by filing a complaint that purports to state an untested claim for relief under some tort or contract theory.

Although the standard for resolving such disputes is an issue of first impression in this Court, the Court will not be writing on an entirely clean slate because many appellate courts in many states, including Maryland, and many other federal trial courts, have considered this question in light of the principle that only a compelling interest is sufficient to warrant infringement of the free speech right to remain anonymous.  Consequently, those courts have ruled that a trial judge faced with a demand for discovery to identify an anonymous Internet speaker so that he may be served with process should:  (1) provide notice to the potential defendant and an opportunity to defend her anonymity; (2) require the plaintiff to specify the statements that allegedly violate her rights; (3) review the complaint to ensure that it states a cause of action based on each statement and against each defendant; (4) require the plaintiff to produce evidence supporting each element of his claims; and, in many jurisdictions (5) balance the equities, weighing the potential harm to the plaintiff from being

-9-

unable to proceed against the harm to the defendant from losing her right to remain anonymous, in light of the strength of the plaintiff's evidence of wrongdoing. Applying these requirements, a court can ensure that a plaintiff does not obtain an important form of relief—identifying its anonymous critics—and that the defendant is not denied important First Amendment rights unless the plaintiff has a realistic chance of success on the merits.

Meeting these criteria can require time and effort on a plaintiff's part. However, everything that the plaintiff must do to meet this test, he must also do to prevail on the merits of his case. So long as the test does not demand more information than a plaintiff would reasonably be able to provide shortly after filing the complaint, without taking any discovery—and other cases show that plaintiffs with valid claims are easily able to meet such a test—the standard does not unfairly prevent the plaintiff with a legitimate grievance from securing redress against an anonymous speaker.

## ARGUMENT

## I.     THE FIRST AMENDMENT REQUIRES A SHOWING OF MERIT ON BOTH THE LAW AND THE FACTS BEFORE A SUBPOENA TO IDENTIFY AN ANONYMOUS SPEAKER IS ENFORCED.

Many appellate courts have addressed the same question on which the decision of this motion turns—what showing should a plaintiff have to make before it may be granted access to the subpoena power to identify an anonymous Internet user who has criticized the plaintiff? As shown below at pages 16 to 20, those courts have decided that it is not enough for the plaintiff to show that it is only **possible** that the plaintiff has a valid claim, or to put forward a good faith belief in the rightness of its cause. Almost every other appellate court has held, whether under the First Amendment or under state procedures, that anonymous defendants are entitled to demand that the plaintiff make a factual showing, not just that the anonymous defendant has made critical statements, but also that the

statements are actionable and that there is an evidentiary basis for the prima facie elements of the claim.  Some appellate courts have required, as well, an express balancing of the plaintiff's interest in prosecuting its lawsuit against the anonymous defendant's reasons for needing to stay anonymous.

A defamation plaintiff is uniquely in a position to know why the statement that it alleges to be false is, in fact, false and defamatory.  Unlike, for example, a personal injury plaintiff, who may know only that she or he is suffering in some way, without knowing why, the defamation plaintiff typically knows, before it decides to file suit, the evidence that would show the defendant's accusation to be false and defamatory.  There is typically no reason why, at the outset of a case, public figure like Kimberlin about whom false statements have allegedly been made cannot present evidence of falsity.  In light of the constitutional protection for anonymous speech, and the value that society places on that right, this Court should join the broad judicial consensus in requiring such a showing.

**A.     The Constitution Limits Compelled Identification of Anonymous Internet Speakers.**

The First Amendment protects the right to speak anonymously.  *Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150, 166-167 (2002); *McIntyre v. Ohio Elections Comm.*, 514 U.S. 334 (1995); *Talley v. California*, 362 U.S. 60 (1960).  These cases have celebrated the important role played by anonymous or pseudonymous writings over the course of history, from Shakespeare and Mark Twain to the authors of the Federalist Papers:

> [A]n author is generally free to decide whether or not to disclose his or her true identity.  The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible.   Whatever the motivation may be, . . . the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition

of entry.   Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.

*   *   *

Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent.

*McIntyre*, 514 US at 341-342, 356 (emphasis added).

The right to speak anonymously is fully applicable online.  The Supreme Court has treated the Internet as a public forum of preeminent importance because it places in the hands of any individual who wants to express his views the opportunity to reach other members of the public who are hundreds or even thousands of miles away, at virtually no cost.  *Reno v. ACLU*, 521 U.S. 844, 853, 870 (1997).  Several courts have specifically upheld the right to communicate anonymously over the Internet.  *Independent Newspapers v. Brodie*, 966 A.2d 432 (Md. 2009); *In re Does 1-10*, 242 SW3d 805 (Tex. App. 2007); *Mobilisa v. Doe*, 170 P.3d 712 (Ariz. App. 2007); *Doe v. Cahill*, 884 A.2d 451 (Del. 2005); *Dendrite v. Doe*, 775 A.2d 756 (N.J. App. 2001).

Internet speakers may choose to speak anonymously for a variety of reasons.  They may wish to avoid having their views stereotyped according to their racial, ethnic or class characteristics, or their gender.  They may be associated with an organization but want to express an opinion of their own, without running the risk that, despite the standard disclaimer against attribution of opinions to the group, readers will assume that the group feels the same way.  They may want to say or imply things about themselves that they are unwilling to disclose otherwise.  And they may wish to say things that might make other people angry and stir a desire for retaliation.

