UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| BRETT KIMBERLIN, | ) |
|       Plaintiff, | ) ) ) |
| v. | )    Case No. 8:13-cv-03059-PWG ) |
| NATIONAL BLOGGERS CLUB, *et al.*, | ) ) |
|       Defendants. | ) |

## LEVY AFFIDAVIT

1. My name is Paul Alan Levy. I am lead counsel on the opposition of defendant Ace of Spades to plaintiff's motion for leave to pursue discovery to identify Ace of Spades.

2. In approximately 1988, I represented Brett Kimberlin in connection with a Freedom of Information Act request for documents pertaining to the reaction of the Bureau of Prisons to his discussion with reporters about his claims to have sold drugs to Dan Quayle. I have not represented Kimberlin since then, although I consulted with other lawyers who represented him in a lawsuit relating to that controversy.

3. After Ace of Spades contacted me for assistance in opposing Kimberlin's motion for leave to take discovery, I spoke to Kimberlin about his motion. After I told Kimberlin that, notwithstanding arguments he had given me about why we should not provide such representation, we would be filing an opposition to his motion, Kimberlin sent an email to Ace of Spades. Kimberlin personally confirmed to me that he had sent the email that is attached as Exhibit A.

4. I attach as Exhibit B a copy of an article from the *Indianapolis Star*, which I retrieved from its web site.

5. I attach as Exhibit C a copy of excerpts from a biography of Kimberlin, which refers to

an Indianapolis Star article and to Kimberlin's having learned about some of the contents of the article.

    6. I attach as Exhibit D an excerpt from a hearing transcript in *Kimberlin v. Allen*.

        Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on February 18, 2014.

_____

From: Justice Through Music <justicejtmp@comcast.net>
Date: Tue, Feb 11, 2014 at 11:28 PM
Subject: Kimberlin v. NBC
To: aceofspadeshq@gmail.com

Ace:

I talked to Paul Levy today about his potential representation of you with regard to the subpoena I have asked for to identify you so I can serve you with a copy of the Complaint in Kimberlin v. NBC. I have known Paul for almost 30 years and he has represented me in several matters. He also represented BreitbartUnmasked in a case brought by Aaron Walker against me 16 months ago. He is a good lawyer but he may be laboring under a conflict of interest, which I will raise to the judge if Paul files anything on your behalf. In fact, Public Citizen and an organization with which I am affiliated are currently co-Plaintiffs in a case just filed last week against the FEC.

I mentioned to Paul that I would be willing to withdraw the subpoena if you were willing to settle the case, and then you could maintain your anonymous identity. Paul said that he is not representing you on any settlement but rather only on opposing the subpoena, and therefore would not raise that issue with you. Therefore, I am making the offer directly.

I have been in discussions with several of the other defendant attorneys over the past week or two about settlement and the offer is basically to remove content and compensate me in a reasonable manner. At least one of the defendants has already removed content voluntarily and now we are just having to discuss the compensation aspect.

I understand that people sometimes have legitimate reasons for wanting to blog anonymously, such as family, fear of retaliation and loss of employment. I am not out to expose you, but I do want to serve you with the Complaint so we can have a court decide if my case has merit. So we have competing factors here and that is why I am offering to settle without facing the risk of exposure.

A couple things to keep in mind while pondering this. I have another case pending in Montgomery County Circuit Court and have had two judges issue orders to identify an anonymous blogger. That blogger got EFF involved in the case and they corralled a First Amendment lawyer to represent him, but he lost, not once but twice. I also identified another anonymous blogger named Seth Allen in that Court. Paul also recently lost the highly publicized case, Yelp v. Hadeed, where the Virginia Court of Appeals ruled that anonymous commenters should be identified for some very tame defamation compared to my case.
http://scholar.google.com/scholar_case?case=9322561183405050689&hl=en&as_sdt=6&as_vis=1&oi=scholarr

Also, in 2011, I sought in Montgomery County Circuit Court to identify Aaron Walker who was blogging under the pseudonym Aaron Worthing. I made him an offer to drop the Motion to Compel if he would remove content and a few other things. He thought that I could not identify him, and so came back with bluster and bravado. Two days later I did identify him, and he then

# Levy Affidavit
# Exhibit A

felt the need to tell his employer that he had been the publisher of the Muslim hate blog, Everybody Draw Mohammed. The employer then went to his office and found it filled with hateful depictions of the Prophet Mohammed and other evidence showing that he blogged on company time. Accordingly, he was fired and for more than two years has been unemployed and unemployable.

So ponder my offer. You can communicate with me directly at this email, or call me, or have an attorney act as a go between.