Although the Internet allows individuals to speak anonymously, it creates an unparalleled capacity to monitor every speaker and to discover his or her identity.  Because of the Internet's

-12-

technology, any speaker who sends an e-mail or visits a website leaves an electronic footprint that, if saved by the recipient, starts a path that can be traced back to the original sender. *See* Lessig, *The Law of the Horse: What Cyber Law Might Teach*, 113 Harv. L. Rev. 501, 504-505 (1999). Thus, anybody with enough time, resources and interest, if coupled with the power to compel disclosure of the information, can learn who is saying what to whom. Consequently, to avoid the Big Brother consequences of a rule that enables any company or political figure to identify its critics, the law provides special protections for anonymity on the Internet. *E.g.*, Lidsky & Cotter, *Authorship, Audiences and Anonymous Speech*, 82 Notre Dame L. Rev. 1537 (2007).

Experience has taught that, when courts do not create sufficient barriers to subpoenas to identify anonymous Internet speakers named as defendants, the subpoena can be the main point of the litigation, in that plaintiffs may identify their critics and then seek no further relief from the court. Thompson, *On the Net, in the Dark*, California Law Week, Volume 1, No. 9, at 16, 18 (1999). Some lawyers admit that the mere identification of their clients' anonymous critics may be all that they desire to achieve through the lawsuit. *E.g.*, Werthammer, *RNN Sues Yahoo Over Negative Web Site*, Daily Freeman, Nov. 21, 2000, www.zwire.com/site/news.cfm?newsid=1098427&BRD=1769& PAG=461&dept_id=4969&rfi=8. An early advocate of using discovery procedures to identify anonymous critics has urged corporate executives to use discovery first, and to decide whether to sue for libel only after the critics have been identified and contacted privately. Fischman, *Your Corporate Reputation Online*, www.fhdlaw.com/html/corporate_reputation.htm; Fischman, *Protecting the Value of Your Goodwill from Online Assault*, www.fhdlaw.com/html/ bruce_article.htm. Lawyers who represent plaintiffs in these cases have also urged companies to bring suit, even if they do not intend to pursue the action to a conclusion, because "[t]he mere filing

-13-

of the John Doe action will probably slow the postings."  Eisenhofer & Liebesman, *Caught by the Net*, 10 Business Law Today No. 1 (Sept.-Oct. 2000), at 40.  These lawyers have similarly suggested that clients decide whether it is worth pursuing a lawsuit only after finding out who the defendant is.  *Id.*  Indeed, in *Swiger v. Allegheny Energy*, 2006 WL 1409622 (E.D. Pa. May 19, 2006), a company represented by the largest and most respected law firm in Philadelphia filed a Doe lawsuit, obtained the identity of an employee who criticized it online, fired the employee, and then dismissed the lawsuit without obtaining any judicial remedy other than the removal of anonymity.

Similarly, companies that make pornographic movies have recently been brought mass copyright infringement lawsuits against hundreds of anonymous Internet users at a time, without any intention of going to trial, but hoping that embarrassment at being subpoenaed and then publicly identified as defendants in such cases will be enough to induce them to pay thousands of dollars in settlements.  *Mick Haig Productions v. Doe*, 687 F.3d 649, 652 & n.2 (5th Cir.  2012); *Patrick Collins v. Doe 1*, 288 F.R.D. 233 (E.D.N.Y. 2012).  Indeed, some pornographic films are now being made not to be sold, but to be used as the basis for subpoenas to identify alleged downloaders who can then be pressured to "settle" to avoid the embarrassment of being named publicly as defendants in such litigation.  *On The Cheap, LLC v. Does 1–5011*, 280 F.R.D. 500, 504 n.6 (N.D. Cal. 2011).  These abuses provide yet another reason why strict standards should be applied to such subpoenas.

Although Kimberlin is not a government official, he asks the Court to issue a subpoena that would invoke judicial authority to compel a third party to provide information.  A court order, even when issued at the behest of a private party, is state action and hence is subject to constitutional limitations.  That is why, for example, an action for damages for defamation, even when brought by an individual, must satisfy First Amendment scrutiny, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349

(1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964), and why a request for injunctive relief, even at the behest of a private party, is similarly subject to constitutional scrutiny. *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971); *Shelley v. Kraemer*, 334 U.S. 1 (1948).   Because compelled identification trenches on the First Amendment right of anonymous speakers to remain anonymous, justification for infringing that right requires proof of a compelling interest, and beyond that, the restriction must be narrowly tailored to serve that interest.   *McIntyre*, 514 U.S. at 347.

As one court said in refusing to order identification of anonymous Internet speakers whose identities were allegedly relevant to the defense against a shareholder derivative suit, "If Internet users could be stripped of . . . anonymity by a civil subpoena enforced under the liberal rules of civil discovery, this would have a significant chilling effect on Internet communications and thus on basic First Amendment rights."   *Doe v 2theMart.com*, 140 F. Supp.2d 1088, 1093 (W.D. Wash. 2001). *Columbia Insurance Co. v. Seescandy.com*, 185 F.R.D. 573 (N.D .Cal. 1999), put it this way:

> People are permitted to interact pseudonymously and anonymously with each other so long as those acts are not in violation of the law.  This ability to speak one's mind without the burden of the other party knowing all the facts about one's identity can foster open communication and robust debate . . . .  People who have committed no wrong should be able to participate online without fear that someone who wishes to harass or embarrass them can file a frivolous lawsuit and thereby gain the power of the court's order to discover their identities.