Thanks,

Brett (301) 320 5921

# Bizarre plots planned by Speedway bomber
# Kimberlin case a maze of murder, deceit

**By R. JOSEPH GELARDEN**

Brett C. Kimberlin schemed to elude justice with a series of bizarre plots designed to murder, maim and rob his enemies, create havoc at Speedway and discredit the chief government prosecutor.

These plots occurred as lawmen followed the trail of the man who terrorized Speedway with bombs in 1978. They were revealed to The Indianapolis Star last week after a federal jury convicted Kimberlin of the bombings.

ON SHEETS of yellow legal pad, Kimberlin asked another inmate in the Marion County Jail to arrange for the murder of Bernard L. (Buddy) Pylitt, the former first assistant U.S. attorney who coordinated his prosecution.

The offer contained a list of 10 names, including a potential prosecution witness, Robert Scott Bixler. Some names had crosses next to them. These indicated those marked for murder, it was learned.

Other names, believed to be persons who cheated Kimberlin in drug deals, were marked by dollar signs. They were to be roughed up and robbed.

"THERE WERE six to be killed, two or three to be roughed up and one or two were to be robbed," a source said.

Instead of following through on Kimberlin's offer, the inmate tipped off authorities.

In a second episode, Kimberlin wanted to convince lawmen of his innocence so he asked another jail inmate, in writing, to create a diversion.

Kimberlin pledged to give the inmate money to post bail. Then the inmate was supposed to plant a bomb — made with the identical components used in the eight Speedway blasts — in the Westside suburb.

THE EXPLOSION was to be timed when Kimberlin was behind bars, thus creating the impression among police that Kimberlin could not be the real Speedway bomber. Again, the inmate notified investigators.

Kimberlin harbors a special hatred for Pylitt, referring to him as "Pontius" Pylitt. The diminutive bomber outlined a special plan for him.

In his distinctive printed style script, Kimberlin noted Pylitt was a bachelor and, therefore, vulnerable. A jail inmate — a third one — was urged to arrange for a woman to seduce Pylitt in full view of the videotape cameras of a private investigator.

"Pylitt has political ambitions," Kimberlin wrote. "He wants to be governor." Kimberlin wanted to embarrass and discredit him with the videotaped sexual escapade. And, for the third time, Kimberlin's letter found its way to the prosecutor's files.

A similar scheme was proposed to discredit Bixler.

**THE INVESTIGATION** of the Speedway bombings followed a twisted trail that started with the murder of a housewife near the shadows of the Indianapolis Motor Speedway and wound its way to Ohio, Texas, Colombia and back to Indianapolis.

Along the way, detectives found maimed bodies, broken families, strange relationships and international drug smugglers.

The trail ended as it began — with a brutal murder.

On Saturday, July 29, 1978, Julia Scyphers, a 65-year-old grandmother, was in her living room chatting with her granddaughters at her small home at 1651 Cunningham Drive, Speedway.

About 3 p.m. a man knocked on her door asking about some items she had displayed at a garage sale.

When Mrs. Scyphers went outside to the garage to show him the items, he slipped a .25-caliber pistol from his black briefcase and shot her once in the back of the head. She slumped to the floor beside the family car.

A NOISE, described as the sound of a falling TV tray, drew the attention of her husband, Fred, 68, and he saw a man pulling out of the driveway in a late-model car.

Speedway police were puzzled by the murder. "She had no enemies," they said.

But she did. Investigators learned her daughter, Sandra Barton, was a close, very close, friend of Brett C. Kimberlin. The relationship between the pair was complicated by his strange affection for Mrs. Barton's preteen daughter, Debbie.

Investigators learned Debbie, accompanied Kimberlin on several long, unsupervised trips, including holidays in Florida, Mexico and Hawaii.

Mrs. Scyphers violently disapproved of Kimberlin's questionable relationship with Debbie and her mother. The concerned grandmother arranged for Debbie and her sister, Shari, to leave their mother's home

See KIMBERLIN Page 18

Levy Affidavit

Exhibit B

★ Continued From Page 1

and move in with her.

**SEPARATED FROM** Debbie, Kimberlin threatened suicide.

The investigators were told Kimberlin was a Broad Ripple businessman who owned a store that sold natural foods and Earth Shoes and a cafe that served only health foods. He was a vegetarian who practiced transcendental meditation.

But the fashionable business appeared to be an elaborate cover-up. Narcotics detectives had long counted Kimberlin on their list of major marijuana smugglers.

Police added the drug smuggling to the weird Julia Scyphers-Sandra Barton-Debbie relationship and began a quiet inquiry into his background.

A month later, Sept. 1, within an hour, three bombs blasted the quiet suburb. Over the next five days, there were five additional explosions.