*Id.* at  578.

**B.     Most Courts Now Require a Detailed Legal and Evidentiary Showing for the Identification of John Doe Defendants Sued for Criticizing the Plaintiff.**

The fact that a plaintiff has sued over certain speech does not create a compelling government interest in taking away defendant's anonymity. The challenge for courts is to find a standard that

makes it neither too easy nor too hard to identify anonymous speakers. Setting the bar "too low will chill potential posters from exercising their First Amendment right to speak anonymously. The possibility of losing anonymity in a future lawsuit could intimidate anonymous posters into self-censoring their comments or simply not commenting at all." *Cahill*, 884 A.2d at 457.

Courts have drawn on the media's privilege against revealing sources in civil cases to enunciate a similar rule protecting against the identification of anonymous Internet speakers. The leading decision on this subject, *Dendrite v. Doe*, established a five-part standard that became a model followed or adapted throughout the country, specifically including Maryland:

> **1. Give Notice:** Courts require the plaintiff (and sometimes the Internet Service Provider) to provide reasonable notice to the potential defendants and an opportunity for them to defend their anonymity before issuance of any subpoena.

> **2. Require Specificity:** Courts require the plaintiff to allege with specificity the speech or conduct that has allegedly violated its rights.

> **3. Ensure Facial Validity:** Courts review each claim in the complaint to ensure that it states a cause of action upon which relief may be granted based on each statement and against each defendant.

> **4. Require An Evidentiary Showing:** Courts require the plaintiff to produce evidence supporting each element of its claims.

> **5. Balance the Equities:** Courts weigh the potential harm (if any) to the plaintiff from being unable to proceed against the harm to the defendant from losing the First Amendment right to anonymity.

*See id.* at 760-61.

Some states, following the lead of the Delaware Supreme Court, have rejected the fifth, explicit balancing stage of the analysis. In *Doe v. Cahill*, 884 A.2d 451, the trial court had ruled that a town councilman who sued over statements attacking his fitness to hold office could identify the anonymous posters so long as he was not proceeding in bad faith and could establish that the

statements about him were actionable because they might have a defamatory meaning. However, the Delaware Supreme Court ruled that a plaintiff must put forward evidence sufficient to establish a prima facie case on all elements of a defamation claim that ought to be within his control without discovery, including evidence that the statements are false.

We argue in the final section of this brief for the adoption of the original *Dendrite* standard rather than the *Cahill* variation, but for the present purposes it is sufficient to note the many other appellate courts that have adopted either *Dendrite* or *Cahill*.

The following state appellate courts have endorsed the *Dendrite* test, including the final balancing stage:

> *Mobilisa v. Doe*, 170 P.3d 712 (Ariz. App. 2007): A private company sought to identify the sender of an anonymous email message who had allegedly hacked into the company's computers to obtain information that was conveyed in the message. Directly following *Dendrite*, and disagreeing with the Delaware Supreme Court's rejection of the balancing stage, the court analogized an order requiring identification of an anonymous speaker to a preliminary injunction against speech. The Court called for the plaintiff to present evidence sufficient to defeat a motion for summary judgment, followed by a balancing of the equities between the two sides.

> *Independent Newspapers v. Brodie*, 966 A.2d 432 (Md. 2009): The court required notice to the Doe, articulation of the precise defamatory words in their full context, a prima facie showing, and then, "if all else is satisfied, balanc[ing of] the anonymous poster's First Amendment right of free speech against the strength of the prima facie case of defamation presented by the plaintiff and the necessity for disclosure of the anonymous defendant's identity." *Id.* at 457.

> *Mortgage Specialists v. Implode-Explode Heavy Industries*, 999 A.2d 184 (N.H. 2010): A mortgage lender sought to identify the author of comments saying that its president "was caught for fraud back in 2002 for signing borrowers names and bought his way out." The New Hampshire Supreme Court held that "the Dendrite test is the appropriate standard by which to strike the balance between a defamation plaintiff's right to protect its reputation and a defendant's right to exercise free speech anonymously." *Id.* at 193.

> *Pilchesky v. Gatelli*, 12 A.3d 430 (Pa. Super. 2011): The court required a city council

chair to meet the *Dendrite* test before she could identify constituents whose scabrous accusations included that she had sold out her constituents, prostituted herself after having run as a reformer, and gotten patronage jobs for her family.

> *In re Indiana Newspapers*, 963 N.E.2d 534 (Ind. App. 2012): The Court reversed on order allowing the recently retired head of a local charity to identify an anonymous individual who had commented on a newspaper story about the financial problems of the charity by asserting that the missing money could be found in the plaintiff's bank account, because he had provided no evidence that the accusation was false.

Several other state appellate courts have followed a *Cahill*-like summary judgment standard

without express balancing:

> *Krinsky v. Doe 6*, 72 Cal. Rptr. 3d 231 (Cal. App. 2008): The appellate court reversed a trial court decision allowing an executive to learn the identity of several online critics who allegedly defamed her by such references as "a management consisting of boobs, losers and crooks."

> *In re Does 1-10*, 242 S.W.3d 805 (Tex. App. 2007): The court granted mandamus reversing a decision allowing a hospital to identify employees who had disparaged their employer and allegedly violated patient confidentiality through posts on a blog.