Although the blasts seemed to be set in areas where they would cause damage but not injury, an exploding gym bag in the parking lot of Speedway High School hurled Carl D. DeLong into the air, shattering his leg (it was later amputated) and injuring his wife, Sandra.

**EVEN BEFORE** the last bomb blast, local agents from the Treasury Department's Bureau of Alcohol, Tobacco and Firearms (ATF) joined a hundred-man task force investigating the explosions.

At the head were ATF agents Bernard C. (Ben) Neihaus, 37, and Patrick M. Donovan, 31.

Neihaus, an Indianapolis native, was born on Palmer Street on the Southside, just across the street from Sacred Heart School. His mother, Helen Neihaus, once was vice-chairman of the county Democratic Party.

Donovan, a veteran of nine years of ATF service, moved here from Milwaukee after he obtained a degree from Wisconsin State University.

Carefully gathering fragments and debris at the bomb sites for study by ATF crime lab experts, the investigators soon learned the blasts were caused by crude but effective bombs. The devices used modified blue-and-white Mark Time appliance timers to send sparks from a 6-volt dry cell battery through an electric blasting cap shoved into one or more sausage-like tubes of Tovex 200. Tovex is a water gel explosive produced to replace dynamite.

**AS ATF AGENTS** and other policemen tracked persons who bought the timers at their only local sales outlet, Graham Electronics, others tried to uncover a motive for the blasts.

Kimberlin seemed to be the only one with a possible motive — to distract police attention from the Scyphers murder and delay or halt their quiet investigation of him.

The reported strategy didn't work. Fifty to 100 ATF agents poured into Indianapolis and began a 24-hour surveillance of him, snapping pictures from hidden locations.

The pictures were mixed with others and shown to sales clerks at the Graham stores to see if they could pick out the man who bought the timers.

They said Kimberlin looked like the man.



**Brett C. Kimberlin in 1978**
*Wearing Department of Defense uniform*

As agents sorted out details, the owner of a Westside print shop called investigators from the U.S. Army to report a customer asking him to reproduce military drivers licenses and other government materials.

**ARMY INVESTIGATORS,** puzzled by the incident, called FBI agent Chester Jackson.

On Sept. 20, 1978, Army detectives saw a little man, dressed as a security guard, drive up to the print shop in a white 1970 Chevrolet Impala.

About that time Jackson arrived. He went inside to check out the complaint and asked the security guard for identification.

When the routine request was refused, Jackson ordered the security guard to sit in a chair. Jackson intended to take the man's name and let him go, but, moments later, he saw him try to eat some of the fake military licenses.

Calling the office of the U.S. district attorney for instructions, he was told if the man wouldn't give his name, he should be jailed. Jackson complied.

The next day, Jackson was talking to Pylitt and Kennard P. Foster, an assistant U.S. attorney, and Foster asked if the security guard ever identified himself.

"YA," DRAWLED Jackson. "He said his name was Kimber-line or something."

The name rocked Pylitt and Foster. "Damn, we're looking at that guy in the Speedway bombings," Pylitt snapped.

The government lawyers quickly set in motion a two-pronged attack. One was directed at obtaining a search warrant for the 1970 Impala. The other went to Jackson County where Kimberlin was supposed to have a hideout tucked in the Hoosier National Forest, near Huston.

When FBI agent Jack Yara popped open the Chevy's trunk, he bent over and began inventorying the contents. Then he let out a yell and motioned to Neihaus.

"He pointed to the suitcase, bearing the initials BCK, and I went blank," Neihaus testified. "Then I recognized the blue-and-white plastic covers. They were Mark Time timers. I was stunned."

Neihaus quickly called his partner, Pat Donovan, who called Pylitt, ordering preparation of a second search warrant, this one for the suitcase.

**INSIDE THE** suitcase, they discovered the key to the bombing case — timers modified to turn on electric current, lead shot, dry-cell battery. Later lab reports showed traces of a chemical found only in Tovex.

Federal investigators learned later that evening that the search of the Jackson County property — later called a Kimberlin family retreat — uncovered a buried steel tank. The tank held 1,000 pounds of marijuana. Because they could not determine the owner of the drug, it was confiscated as contraband, but no one was arrested.

"It was a big day," Neihaus acknowledged.

Later, agents would learn Kimberlin and his construction workers bought some explosives in 1975 to blast away rock so they could bury the steel tank.

They bought the explosives, two cases of Tovex 200 — the same explosive later linked to the Speedway bombs — at the DuPont sales outlet at Belmont, Ind.

**ABOUT TWO WEEKS** after he was arrested, Kimberlin was released from jail. The charges were dropped because state and federal prosecutors wanted to dig deeper into his background and decide whether he should be charged on state or federal charges.