> *Solers v. Doe*, 977 A.2d 941 (D.C. 2009): The court held that a government contractor could identify an anonymous whistleblower who said that plaintiff was using unlicensed software if it produced evidence that the statement was false. The court adopted *Cahill* and expressly rejected *Dendrite*'s balancing stage.

Intermediate appellate courts in three other states have refused to create special procedures

pursuant to the First Amendment because they concluded that existing state procedural rules

provided equivalent protections, giving Doe defendants the opportunity to avoid being identified

pursuant to subpoena if the plaintiff cannot establish a prima facie case. In Illinois, two appellate

panels relied on Illinois court rules that already required a verified complaint, specification of the

defamatory words, determination that a valid claim was stated, and notice to the Doe. *Maxon v.*

*Ottawa Pub. Co.*, 929 N.E.2d 666 (Ill. App. 2010); *Stone v. Paddock Pub. Co.*, 961 N.E.2d 380 (Ill.

App. 2011). In Michigan, two separate panels of the Court of Appeal reached different conclusions.

-18-

The first panel said that an anonymous defendant could obtain a protective order against discovery, deferring enforcement of an identifying subpoena while he pursued a motion for summary disposition either on the face of the complaint or for failure to produce sufficient evidence of defamation. *Thomas M. Cooley Law School v. John Doe 1*, 833 N.W.2d 331 (Mich. App. 2013). Because the court deemed these state-law procedures adequate to meet First Amendment standards, and accordingly reversed the trial court's order enforcing the plaintiff's subpoena, it declined to decide whether special First Amendment procedures might be needed in some cases. The court recognized that a later case might impel it to adopt the *Dendrite* approach, or that rulemaking by the state supreme court might provide a good basis for the adoption of that standard. A second panel endorsed the *Dendrite* approach, treated the first panel's decision as having rejected that approach, and invited the Michigan Supreme Court to resolve the difference. *Ghanam v. Does*, — N.W.2d —, 2014 WL 26075 (Mich. App. Jan. 2, 2014); Ghanam's application for leave to appeal is pending in the Michigan Supreme Court, No. 148726. Most recently, the Virginia Court of Appeals refused to follow *Dendrite* on the ground that a state statute, which requires plaintiffs to show that an anonymous speaker's statements "are or may be tortious or illegal," sets the proper substantive and procedural standards for subpoenas to identify anonymous speakers. *Yelp, Inc. v. Hadeed Carpet Cleaning*, 62 Va. App. 678, 752 S.E.2d 554 (Va. App. 2014), appeal pending in Virginia Supreme Court, No. 140242.

Federal courts have repeatedly followed *Cahill* or *Dendrite*. *E.g.*, *Highfields Capital Mgmt. v. Doe*, 385 F. Supp.2d 969, 976 (N.D. Cal. 2005) (requiring an evidentiary showing followed by express balancing of "the magnitude of the harms that would be caused to the competing interests"); *Art of Living Foundation v. Does 1-10*, 2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) (endorsing the

*Highfields Capital* test); *Fodor v. Doe*, 2011 WL 1629572 (D. Nev. Apr. 27, 2011) (following

*Highfields Capital*); *Koch Industries v. Doe*, 2011 WL 1775765 (D. Utah May 9, 2011) ("The case

law . . . has begun to coalesce around the basic framework of the test articulated in *Dendrite*,"

*quoting SaleHoo Group v. Doe*, 722 F. Supp.2d 1210, 1214 (W.D. Wash. 2010)); *Best Western Int'l*

*v. Doe*, 2006 WL 2091695 (D. Ariz. July 25, 2006) (court used a five-factor test drawn from *Cahill*,

*Dendrite* and other decisions); *In re Baxter*, 2001 WL 34806203 (W.D. La. Dec. 20, 2001) (preferred

*Dendrite* approach, requiring a showing of reasonable possibility or probability of success); *Sinclair*

*v. TubeSockTedD*, 596 F Supp2d 128, 132 (D.D.C. 2009) (court did not choose between *Cahill* and

*Dendrite* because plaintiff would lose under either standard); *Alvis Coatings v. Does*, 2004 WL

2904405 (W.D.N.C. Dec. 2, 2004) (court ordered identification after considering a detailed affidavit

about how certain comments were false); *Doe I and II v. Individuals whose true names are unknown*,

561 F. Supp.2d 249 (D. Conn. 2008) (identification ordered only after the plaintiffs provided detailed

affidavits showing the basis for their claims of defamation and intentional infliction of emotional

distress). In this district, Judge Hollander addressed a subpoena to identify anonymous speakers in

a case apparently involving commercial speech, applying *Brodie*'s requirements "although they are

not binding on this Court." *In re Drasin*, 2013 WL 3866777, at *5 (D.Md. July 24, 2013). Judge

Hollander decided that, on balance, plaintiff's interests in pursuing the litigation outweighed the

anonymity rights of the speakers in light of the commercial nature of the speech. *Id.* at *4-*5.