(Once, a source recalled, Kimberlin bragged that his brother, Scott, had traveled to India where he supposedly studied transcendental meditation with a famous guru. He said his brother learned the hidden arts of the mysterious East and passed them on to him. "Brett bragged the cops might arrest him but would never hold him. You see, he claimed his brother taught him how to levitate and disappear. He said he just could disappear from jail.")

After several requests, Mrs. Barton agreed to an interview with Neihaus and Donovan. It took place on the evening of Nov. 17, 1978 — the same night four young persons who worked at a Speedway Burger Chef restaurant were kidnapped and slain. Mrs. Barton told a story that was later expanded into an alibi for Kimberlin.

(ALTHOUGH surprised by the event, investigators never have been able to establish any credible link between the Burger Chef murders and the bombings.)

Searching for Kimberlin's Mercedes-Benz sedan, investigators located it in a Dayton (Ohio) repair shop. Kimberlin later testified the car was towed there when it developed electrical problems on Sept. 13, 1978.

There is information the Mercedes was really stored in Indianapolis for a while before it was taken to the Dayton body shop.

"We think it was at the home of a Kimberlin girlfriend," said a source. "At the time, she was a law clerk for U.S. Magistrate Thomas Faulconer. Faulconer's office is next door to the office occupied by the federal prosecutors. The closeness caused some worry that sensitive information might be leaked to Kimberlin. No leak was ever detected."

Around Feb. 8, 1979, Neihaus and Donovan were surprised when a Texas-based customs agent called them asking about Bixler.

**BIXLER,** a pilot, was trying to rent a small airplane at an airport near Alice, Texas. The customs agent, playing a hunch, entered Bixler's name in a national crime computer and learned he was a suspected drug trafficker. The computer reported more information could be obtained from Neihaus.

When Neihaus described Kimberlin, the customs agent said Kimberlin was standing next to Bixler in the airport.

Informed about Kimberlin's links to the marijuana smuggling trade, customs agents began to check him out.

They discovered he and other Hoosiers were openly renting heavy equipment to carve a secret airstrip and a road out of the sagebrush.

In fact, Kimberlin and his aides operated so openly, some local drug traffickers got out of the deal. "He will either get arrested or robbed and killed by rival drug gangs," they said.

On Friday night, Feb. 16, 1979, Kimberlin and his associates set up at the secret air strip under the eye of the federal agents. The watchers waited until U.S. Navy radar screens spotted a lumbering airliner over the Gulf of Mexico, heading for South Texas.

**THE NAVY** called the customs agents, who radioed the watchers. Federal drug agents scrambled on two planes to tail the airliner.

The scheme was thwarted when dense fog covered the airstrip and the pilots couldn't land. "I have to abort," the pilot radioed to Kimberlin and company. "I am out of fuel and got to land."

The plane, a four-engine DC-4, was carrying 10,000 pounds of high-grade Colombian marijuana wrapped in burlap. As the pilot headed for the airport at Cotulla, Texas, about 100 miles away, the aircrew kicked the million-dollar cargo out the door. Texas police, riding horses, later found marijuana bales strewn across 125 miles of desert.

Meanwhile, the watchers arrested the Kimberlin gang after a wild chase through the tumbleweeds and sagebrush. They confiscated an arsenal of weapons, including a futuristic electronic stun gun called a TASAR, pistols with silencers, AR-15 rifles, poison-tipped bullets and makeshift security guard uniforms.

**AFTER THE** arrest, Neihaus was



**Brett C. Kimberlin's 1970 Chevrolet**
*Car in which bomb components found*

ordered to Texas where he talked with Kimberlin. Kimberlin denied the Speedway bombing and involvement in the "pot bombing."

"I was just going for a ride in the desert one night, doing nothing illegal, and I got busted. It will all be cleared up in a few days," Kimberlin predicted.

Neihaus obtained photos of the nine men arrested in the Texas pot bombing." He brought them back to Indianapolis and showed them to Fred Scyphers.

"This is the guy that came to the door that day," Scyphers told Neihaus. "But I want to see him in person before I swear to it."

Neihaus huddled with Marion County Prosecutor Steven Goldsmith who issued a murder warrant for the man, William (Bill) Bowman of West Manchester, Ohio.

**BOWMAN,** out on bond on the Texas caper, was arrested on Feb. 27 and appeared in Marion County Municipal Court on March 1.

Fred Scyphers was in the audience and identified Bowman.

It looked like the Julia Scyphers murder was solved.

A federal grand jury indicted Kimberlin in the Speedway bombing case on Feb. 28.