Plaintiffs who seek to identify Doe defendants often suggest that requiring the presentation

of evidence to obtain enforcement of a subpoena is too onerous a burden, because plaintiffs who can

likely succeed on the merits of their claims will be unable to present such proof at the outset of their

cases. Quite to the contrary, however, many plaintiffs succeed in identifying Doe defendants in

-20-

jurisdictions that follow *Dendrite* and *Cahill*. *E.g.*, *Fodor v. Doe*, *supra*; *In re Baxter*, *supra*; *Does v. Individuals whose true names are unknown*, *supra*; *Alvis Coatings v. Does*, *supra*. Indeed, in *Immunomedics v Doe*, 775 A.2d 773 (N.J. App. 2001), a companion case to *Dendrite*, the court ordered that the anonymous speaker be identified. In *Dendrite* itself, two of the Does were identified while two were protected against discovery. Moreover, this argument fails to acknowledge the fact that an order identifying the anonymous defendant is a form of relief, relief that can injure the defendant (by exposing the defendant to retaliation at the hands of the plaintiff and/or its supporters), and relief that can benefit the plaintiff by chilling future criticism as well as by identifying critics so that their dissent can be more easily addressed. Courts do not and should not give relief without proof.

### C.    Kimberlin Has Not Made the Showing Required Before Discovery to Identify the Anonymous Speaker Is Permissible.

Kimberlin's motion for leave to take discovery argued first that no showing is required under *Brodie* as a condition of issuance of a subpoena, although he did provide the required notice to Ace of Spades. This argument is not correct. To be sure, in jurisdictions in which subpoenas can be issued without a motion, it is more common for the *Dendrite* issue to arise in the context of a motion to quash. But *Dendrite* itself arose from a motion for leave to take discovery, which was required by New Jersey law because the Doe defendants had not yet been served. 756 A.2d at 760, 763-764. In federal court, the plaintiff must normally seek leave to take discovery because subpoenas to identify anonymous defendants are typically served before the Rule 26(f) discovery conference, and, at least when the *Dendrite* issue is called to the court's attention, courts require a showing top overcome the Does' First Amendment rights. *E.g.*, *Ron Paul 2012 Presidential Campaign*

*Committee v. John Does 1-10*, No. 3:12-cv-00240-MEJ (N.D. Cal. Mar. 8, 2012), at page 3 (copy attached).

### 1.    Kimberlin Properly Notified Ace of Spades of His Request to Take Discovery.

The first requirement in the *Dendrite/Brodie* approach is for the plaintiff to notify the Doe of his efforts to take away his anonymity.   Indeed, notice and an opportunity to defend is a fundamental requirement of constitutional due process.  *Jones v. Flowers*, 547 U.S. 220 (2006). Thus, courts have held that when they receive a request for permission to subpoena an anonymous Internet poster, the plaintiff must undertake efforts to notify the poster that she is the subject of a subpoena, and then withhold any action for a reasonable period of time until the defendant has had time to retain counsel. *Seescandy.com*, 185 F.R.D. at 579; *Dendrite*, 775 A.2d at 760; *Brodie*, 966 A.2d at 456.  Kimberlin emailed a copy of his motion Ace of Spades, thus meeting this part of the *Brodie* requirement.

### 2.    Kimberlin Did Not Plead Verbatim Allegedly Defamatory Words.

The qualified privilege to speak anonymously requires a court to review the plaintiff's claims to ensure that he does, in fact, have a valid reason for piercing each speaker's anonymity.   Thus, the court should require the plaintiff to set forth the exact statements by each anonymous speaker that are alleged to have violated his rights.  *Brodie* embraced this requirement: "a trial court . . . should . . . require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster, alleged to constitute actionable speech."  966 A.2d at 456.  But Kimberlin has not come close to doing this.  His complaint quoted one sentence from Ace of Spades' blog post to which he objects, but then pleads in highly conclusory terms that Ace *"imputed* [sic] that Plaintiff

was involved with the 'crime' of SWATting*"* Neither Kimberlin's name nor the term "SWATting" appears in the quoted words; in the entire post, Kimberlin's name appears only once, several paragraphs before the quoted words, and the blog makes no mention of "SWATting." The post opens with a reference to "what's happening to Ali Akbar."  But Akbar was not SWATted; rather, what "happened" to him was that somebody posted online the address and a photo of Akbar's mother's home.  http://theothermccain.com/2012/06/05/ali-akbar-says-world-war-three/.

Moreover, although Akbar founded Kimberlin's bete noir, the National Bloggers Club, neither the quoted words nor the rest of the post say anything about the National Bloggers Club or its tax deductible status.  The RICO and "false representation" claims in the complaint allege generally the "defendants" improperly encouraged donations to Bloggers Club by falsely representing that it enjoyed tax-deductible status under 26 U.S.C. § 501(c)(3).  Even assuming that Kimberlin had standing to sue on this theory, he has not pleaded any actionable words by Ace in this regard.  These claims cannot, therefore, be a basis for discovery into Ace's identity.

### 3.    Kimberlin Has Not Pleaded Any Valid Claims,  for Defamation or Otherwise.

Kimberlin has not pleaded any viable claims against Ace of Spades.  First of all, his defamation claims are time-barred, because the statute of limitations for defamation claims in Maryland is one year, Md. Code Ann. [Cts. & Jud. Proc..] § 5-105, and the only blog post Kimberlin has pleaded against Ace of Spades was posted more than one year before Kimberlin filed his complaint. Although the blog post has remained online, Maryland follows the single publication rule under which the limitations period runs from the date of first publication.  *Hickey v. St. Martin's Press*, 978 F. Supp. 230, 235-236 (D. Md. 1997).  Moreover, although Kimberlin contends that the

blog post implies that he was guilty of SWATting, nothing in the blog post says that.  Claims for defamation must be pleaded in haec verba.  *Fuste v. Riverside Healthcare Association*, 575 S.E.2d 858, 862, 265 Va. 127, 134 (2003); *Royal Palace Homes v. Channel 7 of Detroit*, 495 N.W.2d 392, 396 (Mich. App. 1992);  *Asay v. Hallmark Cards*, 594 F.2d 692, 699 (8th Cir. 1979).