On March 11, Neihaus was home when he got a call from Austin, Texas. It was Sandra Barton's sister, Patricia Strait, who had worked closely with police to help solve the murder of her mother.

"You better sit down, you won't believe this," she predicted. "I was raking my yard and found a sack under a cedar tree next to my house.

"I found timers and explosives."

A surprised Neihaus told her not to touch the bag. He dispatched an agent from the ATF office in Austin to take charge of the explosives.

**THE BAG** contained blasting caps, blue-and-white Mark Time timers, an AR-15 rifle and 14 plastic-covered sausages of Tovex 200 with factory markings that led right back to the two cases of Tovex bought by Kimberlin at Belmont, Ind., in 1975.

According to sources, Kimberlin knew the Straits were helping police in the Julia Scyphers murder probe. He once tried to get Neihaus to investigate the Straits, who took in Sandy Barton's daughters after their grandmother was murdered. Informants reported Kimberlin left the bag at the Strait residence to frame them for the Speedway bombings.

On March 14, 1979, only three days after the explosives were discovered by Mrs. Strait, Fred Scyphers died of cancer at his Speedway home.

On May 24, the Marion County Grand Jury declined to indict William Bowman for the murder of Julia Scyphers. With the death of the chief witness, there was no case against him.

**IN NOVEMBER,** Kimberlin entered a guilty plea to a conspiracy charge in the Texas marijuana smuggling case. He was sentenced to serve four years in jail.

Kimberlin was tried on the Speedway bombing case in September 1980. A federal jury was unable to reach a decision on the bombing charges, but convicted him of impersonating a federal officer and other minor charges. Judge James E. Noland ordered him to serve a 12-year term.

On Oct. 20, 1980, at Dayton, Ohio, Scott E. Kimberlin was murdered in a robbery. He was shot with what is believed to be his own gun. It was an AR-15 rifle purchased at the Outdoor Sports Headquarters, Dayton, on Sept. 13, 1978, by a relative of a man suspected of working with Brett in drug schemes. The man bought a box of .223 caliber bullets at the same time.

**ON SEPT. 20, 1978,** Brett Kimberlin was arrested after he got out of a 1970 Chevrolet bought at Dayton on Sept. 13, 1978. Federal agents found a box of .223 ammunition bought from the Outdoor Sports Headquarters in the trunk of the white Chevrolet.

Last Thursday, a federal jury convicted Brett Kimberlin of the Speedway bombing charges.

He faces several lifetimes in prison. He said he will appeal. He is 27 years old.

Case 8:13-cv-03059-PWG   Document 75-1   Filed 02/18/14   Page 7 of 18

# CITIZEN K

The Deeply Weird American
Journey of Brett Kimberlin

# Mark Singer



ALFRED A. KNOPF    NEW YORK    1996

Levy Affidavit
Exhibit C

traffic. Kimberlin said he booked a charter jet to fly them, but it was also grounded by the weather. Finally, three days after the murder, they were able to catch a flight. (Kimberlin arranged for someone to return Sandi's car to Indianapolis.) Meanwhile, the Speedway police were feeding the press their unfolding theories of the crime. The *Indianapolis Star* ran a banner headline that said: HIRED GUNMAN KILLED WOMAN? The story posed a series of hypothetical questions—"innocent victim . . . in a tragic mix-up? . . . crazed 'thrill' killer? . . . why . . . an active church member and grandmother?"—and then concluded that "Police know of nothing in the background of any family member that would explain the slaying."

Meanwhile, Kimberlin had initiated his own investigation, in the form of a plea to his psychic adviser. "I called Dykshoorn and said I needed his help. I told him a friend of mine's mother got murdered and the killer got away. He asked what happened and I told him what I knew and he said, 'I can't get involved. I don't get involved in murders involving drugs.' And I said, 'Nobody said anything about drugs. This was a robbery.' And he said, 'This case involves drugs.' I taped the conversation. I argued with him. I implored him to come."

Kimberlin said Dykshoorn's insistence that the killing was drug-related left him feeling "kind of pissed off," and as a result, "I never spoke to Dykshoorn again." In other words, Kimberlin was rejecting a scenario Dykshoorn evidently had envisioned through the medium of his superior intuition—the very attribute that had drawn Kimberlin to him in the first place. The plotline Kimberlin preferred began with some sort of robbery and ended abruptly in a random act of anonymous violence. A drug-related script didn't fit any reality that he wished to reckon with.