The remaining claims against Ace of Spades are similarly faulty.  To the extent that the claims turn on the allegation that Ace defamed Kimberlin, a plaintiff cannot make an "end-run around First Amendment strictures" on a defamation case by labeling his claims with the names of some other torts.  *Food Lion v. Capital Cities/ABC*, 194 F.3d 505, 522 (4th Cir. 1999); *Hustler Magazine v. Falwell*, 485 U.S. 46, 55-57 (1988).  Kimberlin's failure to plead defamatory words thus condemns each of the other claims in his complaint, at least insofar as Kimberlin may seek to rely on those claims as a basis for identifying Ace of Spades.  Moreover, a ruling from this district held that, to the extent that a claim for false light invasion of privacy turns on a defamation theory, the one-year limitations period applies to such claims as well,  *Smith v. Esquire, Inc.*, 494 F. Supp. 967, 970-971 (D. Md. 1980).  Although the Maryland Court of Special Appeals since disagreed with *Smith*'s prediction of Maryland law, *Allen v. Bethlehem Steel Corp.*, 76 Md. App. 642, 649, 547 A.2d 1105 (Md. App. 1988), the Maryland Court of Appeals has yet to address the question.  If there were not so many other reasons why Kimberlin's motion for discovery should be denied, Ace of Spades would urge the Court to certify this limitations question to the Maryland Court of Appeals.

Moreover, although Kimberlin apparently alleges that Ace of Spades is part of a RICO conspiracy to defame him, and to encourage donations to the National Bloggers Club through false assertions about tax-deductible status, those claims have not been sufficiently pleaded against Ace of Spades, for several reasons.  For one thing, the First Amendment protects not just the right to

-24-

criticize public figures like Brett Kimberlin, but also the right to band together with others who share similar views. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 907-908 (1982); *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 294 (1981). In such cases, the First Amendment bars imposition of liability "merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *Claiborne Hardware*, 458 U.S. at 908. Instead, liability for membership in the group can be imposed only if the defendant "itself possessed unlawful goals and . . . the individual held a specific intent to further those illegal aims." 458 U.S. at 920. Kimberlin has not alleged that Ace of Spaces had the unlawful goals that Kimberlin's allegations do attribute to some other members of the supposed conspiracy, or that Ace had a specific intent to further illegal aims. Even assuming that a RICO claim can properly be brought over alleged defamation—a possibility thoroughly refuted by the memorandum supporting defendant Malkin's motion to dismiss, DN 41-1 at 8-10—the failure to allege Ace's specific adherence to the alleged defamatory goals of the conspiracy condemns Kimberlin's RICO claims against Ace.

Insofar as Kimberlin attempts to plead a RICO claim based on the supposed effort to deceive some conservatives into making donations to the National Bloggers Club by lying about its tax-exempt status, Kimberlin lacks standing to complain about that possibility—he claims neither that he donated to the club nor that he was misled by the supposed lies. Nor, indeed, does Kimberlin plead that Ace of Spades shared that conspiratorial goal. Kimberlin has, therefore, not satisfied this prong of the *Dendrite / Brodie* test either.

> **4.      Kimberlin Presented No Evidence Supporting the Elements of His Prima Facie Case on any Claim Against Ace of Spades, of Defamation or Otherwise**.

Even if the Court concludes that defamation has at least been adequately alleged about one

portion of each of the challenged statements, no person should be subjected to compulsory identification through a court's subpoena power unless the plaintiff produces sufficient evidence supporting each element of its cause of action to show that it has a realistic chance of winning a lawsuit against that defendant.  This requirement, which has been followed by every federal court and every state appellate court that has addressed the standard for identifying anonymous Internet speakers, prevents a plaintiff from being able to identify his critics simply by filing a facially adequate complaint.  In this regard, plaintiffs often claim that they need to identify the defendants simply to proceed with their case.  However, relief is generally not awarded to a plaintiff unless and until the plaintiff comes forward with evidence in support of his claims, and the Court should recognize that identification of an otherwise anonymous speaker is a major form of relief in cases like this.  Requiring actual evidence to enforce a subpoena is particularly appropriate where the relief itself may undermine, and thus violate, the defendant's First Amendment right to speak anonymously.

To address this potential abuse, the Court should borrow by analogy the holdings of cases involving the disclosure of anonymous sources.  Those cases require a party seeking discovery of information protected by the First Amendment to show that there is reason to believe that the information sought will, in fact, help its case.  *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 6-9 (2d Cir. 1982); *Richards of Rockford v. PGE*, 71 F.R.D. 388, 390-391 (N.D. Cal. 1976).  *Cf. Schultz v Reader's Digest*, 468 F.Supp. 551, 566-567 (E.D. Mich. 1979).  In effect, the plaintiff should be required to meet the summary judgment standard of creating genuine issues of material fact on all issues in the case, *Cervantes v. Time*, 464 F.2d 986, 993-994 (8th Cir. 1972), before it is allowed to obtain the identities of anonymous speakers.  "Mere speculation and conjecture about the fruits

of such examination will not suffice." *Id.* at 994.