BY THE time Sandi reached Indianapolis, the police were eager to talk with her, and so was Kimberlin. When he arrived at the Scyphers residence that evening, however, she ran outside and warned him that he wasn't welcome. Her father was brandishing a gun and claiming that Brett was somehow responsible for the murder. "Sandi was being interrogated about her trip, and she was all freaked," he told me. "And her sister starts asking her all these fucking questions. And she was telling it like I'd told her—that the trailer was loaded with furniture. But the circumstances were terrible. It looked like she was being very eva-

sive. It's like being caught with your pants down when you're not trying to fuck somebody, you're just trying to look at a scar on their ass."

Naturally, Kimberlin said, he was thoroughly taken aback by this development, and there was nothing he could do to mollify Fred Scyphers or Louise Crosby. But he did have the tape recording of his conversation with Dykshoorn to play for Sandi: "If there was ever any doubt in her mind that I was even remotely, tangentially involved in the murder—she never said so, but it might have been in the back of her mind—listening to that tape eliminated any doubts."

The police were more skeptical, and the next day they summoned Kimberlin to headquarters for questioning. He arrived in the company of an attorney. Press accounts, which did not mention Kimberlin by name, stated that he was advised of his rights, offered no response to several "pertinent" questions, and declined to take a "psychological stress evaluation test," or polygraph. The *Star* said that Julia Scyphers "reportedly had a series of bitter disputes with a wealthy Marion County businessman" that "stemmed from the businessman's refusal to stop associating with certain members of Mrs. Scyphers' family," and that "the victim had informed friends she was considering filing a peace bond to put a legal stop to his visits."

Kimberlin's refusal to submit to a polygraph, he said, was his attorney's idea. As far as the murder was concerned, he had nothing to hide. Any questions about Sandi's trip to Texas, however, would require an evasive response that would flunk him. "At first I was willing to take a polygraph," he told me. "I said, 'Sure, but you have to have everybody else in the family take a polygraph too.' But then my attorney wouldn't let me."

A NEWSPAPERMAN in Indianapolis has referred to the Speedway Police Department of this era as "Barney Fife and Company." Early on, public pronouncements by Robert Copeland, the chief of police, suggested that a solution was imminent: "MAJOR BREAK" IN MURDER SEEN and KILLER SUSPECTS NARROWED TO 3. Before long, though, it became apparent that the murder investigation was testing the authorities beyond their capacities. The department had only three detectives, one of whom was assigned as a juvenile officer. Crime in Speedway was a tiny industry: half a dozen robberies a year and only fifty or sixty burglaries.

Within a week and a half, the police were nakedly frustrated. "We're almost sure we know what happened," Copeland complained. "But just go try to prove it. We were very optimistic last week, but the investigation is taking a lot longer than we expected. We're running into a lot of roadblocks." On the advice of an attorney, Sandi formally refused to submit to a polygraph, and she failed to attend her mother's funeral. The police wanted to know exactly where in Texas she had been and what she was doing at the time of the murder, but according to the *Star*, she "refused to answer several questions posed by investigators." Fred Scyphers and the two witnesses who'd seen the killer put the attaché case in his trunk were placed under hypnosis by a Marion County sheriff's deputy, in the hope that they might recall more precise details. A *Star* headline said: POLICE BAFFLED BY MURDER VICTIM'S DAUGHTER. In the *Indianapolis News* was a short item: SCYPHERS CASE NEAR STANDSTILL.

Kimberlin said that after being questioned, he tried to resume his routines. The police "had been fucking with me," but he thought of them as "like Keystone Cops, a bunch of bungling fools." He was working on building an addition to the Good Earth. He stayed busy, as always, with his smuggling scams. Sandi's boyfriend at the time, a medical student, moved out-of-state. She had rented a new apartment, in the western suburb of Brownsburg. Jessica and Yvonne had moved in with their grandfather, and "Sandi didn't really have anybody to be with," so Kimberlin said he spent a lot of time with her.

Four weeks following the murder, after a ten-day hiatus in newspaper coverage, the *News* revealed a fragmentary detail of Sandi's trip to Texas: she allegedly had initialed rental papers when the trailer was picked up in Indiana and dropped off in Texas. The story also noted that federal narcotics agents had previously investigated Kimberlin, identified not by name but as "a primary suspect." Mainly, the newspaper report reiterated the theory from which the police had not budged: Julia Scyphers was the target of a "revenge murder"; the investigation "centered around a relationship between a female relative of the victim and a young Indianapolis businessman"; Julia Scyphers "had argued with the businessman on several occasions."

Six days later, the bombs started going off.

then she drove him home to Eagle Creek. The next morning, he said, he went to the "safe location" where the Impala was to have been towed—a car dealership. He was unpleasantly surprised when told that the car had never been delivered, and after a round of phone conversations, he learned why: the FBI had impounded the vehicle. Early that afternoon, Kimberlin went downtown to meet with Forrest Bowman. Along the way, he said, he passed a newspaper vending machine and saw the *Indianapolis News*'s proclamation BOMBING SUSPECT IS LINKED TO MURDER.