The extent to which a plaintiff who seeks to compel disclosure of the identity of an anonymous critic should be required to offer proof to support each of the elements of his claims at the outset of his case varies with the nature of the element. Particularly in suits for defamation, several elements of the plaintiff's claim will ordinarily be based on evidence to which the plaintiff, and often not the defendant, is likely to have easy access. For example, the plaintiff is likely to have ample means of proving that a statement is false and that it caused the plaintiff harm. Thus, it is ordinarily proper to require a plaintiff to present proof of such elements of its claim as a condition of enforcing a subpoena for the identification of a Doe defendant.

Here, even if the complaint were facially adequate, Kimberlin's request for leave to pursue discovery fails because he has adduced no evidence in support of his complaint. There is no evidence that anything Ace said about Kimberlin was false, or that Ace made false statements about anybody's tax deductible status, or that she joined in any conspiracy. Indeed, Kimberlin's motion for leave to take early discovery offers not evidence whatsoever in support of anything alleged in his amended complaint.

### 5.   The *Dendrite/Brodie* Balancing of Interests Strongly Favors Doe.

Even if Kimberlin were to amend his complaint and submit evidence sufficient to establish a prima facie case of defamation against Ace of Spades,

> [t]he final factor to consider in balancing the need for confidentiality versus discovery is the strength of the movant's case . . .. If the case is weak, then little purpose will be served by allowing such discovery, yet great harm will be done by revelation of privileged information. In fact, there is a danger in such a case that it was brought just to obtain the names . . .. On the other hand, if a case is strong and the information sought goes to the heart of it and is not available from other sources, then the balance may swing in favor of discovery if the harm from such discovery is

not too severe.

*Missouri ex rel. Classic III v. Ely*, 954 S.W.2d 650, 659 (Mo. App. 1997).

Similarly, *Dendrite* called for such individualized balancing when the plaintiff seeks to compel

identification of an anonymous Internet speaker:

> [A]ssuming the court concludes that the plaintiff has presented a prima facie cause
> of action, the court must balance the defendant's First Amendment right of
> anonymous free speech against the strength of the prima facie case presented and the
> necessity for the disclosure of the anonymous defendant's identity to allow the
> plaintiff to properly proceed.

775 A.2d at 760.

And in *Brodie*, the Maryland Court of Appeals said,

> if all else is satisfied, [a trial court must still] balance the anonymous poster's First
> Amendment right of free speech against the strength of the prima facie case of
> defamation presented by the plaintiff and the necessity for disclosure of the
> anonymous defendant's identity, prior to ordering disclosure.

966 A.2d at 456.

A standard comparable to the test for grant or denial of a preliminary injunction, where the

court considers the likelihood of success and balances the equities, is particularly appropriate

because an order of disclosure is an injunction—not even a preliminary injunction.  In every case,

a refusal to quash a subpoena for the name of an anonymous speaker causes irreparable injury,

because once speakers lose anonymity, they can never get it back.   Moreover, denial of a motion to

identify the defendant based on either lack of sufficient evidence or balancing the equities does not

compel dismissal of the complaint.   Plaintiffs can renew their motions after submitting more

evidence.   The inclusion of a balancing stage allows Does to show that identification may expose

them to significant danger of extra-judicial retaliation.   In that case, the court might require a greater

quantum of evidence on the elements of plaintiff's claims so that the equities can be correctly balanced.

On the other side of the balance, a court should consider the strength of the plaintiff's case and his interest in redressing the alleged violations. The Court can consider not only the strength of the plaintiff's evidence but also the nature of the allegations, the likelihood of significant damage to the plaintiff, and the extent to which the plaintiff's own actions are responsible for the problems of which he complains. The balancing stage allows courts to apply a *Dendrite* analysis to many different causes of action, not just defamation, following the lead of the Arizona Court of Appeals, which in *Mobilisa v. Doe* warned against the consequences of limiting the test to only certain causes of action. 170 P.3d at 719. If courts impose such limits, plaintiffs who hope to identify and intimidate anonymous speakers could simply conjure up additional causes of action to allege against them.

Moreover, the adoption of a balancing approach can favor plaintiffs as well as anonymous defendants. For example, several courts have held that, although anonymous defendants accused of copyright infringement could be engaged in speech of a sort, the First Amendment value of offering copyrighted recordings for download is low, and the likely impact of being identified as one of several hundred alleged infringers is also likely low. *Call of the Wild Movie, LLC v. Does 1-1,062,* 770 F. Supp.2d 332 (D.D.C. 2011); *Sony Music Entertainment v. Does 1-40*, 326 F. Supp.2d 556 (S.D.N.Y. 2004); *London-Sire Records v. Doe 1*, 542 F. Supp.2d 153, 164 (D. Mass. 2008). Hence, such courts accept a lower level of evidence to support the prima facie case of infringement. *Call of the Wild*, 770 F. Supp.2d at 350-351 nn.7, 8. It has been argued that these cases represent a copyright exception to the *Dendrite* rule, but other courts have, more properly, held that the cases

turn on the nature of the speech at issue.  *Art of Living Foundation v Does 1-10*, 2011 WL 5444622
(N.D. Cal. Nov. 9, 2011).  Similarly, in *In Re Anonymous Online Speakers*,  661 F.3d 1168, 1177
(9th Cir. 2011), the court of appeals said that when a Doe lawsuit is filed over commercial speech,
the lesser protection that the First Amendment affords for commercial speech should be reflected
in a more permissive approach to identifying the defendant.  Although these courts do not explicitly
invoke the balancing stage of *Dendrite*, they implicitly do so.