"I saw this headline about the bombing investigation and I bought a newspaper and started reading it," he told me. "I think: Oh, this might be interesting. And then I read the first couple of paragraphs—about a Broad Ripple businessman—and I realize they're talking about me and I'm just floored. I didn't even read the rest of the article. I just ran to Bowman's office. He didn't know anything about it yet."

In his haste and alarm, Kimberlin added, he initially didn't focus carefully on the newspaper story's details—for instance, in the fourth paragraph: "It also has been learned that Federal officials have confiscated timing devices from a car reportedly owned by the suspect."

For a vehicle intended to be thrown away, meticulous attention was being lavished on this Chevrolet. Several FBI agents, as well as a peer from the ATF, Bernard (Ben) Niehaus, were present when the search got under way in the printing shop parking lot. The original warrant was limited to evidence related to the misdemeanor possession charges. The agents would later testify that after forcing open the trunk—and this would become central to the prosecution of the bombings case—they discovered objects that had nothing to do with the misdemeanors. Niehaus phoned a fellow ATF agent, Patrick Donovan, and described particulars that provided for yet another search warrant. The most provocative item Niehaus saw that morning was a black leather suitcase imprinted in gold with the initials BCK—the monogram of Brett Coleman Kimberlin. Inside, the government would one day explain to a jury, were four Mark Time timers. Each had been altered so that it was identical to the devices that triggered the bombs in Speedway.

port began by stating that he had properly informed Kimberlin of his constitutional rights, then continued:

> When advised that the topic of conversation was to be the Speedway bombings, he said he was happy to talk about them. He said he wasn't involved and was willing to do what he could to cooperate with the government to prove his innocence. He stated he would be willing to take a polygraph examination concerning the bombings. When asked if he had not been offered a polygraph on other occasions and had agreed to submit to the test until the actual time of the examination and then refused, he said that was true, and that he had done so on his attorney's advice. When asked if that would happen this time, he said "probably, but I don't know." He also said he would like to testify before the grand jury concerning the bombings.
>
> Kimberlin also said he was being framed for the bombings and the ATF should be looking for three FBI agents who had a vendetta against him, and had been conducting the vendetta for years. He said the vendetta was a result of the fact that his father, an attorney for Public Service of Indiana, had won the largest cash settlement in history from the United States government, and that the only way the government could get back at Mr. Kimberlin was through Brett. When asked the names of the three FBI agents, Kimberlin refused to name them and said he refused because he is not a snitch and did not want to get anyone in trouble even if they were framing him.
>
> Kimberlin also said he had read in the newspaper that the bombs were set off as pranks by racing fans and wondered if this had been explored.
>
> Kimberlin also said he did not know where he had been each night during the bombings except that he had been doing the floors at his health food store part of the time.
>
> Relative to Sandra Barton, Kimberlin told me to "get off her goddamn back." He said she is "straight as an arrow" and would not do anything wrong. He also referred to Julia Scyphers, Barton's mother and the victim of a murder, as a "goddamned bitch." He further stated that if we wanted to

find out who murdered Mrs. Scyphers, we should consider Sandra Barton's brother-in-law in Austin, Texas, who Kimberlin said was a CIA agent.

As to his arrest in Texas on federal drug charges, Kimberlin stated that he had just happened to be out in the desert in the middle of the night and was wrongly arrested. He said the situation would be cleared up. When asked why he presented false identification at the time of the arrest, he said that he had not given false identification to the agents, they had found it in his wallet.

Several days after being arraigned, Kimberlin attended a bail-reduction hearing, by which time he was represented by Gerald Goldstein, a high-dollar drug-defense specialist from San Antonio. His fellow defendants, all of whom had comparatively modest bond requirements, were already free on bail. The morning of the hearing, Kimberlin said, he was placed in a holding tank in the federal courthouse. From the wire-mesh cell, he could see a teletype machine spitting out paper with his name on it; the machine chugged away, it seemed, for at least half an hour. Kimberlin couldn't make out the content of the printout. The thought occurred that it might be a copy of his criminal record, but his wasn't *that* extensive. When he was taken before the magistrate, an assistant U.S. attorney was holding the document. "It was about thirty feet long, it was dragging on the floor," Kimberlin said. The government attorney, Robert Berg, explained to the magistrate that the dispatch, freshly arrived from Indianapolis, was the text of a thirty-four-count federal indictment: six of the eight bombings; possession of unregistered firearms; unlawful possession of explosives; unlawful transport of ammunition; unauthorized possession of military insignia and the presidential seal; impersonating a federal officer; and the injury to Carl DeLong. The Texas magistrate declined to reduce Kimberlin's bail. Meanwhile, in Indiana, the barrier to freedom had been raised by several multiples. The judge there had set a separate bail of $800,000.