Here, the balance strongly favors Ace of Spades.  First, there is a serious danger of retaliation
against Ace of Spades.  Ace is concerned by Kimberlin's past reputation for violent acts — resulting
not only from Kimberlin's convictions for the terroristic bombing campaign in Speedway, but also
past reports about Kimberlin's effort to procure the murder of the prosecutor of the bombing cases,
and the police investigation into whether Kimberlin was involved in the gang-style slaying of Julia
Scyphers and then planted the bombs to cover up that crime, reported in the Indianapolis Star.
Gelarden, *supra*.  Moreover, even assuming that Kimberlin was not himself involved in the
SWATting of his critics (and as long ago as 2012, Ace of Spades specifically urged her readers **not**
to assume that Kimberlin was the SWATter, because she does not believe that he was), the fact
remains that several of Kimberlin's critics have been SWATted.  Complaint ¶¶ 58-62.  Given
Kimberlin's public identification of other critics as soon as his subpoenas revealed their identities,
Ace of Spades has every reason to fear violence at the hands of Kimberlin's admirers if Kimberlin
obtains his identifying information.

Ace of Spades also has reason to fear the economic consequences of Kimberlin's obtaining
her identifying information.  Indeed, in an email that Kimberlin sent directly to Ace of Spades after
learning that undersigned counsel Mr. Levy was planning to file this opposition, Kimberlin bragged

that he had obtained identifying information about another of his online critics, Aaron Walker, and that Walker lost his job as a result of his employer's learning about Walker's activities.   Levy Affidavit Exhibit A.   This potential impact on Ace of Spades, wholly apart from the expense of having to hire counsel if she has to defend on the merits against a pro se litigant, provides a strong equitable reason to deny discovery.

Under *Brodie,* the Doe's interests in remaining anonymous should be weighed against the strength of the plaintiff's prima facie case.   Although counsel cannot argue about how Kimberlin's showing should be weighed unless and until Kimberlin produces admissible evidence in support of his claims, two issues are likely to be salient.   First, even assuming that Kimberlin introduces admissible evidence that a statement about him by Ace of Spades was false, any defamation claim is likely to be undermined by Kimberlin's poor existing reputation in light of his extensive criminal history; hence the incremental harm caused by a false statement is unlikely to be significant.   The Court need not go so far to as to rule, as argued by defendant Malkin in support of her motion to dismiss, that Kimberlin is sufficiently libel-proof to warrant dismissal of his libel claims on the face of the complaint, DN 41-1, pages 23-26.   But as an equitable matter, the major stains on Kimberlin's reputation as a result of his lengthy record of convictions for serious crimes, as well as the other crimes to which he confessed to his biographer or that have been reported in the mainstream media, not to speak of the extensive criticisms of Kimberlin on dozens of blogs, would seriously undercut the strength of his prima facie case.

Moreover, any evidence that Kimberlin might adduce in the form of a personal affidavit would have to be weighed in light of the fact that he is a convicted perjurer.   Although the perjury conviction was obtained many years ago, his record discloses instances of forgery and false

testimony in the ensuing years.  Indeed, during one of the lawsuits that he filed against a different online critic, he apparently gave false testimony at a damages hearing, including testimony that he had never heard that he was a suspect in the murder of Julia Scyphers even though he told his biographer that he was questioned about the murder, was aware of being named as a suspect at the time, and talked to his lawyer about it. Levy Affidavit Exhibit C and D (compare Hearing Transcript in *Kimberlin v. Allen* pages 28-29 with *Citizen K,* pages 87-89, 98, 109-110).  There is evidence in this very case that Kimberlin still has no compunction about falsifying documents to gain a legal advantage.  *See* DN 41-1, Malkin Memo Supporting Motion to Dismiss, at pages 2-5, and Exhibits A and B (Kimberlin apparently altered the caption).  Therefore, assuming that Kimberlin attempts to introduce evidence to establish a prima facie case supporting any of his claims against Ace of Spades, the Court should consider the nature of Kimberlin's proofs against Kimberlin's history of deliberate dishonesty to judicial tribunals, in assessing the weight of Kimberlin's prima facie case.

## CONCLUSION

The motion for leave to take discovery should be denied.

Respectfully submitted,

  /s/ Paul Alan Levy
Paul Alan Levy (pro hac vice sought)

  Public Citizen Litigation Group
  1600 20th Street NW
  Washington, D.C. 20009
  (202) 588-1000
  plevy@citizen.org

   /s/ David Rocah
David Rocah (Bar No. 27315)

ACLU of Maryland
3600 Clipper Mill Rd., #350
Baltimore, Maryland 21211
(410)889-8550, ext. 111
rocah@aclu-md.org
Attorneys for Defendant Ace of Spades

February 18, 2014

**CERTIFICATE OF SERVICE**

The foregoing brief and accompanying affidavit of Paul Alan Levy are being filed with the Court's ECF system which will effect service on all parties that are represented by counsel.  In addition, on this date I am sending the brief and affidavit to pro se plaintiff Brett Kimberlin by email at justicejtmp@comcast.net, pursuant to plaintiff's express consent to being served by email.


＿＿＿＿ /s/ David Rocah ＿＿＿＿＿＿＿＿＿
David Rocah