THE DAY of the indictment, 28 February 1979, was, for Indianapolis, uncommonly eventful. Though an account of the grand jury's action occupied a prominent position in that evening's *Indianapolis*

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
-------------------------------x
                               :
BRETT KIMBERLINE,              :
                               :
         Plaintiff,            :
                               :
              v.               :     Civil No. 339254
                               :
SETH ALLEN,                    :
                               :
         Defendant.            :
                               :
-------------------------------x
```

HEARING

Rockville, Maryland                           November 14, 2011

# Levy Affidavit
# Exhibit D

DEPOSITION SERVICES, INC.
12321 Middlebrook Road, Suite 210
Germantown, MD 20874
(301) 881-3344

```
            IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND


---------------------------------x
                                 :
BRETT KIMBERLINE,                :
                                 :
         Plaintiff,              :
                                 :
              v.                 :        Civil No. 339254
                                 :
SETH ALLEN,                      :
                                 :
         Defendant.              :
                                 :
---------------------------------x
```

Rockville, Maryland

November 14, 2011

WHEREUPON, the proceedings in the above-entitled matter commenced

BEFORE:   THE HONORABLE RICHARD E. JORDAN, JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

BRETT KIMBERLINE, Pro Se
P.O. Box 228
Cabin John, Maryland  20818

FOR THE DEFENDANT:

SETH ALLEN, Pro Se
614 Washington Street, No. 1
South Easton, Massachusetts  02375

I N D E X

                                                                    Page

Opening Statements:

    Brett Kimberline, Pro Se                                   9
    For the Plaintiff

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Brett Kimberline | 13 | 26 | -- | -- |
| For the Defendant: | | | | |
| Seth Allen | 68 | 83 | -- | -- |

| EXHIBITS | MARKED | RECEIVED |
|---|---|---|
| For the Plaintiff: | | |
| Exhibit No. 1 | -- | 82 |
| Exhibit No. 2 | -- | 82 |
| For the Defendant: | | |
| Exhibit No. 1 | 69 | 82 |

                                                                    Page

Closing Arguments:

    Brett Kimberline, Pro Se                                  97
    For the Plaintiff

    Seth Allen, Pro Se                                        101
    For the Defendant

Judge's Ruling                                                      107

1   A   He's trying to establish that 32 years ago, I was
2   convicted of something.
3   Q   What --
4   A   32 years ago.
5   Q   Well, what I'm trying to ask is, what did, is there
6   anything that I posted that hadn't been posted before in, in
7   mainstream media?  And what would that have included, such as,
8   that you were a murder suspect in the death of Julia Scyphers.
9          THE COURT:  Is that a question, whether there was --
10         MR. ALLEN:  How --
11         THE COURT:  -- prior posting of --
12         MR. ALLEN:  Is --
13         THE COURT:  -- allegations?  Is that your question?
14         BY MR. ALLEN:
15  Q   Is there anything -- yes.
16         THE COURT:  Okay.
17         THE WITNESS:  That's never, that's never been posted
18  before to my knowledge.
19         THE COURT:  Okay.
20         BY MR. ALLEN:
21  Q   It was written about by Mark Singer of the New
22  Yorker?
23  A   Never heard of that.
24  Q   And, you never heard of Mark Singer?
25  A   I said I never, I never heard that.

```
 1      Q     You never, you never knew that you were --
 2      A     I was not.
 3      Q     You're saying you weren't a suspect in the, in the
 4  murder of Julia Scyphers?
 5      A     I was never a suspect, no.
 6      Q     You were never a suspect?
 7      A     (Unintelligible).
 8      Q     You contend that, that I, I damaged, some of the
 9  reasons that I damaged your, your revenue strain for your
10  nonprofits, was because I called you a bomber, for example?
11      A     That's true.
12      Q     Were you convicted of setting bombs, and has that
13  been highlighted, highlighted by mainstream media?
14      A     It was reported 32 years ago.
15      Q     Are you a private individual or a public figure?
16      A     Private individual.
17      Q     Have you posted videos of yourself as a musician?
18      A     (No audible response.)
19      Q     Did you, have you been on radio talk shows, the L.A.
20  Steel Show?
21      A     Have I appeared on radio shows?
22      Q     How many radio shows have you appeared on, do, would
23  you estimate?
24      A     Very few.
25      Q     Very few.  But you have been on them?
```