**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION

BRETT KIMBERLIN,                             )
                                             )
      Plaintiff,                         )
                                             )
v.                                           )          **Case No. PWG 13-3059**
                                             )
NATIONAL BLOGGERS CLUB, et al.,              )
                                             )
      Defendants.                        )

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO**
**DISMISS UNDER RULE 12(B)(6) AND THE MARYLAND "ANTI-SLAPP"**
**STATUTE BY DEFENDANTS ERICK ERICKSON, REDSTATE,**
**SIMON & SCHUSTER, INC., AND JAMES O'KEEFE**

BAKER & HOSTETLER LLP
Mark I. Bailen (13805)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel:202-861-1500
Fax:202-861-1783
mbailen@bakerlaw.com
*Counsel for Defendants RedState, Erick*
*Erickson, Simon & Schuster and James*
*O'Keefe.*

TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

    A.    Plaintiff Brett Kimberlin ................................................................2

    B.    Defendants Erickson and RedState ..............................................5

    C.    Defendants Simon & Schuster and O'Keefe .................................8

LEGAL STANDARD ...............................................................................................8

ARGUMENT .........................................................................................................9

    I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED AS TO REDSTATE, ERICKSON, SIMON & SCHUSTER, AND JAMES O'KEEFE UNDER RULE 12(b)(6). ....................................................9

        A.    Kimberlin Has Failed to State A Claim for Defamation (Count V). .........10

            1.    Maryland's Statute of Limitations Bars Kimberlin's Defamation Claims Against RedState and Erickson. ....................10

            2.    Kimberlin Fails to Identify Any False and Defamatory Statements of Fact that Were Made With Actual Malice. ..........11

                *a.*    *Kimberlin fails to identify the allegedly defamatory statements.* ........................................................12

                *b.*    *Kimberlin fails to plead facts that establish actual malice by any of the Movants.* .............................13

                *c.*    *Kimberlin fails to plead facts to establish any of the other elements of a defamation claim.* ...............15

            3.    Plaintiff's Defamation Claim Is Barred Under the Libel-Proof Doctrine. ......................................................20

        B.    The False Light Invasion of Privacy Claim (Count VI) Fails As A Matter of Law. ................................................22

        C.    The Intentional Infliction of Emotional Distress Claim (Count VII) Fails As A Matter of Law. ...................................23

D.      The RICO Claim (Count I) Fails As A Matter of Law. ..............................24

E.      The Claim Under 42 U.S.C. § 1985 (Count III) Fails As A Matter of
        Law. .........................................................................................................27

II.     KIMBERLIN'S CLAIMS SHOULD BE DISMISSED PURSUANT TO
        MARYLAND'S ANTI-SLAPP STATUTE. ..........................................................28

III.    MOVANTS ARE ENTITLED TO THEIR COSTS AND ATTORNEYS'
        FEES. ................................................................................................................30

CONCLUSION.......................................................................................................................31

## TABLE OF AUTHORITIES

**CASES**

*Allen v. Bethlehem Steel Corp.*, 547 A.2d 1105 (Md. Ct. Spec. App. 1988) ............................... 22

*AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.,* 903 F.2d 1000
(4th Cir. 1990) ...................................................................................................................... 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 9

*Bhari Info. Tech. Sys. Private, Ltd. v. Sriram*, No. PWG-13-1480, 2013 WL 6231389
(D. Md. Dec. 2, 2013) ........................................................................................................... 24

*Brown v. Ferguson Enter., Inc.*, CCB-12-1817, 2012 WL 6185310
(D. Md. Dec. 11, 2012) .......................................................................................................... 12

*Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976) ........................................................................ 18

*Byrd v. Hopson*, 108 Fed. App'x 749 (4th Cir. 2004) ............................................................... 31

*Cardillo v. Doubleday & Co, Inc.*, 518 F.2d 638  (2d Cir. 1975) ............................................. 21

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ....................................................................... 31

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 1978) ..................................................... 30

*Colfield v. Safeway Inc.*, CIV. WDQ-12-3544, 2013 WL 5308278
(D. Md. Sept. 19, 2013) ......................................................................................................... 24

*Davidson-Nadwodny v. Wal-Mart Assoc., Inc.*, No. CCB-07-2595, 2008 WL 2415035
(D. Md. June 3, 2008) ............................................................................................................ 12

*EE Mart FC, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 1:11-CV-03351-JKB, 2012
WL 1331869 (D. Md. Apr. 17, 2012) ..................................................................................... 24

*Francis v. Giancomelli*, 588 F.3d 186, 196-97 (4th Cir. 2009) ................................................ 27

*Gannett Co., Inc. v. Anderson*, 947 So. 2d 1 (Fla. 2d DCA 2006) ............................................ 23

*Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970) ..................................................... 18

*Griffin v. Breckenridge*, 403 U.S. 88  (1971) ........................................................................... 27

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) .................................................................. 26

*Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155 (4th Cir. 1985) ............................ 27

*Hatfill v. The New York Times Co.*, 532 F.3d 312 (4th Cir. 2008) ................................ 13

*Hickman v. Obama*, CIV. A. No. JKB-13-1284, 2013 WL 2390869
(D. Md. May 29, 2013) .................................................................................... 24

*Holt v. Camus*, 128 F. Supp. 2d 812 (D. Md. 1999) ...................................................... 22

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) .................................................. 23

*Inlet Assoc. v. Harrison Inn Inlet, Inc.*, 596 A.2d 1049 (Md. 1991)............................... 29

*Jackson v. Longcope*, 476 N.E.2d 617 (Mass. 1985)...................................................... 21

*Jacron Sales Co., Inc. v. Sindorf*, 350 A.2d 688 (Md. 1976)......................................... 15

*Lamb v. Rizzo*, 391 F.3d 1133 (10th Cir. 2004)............................................................. 21

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496  (1991)........................................ 19

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369  (4th Cir. 2012).............. 9

*Mills v. Meadows*, 1 F. Supp. 2d 548 (D. Md. 1998)..................................................... 27

*Moreno v. PF Hurley, Inc.*, Civ. No. RWT-07-1515, 2009 WL 3208324
(D. Md. Sept. 29, 2009) .................................................................................... 31

*Ollman v. Evans*, 750 F.2d 970, 980 (D.C. Cir. 1984) ................................................. 17

*Patton v. County of Kings*, 857 F.2d 1379  (9th Cir. 1988) ......................................... 31

*Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176 (4th Cir. 2009) ................................... 5

*Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999) ............................................... 6

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280 (4th Cir. 1987) .............. 17

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)............................................................. 25

*Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1995) ...................................................... 24

*Sellner v. Panagoulis*, 565 F. Supp. 238 (D. Md. 1982)............................................... 28

*Shabazz v. Bob Evans Farms, Inc.*, 881 A.2d 1212  (Md. Ct. Spec. App. 2005) ........................ 10

*Sirpal v. Fengrong Wang*, CIV. WDQ-12-0365, 2012 WL 2880565
(D. Md. July 12, 2012) ................................................................................ 23

*Smith v. Esquire, Inc.*, 494 F. Supp. 967  (D. Md. 1980) ................................ 22

*Stern v. Cosby*, 645 F. Supp. 2d 258 (S.D.N.Y. 2009) ................................... 20

*Swan v. Boardwalk Regency Corp.*, 969 A.2d 1145 (N.J. App. Div. 2009) ............................... 23

*Tani v. Washington Post*, Civil No. PJM 08-1130, 2009 WL 8652384
(D. Md. June 18, 2009) ................................................................................ 10

*Taylor v. Anne Arundel Cnty., Md.*, CIV. WDQ-12-2468, 2013 WL 4451221
(D. Md. Aug. 15, 2013) ................................................................................ 23

*Telnikoff v. Matusevitch*, 702 A.2d 230  (Md. 1997) ..................................... 15

*United States v. Neff*, 2013 WL 30650 (N.D. Tex. Jan. 3, 2013) .................... 1

*Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002) .............................................. 9

*Walters v. McMahen*, 684 F.3d 435 (4th Cir. 2012) ...................................... 9

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999) ............................................... 14

**KIMBERLIN CASES**

*Kimberlin v. Allen, et al.*, Case No. 339254V, Circuit Court for Montgomery County,
Maryland ...................................................................................................... 9

*Kimberlin v. Allen, et al.*, Case No. V339254, Circuit Court for Montgomery County,
Maryland ...................................................................................................... 8

*Kimberlin v. Walker, et al.*, Case No. 380966V, Circuit Court for Montgomery County,
Maryland ...................................................................................................... 5

*Kimberlin v. Dewalt*, 12 F. Supp. 2d 487 (D. Md. 1998) .............................. 3

*Kimberlin v. Quinlan*, 199 F.3d 496 (D.C. Cir. 1999) ........................... 4 , 14

*Kimberlin v. White*, 7 F.3d 527 (6th Cir. 1993) ........................................... 5

*United States v. Kimberlin*, 483 F. Supp. 350 (S.D. Ind. 1979) .................... 5

**STATUTES**

Md. Code Ann., Cts. & Jud. Proc. § 5-807 (Maryland's "Anti-SLAPP Statute") .......................... 1

18 U.S.C. § 1962 ................................................................................................. 15

Md. Code Ann., Cts. & Jud. Proc. § 5-105 (West 2013) ............................................. 16

U.S.C. § 1985 ............................................................................................. 2, 15, 33, 36

**OTHER AUTHORITIES**

Bruce W. Sanford, *Libel and Privacy*, at 7—118-119 (Aspen 2d ed., 2002 Supp.) ..................... 21

Restatement (Second) of Torts § 571 ......................................................................... 18

*Webster's II New College Dictionary* 838 (1995) ....................................................... 18

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ............................................................. 1, 9

Defendants Erick Erickson, RedState, Simon & Schuster, Inc. and James O'Keefe (collectively, "Movants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss Pursuant to Rule 12(b)(6) the Maryland Anti-SLAPP Statute.

## **INTRODUCTION**

News and commentary website RedState, book publisher Simon & Schuster, journalist/commentator Erick Erickson, and author/investigative journalist James O'Keefe have been sued by Plaintiff Brett Kimberlin for defamation and other claims based solely on their publishing of information and commentary about Kimberlin and his connection to a public controversy involving "swatting"—that is, the act of making a call to 911 "in which a false report of a violent crime is made to elicit a police Special Weapons and Tactics squad ("SWAT") response to the physical address of a targeted individual, his or her family members, or place of employment."[1]

Kimberlin does not allege that any of these defendants directly accused him of any specific swatting incident—indeed, the 213-paragraph Amended Complaint against 22 defendants contains only a few vague references to Movants. Rather, their publications discussed victims of swatting or generally alluded to swatting and Kimberlin. None accuses Kimberlin of criminal activity related to any swatting episode.

Kimberlin nevertheless asserts that their commentary is defamatory and has injured his reputation. His past acts and reputation, however, which are well-documented in published court opinions from other criminal and civil matters, precludes him from proving actual harm to reputation. Moreover, the publications by RedState and Erickson were published more than a year before the filing of this lawsuit in October 2013 and thus are barred by Maryland's statute

---

[1] *United States v. Neff*, 2013 WL 30650, at *3 (N.D. Tex. Jan. 3, 2013).

of limitations.  Kimberlin also has not properly pled (nor can he) that any Movant published false and defamatory statements of fact about him with actual malice.

His claims for false light invasion of privacy and intentional infliction of emotional distress—which are subject to the same constitutional protections as the defamation claim—rely on the identical factual predicate and thus fail as a matter of law. Clearly, Movants' commentary about a public controversy falls far short of "extreme and outrageous" conduct necessary for an emotional distress claim.  Kimberlin also appears to include Movants in his claims for violation of the federal RICO and civil rights statutes, but he fails to identify any specific acts by these defendants to support the claims. It is implausible on its face for their commentary concerning a public controversy to form the basis of RICO or civil rights claims, and no court has stretched the meaning of these federal statutes to attach to the First Amendment-protected activity at issue here.  All of the claims against Movants should be dismissed under Rule 12(b)(6).

Whatever the merits of Kimberlin's dispute with some of the other defendants, there is no legitimate basis for including Movants in this litigation based on their reporting and commentary on matters of public concern.  Maryland's anti-SLAPP law specifically prohibits cases such as this one that are brought in "bad faith" and that "inhibit the exercise" of defendants' free speech rights. The case also should be dismissed under the Anti-SLAPP Statute, and Movants should be awarded their fees and costs.

## **BACKGROUND**

### A.   **Plaintiff Brett Kimberlin**

Kimberlin is a convicted felon. The United States Court of Appeals for the Sixth Circuit detailed his most notorious criminal activity when affirming the denial of one of his *habeas corpus* petitions:

Kimberlin was convicted as the so-called "Speedway Bomber," who terrorized the city of Speedway, Indiana, by detonating a series of explosives in early September 1978. In the worst incident, Kimberlin placed one of his bombs in a gym bag, and left it in a parking lot outside Speedway High School. Carl Delong was leaving the high school football game with his wife when he attempted to pick up the bag and it exploded. The blast tore off his lower right leg and two fingers, and embedded bomb fragments in his wife's leg. He was hospitalized for six weeks, during which he was forced to undergo nine operations to complete the amputation of his leg, reattach two fingers, repair damage to his inner ear, and remove bomb fragments from his stomach, chest, and arm. In February 1983, he committed suicide.

*Kimberlin v. White*, 7 F.3d 527, 528-29 (6th Cir. 1993).

Kimberlin also has been convicted of conspiracy to smuggle drugs, perjury, and impersonating a federal officer.[2] He forced his way into the press coverage of the 1988 Presidential race by claiming that he sold drugs to then-Vice Presidential candidate Dan Quayle and, later, by claiming that prison officials violated his civil rights after he made this allegation.[3] Kimberlin's widespread public attention landed him a spot in Garry Trudeau's famous *Doonesbury* comic strip, seen by millions of newspaper readers across the country[4]:



---

[2] *Kimberlin v. Dewalt*, 12 F. Supp. 2d 487, 489-490 (D. Md. 1998); *United States v. Kimberlin*, 483 F. Supp. 350, 351 (S.D. Ind. 1979).

[3] *See White*, 7 F.3d at 530-31; *Kimberlin v. Quinlan*, 199 F.3d 496 (D.C. Cir. 1999).

[4] This frame is part of a *Doonesbury* cartoon strip dated November 21, 1991 which is available online at http://www.gocomics.com/doonesbury/1991/11/21/ [last accessed Feb. 15, 2014].

In 1996, *New Yorker* writer Mark Singer authored an entire book depicting Kimberlin as a master manipulator prone to making outlandish and "apparitional" claims with no basis in fact.[5]

   More recently, Kimberlin has been the director of a non-profit group known as Justice Through Music, Am. Compl. ¶9, as well as a high-profile activist against electronic voting machines.  Based on his lobbying efforts, *Time* called him "the blogosphere's secret weapon in the war against e-voting."[6]  After the 2004 election of President George W. Bush, Kimberlin made headlines by publicly offering a $100,000 reward—later increased to $500,000—to anyone who could prove that Bush "stole" the election.[7]

   Stunts like these made Kimberlin the subject of critique by conservative commentators. For instance, in February 2011—several months before any of the swatting incidents referenced in the Amended Complaint and more than a year before any publications allegedly linking Kimberlin with swatting—Kimberlin claimed that he was the target of "scores of anonymous posts on numerous national websites."[8]  Kimberlin responded to this criticism using the weapons of judicial process: he filed subpoenas, restraining orders, and lawsuits against several of his critics, a tactic that has been dubbed "censorship and retaliation through lawfare."[9]  Judge Motz

---

[5] Mark Singer, *Citizen K: The Deeply Weird American Journey of Brett Kimberlin* (Knopf 1996).

[6] Massimo Calabresi, *The Wizard of Odd*, TIME, Jan. 5, 2007.

[7] *Id.*

[8] *See* Amended Complaint, *Kimberlin v. Allen, et al.*, Case No. V339254, Circuit Court for Montgomery County, Maryland (filed Feb. 14, 2011), at ¶12.  In weighing a motion to dismiss, the Court may also consider matters of public record in addition to the pleadings themselves. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[9] Ken White, *Brett Kimberlin and Aaron Worthing: Censorship and Retaliation Through Lawfare*, POPEHAT (May 29, 2012), http://www.popehat.com/2012/05/29/brett-kimberlin-and-aaron-worthing-censorship-and-retaliation-through-lawfare/; *see also* Eugene Volokh, *Aaron Walker, Brett Kimberlin, and the Fog of Litigation*, THE VOLOKH CONSPIRACY (May 29, 2012,

even noted in a separate case that Kimberlin and other defendants—though not Movants—"apparently have been involved in intense political disputes over the years."[10]  It was at this time that bloggers began to note another trend: critics of Kimberlin were the targets of anonymous "swatting" attacks shortly after writing about him.[11]  The instant case is the latest defamation action that Kimberlin has launched against those who have published information about him.[12]

**B.**      **Defendants Erickson and RedState**

Erickson is the Editor-in-Chief of RedState, a prominent, conservative online publication covering politics and national events, and a lead writer—*i.e.*, "blogger"—for the website. Am. Compl. ¶28.  He is also a frequent television commentator and has served as a contributor for CNN and Fox News. *Id.* at ¶22. On May 25, 2012, Erickson published an article on RedState discussing prior swatting incidents involving conservative bloggers—namely, a 2011 incident in which Los Angeles County prosecutor John Patrick Frey and his family were victimized. *Id.* at ¶60.[13] The article made no accusations as to who might be responsible for the crime but simply

---

4:59   PM),    http://www.volokh.com/2012/05/29/aaron-walker-brett-kimberlin-and-the-fog-of-litigation/.

[10] *See Walker v. Kimberlin*, Case No. 8-12-cv-01852-JFM, Dkt #33, p. 1 (D. Md. Nov. 28, 2012).

[11] *E.g.*, *In Barack Obama's America, Yet Another Blogger Gets SWATTED*, PAT DOLLARD (June 25, 2012), http://patdollard.com/2012/06/another-blogger-aaron-worthing-gets-swatted/.

[12] *See e.g., Kimberlin v. Allen, et al.*, Case No. 339254V, Circuit Court for Montgomery County, Maryland (filed Oct. 13, 2010); *Kimberlin v. Walker, et al.,* Case No. 380966V, Circuit Court for Montgomery County, Maryland (filed Aug. 30, 2013).

[13] For this blog post—like most of the publications referenced by Kimberlin—the Amended Complaint does not quote any portion of the article or specifically set forth any statements that are alleged to be defamatory; rather, Kimberlin simply pastes a hyperlink to a website. *See* Am. Compl. ¶¶59, 60. As discussed in greater detail, *infra*, the failure to identify specific statements falls short of the requisite standards for pleading a defamation claim. For purposes of this motion to dismiss, the blog posts cited in the Amended Complaint may be considered by the Court because they are "integral to and explicitly relied on in the complaint." *See Phillips v. LCI Int'l,*

commented that swatting was "a tactic used by left-wing activists and others" and that instances of swatting had "happened to several conservative activists." Ex. C, p. 1. Erickson referenced a blog post where Frey described his terrifying ordeal, and he chastised mainstream media outlets for refusing to cover the swatting incidents, which he attributed to political bias. *Id.*

Just two days later, Erickson was the victim of a swatting incident. Am. Compl. ¶59. On May 27, 2012—the night of the incident—Erickson wrote a brief blog post on RedState, noting that he had written previously about Kimberlin and Frey's swatting incident. *Id.* at ¶69; Ex. B. He then recounted the evening's events: "Tonight, my family was sitting around the kitchen table when sheriff[']s deputies pulled up in the driveway. Someone called 911 from my address claiming there had been an accidental shooting. It wasn't nearly the trauma that [Frey] suffered, but I guess the Erickson household is on somebody's radar." Am. Compl. ¶69; Ex. B, p. 1.

On May 29, 2012, Erickson authored another blog post, describing his swatting incident in greater detail and putting it in context with the prior incidents involving other conservative writers. Am. Compl. ¶60, Ex. C. Erickson discussed the apparent similarities between his incident and Frey's incident, noting that after Frey wrote online about Kimberlin, "[s]omeone had called 911 claiming to be Frey saying he'd just murdered his wife." Ex. C, p. 1. Erickson again noted the reluctance of the mainstream news media to report on the crimes. He also suggested that the swatting incidents were part of a larger trend of political harassment faced by conservatives in recent years and that he and other conservatives might be facing retaliation for

---

*Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (finding that the court could properly consider a news article referenced in—though not attached to—the plaintiffs' complaint because it was "integral to and explicitly relied on in the complaint and because the plaintiffs [did] not challenge its authenticity"). The May 25, 2012 blog post is attached to the Declaration of Mark I. Bailen ("Bailen Decl."), filed herewith, as Exhibit "A". References to exhibits in this memorandum of law, cited as "Ex. __" refer to the corresponding exhibit attached to the Bailen Decl.

commenting on what he perceived to be the hypocrisy of progressive organizations for supporting Kimberlin as a leader of their movement:

> The Obama campaign set up a website listing major donors to a Super PAC supporting Mitt Romney. Naturally, individuals listed by the Obama campaign saw their lives turned upside down by investigators linked to Democratic opposition research firms. They, their families, their businesses, and their employees were harassed. Seemingly random people from random states started requesting old court case files involving the donors.

> It was intimidation.

> And now this. Brett Kimberlin has created several organizations that have gotten money from the Tides Foundation and other organizations. Kimberlin spent many years in prison, convicted of a series of bombings in Speedway, Indiana. Now, when conservatives start pointing out his past and his ties, they have been subject to swatting and other forms of bullying.

*Id.* at 1-2.

On June 8, 2012, Erickson was interviewed on CNN about his swatting incident and about similar incidents involving conservative commentators.[14] Am. Compl. ¶61. During the interview, Erickson was pressed about the widespread commentary in the blogosphere linking Kimberlin to the swatting attacks, but Erickson refused to implicate Kimberlin in the attacks. When asked by the interviewer, "[Y]ou have your ideas [who did this]?" (3:20 of video), Erickson replied, "*I don't know who did this call.*" (3:23 of video). Erickson mentioned the undisputed fact that several bloggers had been subjected to swatting attacks shortly after writing about Kimberlin, but he expressly *denied* any belief that it was Kimberlin who perpetrated the swattings: "In fact, I don't actually think it's him [Kimberlin]. . . . *I don't think that it's him.*" (3:46 of video).

Kimberlin also alleges that Erickson, and others, contacted members of Congress to

---

[14] A video of Erickson's June 8, 2012 interview on CNN is available at http://newsroom.blogs.cnn.com/2012/06/08/swatting-prank-could-be-deadly/ [last accessed February 3, 2014].

encourage a Justice Department investigation into the swatting events and that, as a result, 87 members of the House of Representatives eventually signed a letter to Attorney General Eric Holder in June 2012, urging the Justice Department to look into the issue. Am. Compl. ¶71.

## C.   Defendants Simon & Schuster and O'Keefe

In or around June 2013—after two years of widespread discussion in the media regarding the swatting of conservative commentators and Kimberlin's apparent ties to the incidents—Simon & Schuster, through its imprint Threshold Editions, published a book written by conservative activist and investigative journalist James O'Keefe, titled *Breakthrough: Our Guerilla War to Expose Fraud and Save Democracy*. *Id.* at ¶98.  *Breakthrough* documents O'Keefe's undercover investigations seeking to expose fraud and abuse in American politics, and the counter-attacks against him for his work.[15]   In a chapter recounting the efforts by the New Hampshire Attorney General's office to obtain information about him, O'Keefe referenced a woman who had unsuccessfully sued O'Keefe for harassment and then took to her blog to make her accusations public. O'Keefe noted the connection between this woman and Democratic campaign consultant Neal Rauhauser, whom he identified as an associate of Kimberlin.  In a single paragraph nestled on page 250 of the 320-page book, O'Keefe wrote that Kimberlin was a "scary dude who has pioneered the art of 'swatting'."  He further wrote that "[o]f late, [Kimberlin] has focused his demonic energy on conservative citizen journalists."  Am.  Compl. ¶98; Ex. D, p. 3. Kimberlin is not mentioned on any other page in the book.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts "to raise a right to relief above the speculative level."

---

[15]   A copy of this book chapter, titled "The Rise of Richard Head"—which includes the only references to Kimberlin in *Breakthrough*—is attached to the Bailen Decl. as Ex D.

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that it must show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).

While a trial court must accept the allegations of the complaint as true when considering a motion to dismiss, a court is not required to give deference to mere legal conclusions. *See Walters*, 684 F.3d at 439. Nor is a trial court required to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

## ARGUMENT

Kimberlin has failed to allege sufficient facts to establish a claim for relief as to any of the counts in the Amended Complaint and therefore the case is ripe for dismissal under Rule 12(b)(6). The case also represents an improper attempt to punish Movants for commentary on matters of public concern and thus should be dismissed under Maryland's Anti-SLAPP statute.

## I. THE AMENDED COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(b)(6).

Kimberlin has asserted three state law claims (defamation, false light invasion of privacy, intentional infliction of emotional distress) and two federal law claims (18 U.S.C. § 1962 and 42

U.S.C. § 1985) against Movants.[16]  None have any merit.[17]

**A.      Kimberlin Has Failed to State A Claim for Defamation (Count V).**

**1.      Maryland's Statute of Limitations Bars Kimberlin's Defamation Claims Against RedState and Erickson.**

First and foremost, Maryland's one-year statute of limitations bars any defamation claim based on anything that Movants published more than a year before the Complaint was filed. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-105 (West 2013) ("An action for assault, libel, or slander shall be filed within one year from the date it accrues."). For statements published in "widely available sources"—including the Internet—the cause of action for defamation "begin[s] to accrue on the date of publication." *Tani v. Washington Post*, Civil No. PJM 08-1130, 2009 WL 8652384, at *2 (D. Md. June 18, 2009) (dismissing defamation claims brought more than one year after publication on a website, noting that the articles "were widely available online and could have been discovered immediately"). A court may dismiss a defamation claim when "it is clear from the face of the complaint" that the claim is time-barred. *Johnson v. MV Transp. Inc.*, 716 F. Supp. 2d 410, 413-14 (D. Md. 2010).

The Amended Complaint identifies only four specific publications associated with Erickson and RedState, all of which were published more than a year prior to the initiation of this action on October 15, 2013:  Blog posts published on RedState (May 25, 27, and 29, 2012) and

---

[16] Kimberlin has voluntarily withdrawn his claim for fraud and negligent misrepresentation (Count IV). [Dkt #29, p. 27.]  To the extent he has not, Movants seek dismissal of this claim and incorporate by reference the arguments advanced by the other Defendants. His second cause of action—brought under the Civil Rights Act of 1866—is alleged only against Defendant Patrick Frey. Am. Compl., p. 40.

[17] Kimberlin also includes a claim for punitive damages. *See* Am. Compl. ¶213. It is well-established, however, that a claim for punitive damages is not a stand-alone claim and cannot exist in the absence of an award for compensatory damages. *See, e.g.*, *Shabazz v. Bob Evans Farms, Inc.*, 881 A.2d 1212, 1233-34 (Md. Ct. Spec. App. 2005) ("[A] cause of action does not exist for punitive damages alone. . . .").

Erickson's appearance on CNN (June 8, 2012).  Am. Compl. ¶¶59, 60, 61, 69.  These publication

dates are undisputed and are evident from the Amended Complaint itself, either because

Kimberlin expressly identifies the date in the Amended Complaint or because the date appears in

the text of hyperlinks that are referenced therein (and is evident from the link).[18] All publications

involving Erickson and RedState are barred by the statute of limitations as a matter of law.

### 2.      Kimberlin Fails to Identify Any False and Defamatory Statements of Fact that Were Made With Actual Malice.

To properly plead a claim for defamation under Maryland law,[19] "a plaintiff must allege

specific facts establishing four elements[:] . . . (1) that the defendant made a defamatory

statement to a third person, (2) that the statement was false, (3) that the defendant was legally at

fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van*

*Smith*, 35 A.3d 1140, 1147 (Md. 2012) (internal citations and quotation marks omitted). A

"defamatory statement" is a statement that "tends to expose a person to public scorn, hatred,

contempt, or ridicule, which, as a consequence, discourages others in the community from

---

[18] The Amended Complaint also alleges that Erickson—and others—"contacted Members of the House and Senate" and urged them to conduct a criminal investigation into the issue of swatting. Am. Compl. ¶71. It further alleges that as "[a]s a result" of these contacts, one senator and numerous members of the House of Representatives signed on to a letter urging the Justice Department to investigate. *Id.* The allegations reference an article published on June 11, 2012, titled "Florida Rep. Sandy Adams Leads 85 House Republicans in 'SWATting' Letter," which describes the letter in question. *Id.*; *see also* Kerry Picket, *FLA Congresswoman Leads 87 Member Effort Demanding Swat-ting investigation from DOJ*, WASHINGTON TIMES (June 10, 2012), *available at* http://www.washingtontimes.com/blog/watercooler/2012/jun/10/picket-fla-congresswoman-leads-effort-demanding-sw/ [last accessed Feb. 21. 2014]. Thus, it is clear that the allegations regarding Erickson contacting members of Congress—even if it could somehow be defamatory—occurred prior to June 11, 2012, more than *sixteen months* before the commencement of Plaintiff's suit.

[19] The Amended Complaint alleges that Plaintiff is a resident of Maryland and that Movants reside in Georgia, Washington, D.C., California, and New York. However, for purposes of this Motion, Movants will presume—without conceding—that Maryland law applies as it is not substantially different from the law of any other state whose laws might apply.

having a good opinion of, or associating with, that person." *Id*. The determination of whether a given statement is defamatory is "a question of law for the court," and when examining a statement, "the publication must be read as a whole[.] [W]ords have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed." *Id*. Additionally, opinions and commentary on matters of public concern are immune from civil liability by virtue of the fair comment privilege, which provides that "any member of the community may, without liability, honestly express a fair and reasonable opinion or comment on matters of legitimate public interest," including the "occurrence or prosecution of crimes." *Id.* at 1152.

### a.   *Kimberlin fails to identify the allegedly defamatory statements.*

As an initial matter, Kimberlin must specifically identify the content of any allegedly defamatory publication. *See Brown v. Ferguson Enter., Inc.*, CCB-12-1817, 2012 WL 6185310, at *3 (D. Md. Dec. 11, 2012) (dismissing defamation count where plaintiff's "accusations of defamation contain[ed] no specific description of the content of the alleged statements"); *Davidson-Nadwodny v. Wal-Mart Assoc., Inc.*, No. CCB-07-2595, 2008 WL 2415035, at *4-5 (D. Md. June 3, 2008) (dismissing defamation claims where plaintiff "[did] not specify what actual defamatory statements were made by defendants"). For each of the publications by these Movants, Kimberlin fails to identify *which* statements, if any, are defamatory or *how* they constitute defamation. For most of the publications, he merely pastes a hyperlink to a website or makes general reference to the publication. *See* Am. Compl. ¶¶59, 60, 61, 71. Under *Brown* and *Davidson-Nadwodny*, Kimberlin's failure to specifically identify the allegedly defamatory statements by Erickson and RedState (Am. Compl. ¶¶59-61, and 71) is fatal to his claims.

12

           **b.** *Kimberlin fails to plead facts that establish actual malice by any of the Movants.*

In matters involving public figures, such as here, a plaintiff must plead and prove by clear and convincing evidence that the defendant published the allegedly defamatory statement with "actual malice." *Hatfill v. The New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) (noting that public figures are ones who have received "pervasive fame and notoriety"). Kimberlin is undoubtedly a public figure. He has received "pervasive fame or notoriety" due to his well-documented criminal exploits and his other attention-seeking acts. His criminal history has garnered him wide recognition as the "Speedway Bomber" and a convict of multiple other felonies. He has actively sought to keep himself in the public eye through his claims during the 1988 Presidential election that he had sold marijuana to Dan Quayle and his charges that he was placed in solitary confinement to prevent him from speaking out about these allegations—matters that were widely covered in the press.[20] He was twice featured in *The New Yorker* and was the subject of an entire book.[21] More recently, his political activism has garnered national attention, including a 2007 *Time* magazine article, which detailed his involvement in the debate surrounding use of electronic voting machines and his efforts to demonstrate that Republicans

---

[20] *See, e,g., Kimberlin v. Quinlan*, 199 F.3d 496 (D.C. Cir. 1999); *Kimberlin v. White*, 7 F.3d 527 (6th Cir. 1993); *Quayle Accuser Loses Bid to Reinstate His Lawsuit*, ORLANDO SENTINEL, Apr. 2, 1994, at A14 (1994 WLNR 4389180); *Supreme Court May Pursue Case of Quayle Accuser Kept Silenced*, PITTSBURGH POST-GAZETTE, Oct. 4, 1994, at A5 (1994 WLNR 2222893); *Inmate Who Claimed to be Quayle's Drug Dealer Presses Rights Case*, WASH. POST, Nov. 19, 1991, at A03 (1991 WLNR 4891711); *Official Had Quayle Accuser Detained; Letter Reveals Prisoner Kept from Media on Eve of 1988 Election*, WASH. POST, July 4, 1990, at A09 (1990 WLNR 4591656); *Solitary for Quayle's Accuser*, N.Y. TIMES, Dec. 20, 1988, at B9 (1988 WLNR 1324702).

[21] *See* Mark Singer, *The Prisoner And The Politician*, THE NEW YORKER, Oct. 5, 1992, at 108; Mark Singer, *Unfinished Business*, THE NEW YORKER, Oct. 7, 1996, at 54; Mark Singer, *Citizen K: The Deeply Weird American Journey of Brett Kimberlin* (Knopf, 1996).

had "stolen" votes during the 2004 election.[22] Kimberlin clearly has achieved the fame and notoriety that makes him subject to comment and critique in the media.[23]

Kimberlin has not adequately pled facts that would establish that any of the Movants acted with "actual malice," which is a "high degree of awareness of . . . probable falsity or . . . serious doubts as to the truth of the challenged statements." *Chesapeake Pub. Corp. v. Williams*, 661 A.2d 1169, 1175 (Md. 1995) (Internal citation and quotation marks omitted). A plaintiff must allege *specific facts* showing that the defendants acted with actual malice. *See Mayfield*, 674 F.3d at 377-78 (dismissing a defamation claim where plaintiff offered only a conclusory allegation of malice). In *Schatz v. Republican State Leadership Committee*, the court affirmed dismissal of a defamation action where the complaint used only "actual-malice buzzwords," such as the defendant "had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth and a 'reckless disregard' for whether they were false." 669 F.3d 50, 56 (1st Cir. 2012); *see also Paris v. Sinclair*, 845 F. Supp. 2d 215, 218-19 (D.D.C. 2012) (dismissing defamation claim where there were no factual allegations, other than plaintiff's own conclusory assertions, supporting a finding of actual malice); *Hanks v. Wary Broadcasting, LLC*, 2012 WL 405065, at *12-13 (E.D. Va. Feb. 8, 2012) (similar).

---

[22] *See* Massimo Calabresi, *The Wizard of Odd*, TIME, Jan. 5, 2007.

[23]   Kimberlin also satisfies the limited-purpose public figure test.  He has inserted himself into the center of a public controversy and has access to media and other venues to make his position widely known. *See Hatfill*, 532 F.3d at 318 (detailing limited public figure standard). Since at least 2011, he has been involved in well-publicized spats with various conservative bloggers that have played out in multiple lawsuits filed by him and others. Bloggers who have commented about him have complained that they have been targeted for swattings. Even if involuntarily, Kimberlin has been injected into the vortex of this controversy and has assumed a prominent role in the public debate.  *See Wells v. Liddy*, 186 F.3d 505, 539-40 (4th Cir. 1999) (person who has "assumed the risk of publicity," but "need not have specifically taken action through which he has voluntarily sought a primary role in the controversy" is limited public figure).

Here, the Amended Complaint does not contain a *single factual allegation* about Movants that could support any finding of actual malice. Just as in the cases cited above, Kimberlin merely recites actual malice "buzzwords" against all of the defendants as one collective unit:

- "Defendants published these false and defamatory statements about Plaintiff even though they knew that they were not based on fact or truth." Am. Compl. ¶184.

- "Defendants published these false and defamatory statements about Plaintiff with knowledge of their falsity and/or reckless disregard for their truth." *Id.* at ¶185.

These general, conclusory allegations are plainly insufficient to meet federal pleading standards. The Fourth Circuit rejected practically identical allegations in *Mayfield,* 674 F.3d at 378, finding that such conclusory recitations of the actual malice standard are "precisely the sort of allegations that *Twombly* and *Iqbal* rejected." *Id.* Kimberlin has failed to plead sufficient facts establishing that any defendant acted with actual malice, or any degree of fault.[24]

        c.     *Kimberlin fails to plead facts to establish any of the other elements of a defamation claim.*

The Amended Complaint also contains insufficient pleading as to the other elements of a defamation claim. Each publication is addressed below.

        i.     *Erickson and RedState*

The Amended Complaint identifies three blog postings on Redstate.com from May 2012, one television appearance by Erickson on CNN in June 2012, and alleged "contact[s]" with Members of Congress urging an investigation into the issue of swatting, in or around June 2012. Am. Compl. ¶¶59, 60, 69, 71. Contrary to Kimberlin's conclusory allegations, Erickson's

---

[24] Kimberlin has also failed to plead factual allegations showing that any of the Movants were somehow "negligent" in publishing their commentaries about him—thus barring a claim irrespective of his public figure status. *See Telnikoff v. Matusevitch*, 702 A.2d 230, 246 (Md. 1997) (citing *Jacron Sales Co., Inc. v. Sindorf*, 350 A.2d 688, 697-98 (Md. 1976)).

commentaries did not "falsely blam[e]" him of committing swatting (nor do they contain anything defamatory about him). Am. Compl. ¶60. A plain reading of the blog posts reveals that there is not a single accusation that Kimberlin was responsible for any swatting attacks. At most, Erickson notes the undisputed pattern of conservative commentators being subjected to swatting attacks after mentioning Kimberlin by name.

Erickson's May 25, 2012 post, for example, quotes from a blog by Patrick Frey that "describe[es] just what harassment he and his family were subject to by the online left." Ex. A, p. 1. Similarly, in his May 27, 2012 post—written the same evening that Erickson was "swatted"— Erickson avoids assigning any blame. He merely mentions that he previously wrote about Kimberlin and about Frey's swatting incident, saying that "someone" placed the fake 911 call and stating: "I guess the Erickson household is on somebody's radar." Ex. B, p. 1.

Furthermore, during his June 8, 2012 CNN interview, Erickson did not, as Kimberlin contends, "impute[ ] that Plaintiff was responsible for the swatting" nor did he "push[ ] back against the reporter's protests that there was no evidence of Plaintiff's involvement." Am. Compl. ¶61. Rather, Erickson went to great lengths to make clear that he did not think that Kimberlin was responsible for the attacks: "In fact, I don't actually think it's him [Kimberlin]. . . . *I don't think that it's him.*" (3:46 of video). Erickson did nothing to suggest that Kimberlin encouraged or was otherwise responsible for the swatting attack: "It all came about after writing about this individual [Kimberlin]. Someone who, I guess, likes him, decided to do it, which is a real problem." (4:03 of video).

Erickson's commentaries published on RedState and on CNN were not attacks on Kimberlin but, rather, sought to bring further attention to what appeared to be politically-motivated swatting incidents and to comment on the media's general failure to report on these

crimes. As Erickson opined:  "The mainstream media, which has greater sympathies with the left than the right, would prefer not to cover stories like this"  and "[t]he stories of what is happening are not getting much traction outside of right-of-center blogs and the occasional opinion column at the *Wall Street Journal*, *D.C. Examiner*, and *Washington Times*." Ex. A; Ex. C.  This is just the sort of commentary—"a fair and reasonable opinion or comment on matters of legitimate public interest"—that the law recognizes as non-actionable. *Piscatelli*, 35 A.3d at 1152.

### ii.  *Simon & Schuster and O'Keefe*

The sole allegation against Simon & Schuster and O'Keefe rests on a single paragraph in O'Keefe's book *Breakthrough* in which Kimberlin is called a "scary dude" who has "pioneered the art of swatting" and has "demonic energy."   Am. Compl. ¶98; Ex. D, p. 3.  To be actionable in defamation, however, there must be a statement of fact that "has a precise meaning and thus is likely to give rise to clear factual implications." *Ollman v. Evans*, 750 F.2d 970, 980 (D.C. Cir. 1984). "Statements that are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation." *Id.*; *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 n.21 (4th Cir. 1987) (recognizing that when determining whether a statement constitutes an actionable statement of fact, "the district court must consider whether the defamatory terms have precise meaning, or, on the contrary, whether they are 'loosely definable' and 'variously interpretable'") (internal citations omitted). Thus, accusing a prominent conservative of being a "fellow traveler of fascists" was not actionable as it "cannot be regarded as having been proved to be statements of facts, among other reasons, because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate." *Ollman*, 750 F.2d at 980 (quoting *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976)).

Read in context, the suggestion that Kimberlin "pioneered the art of 'swatting'" is far too imprecise to constitute an imputation of the commission of a crime. Webster's Dictionary defines the verb to "pioneer" as "1. To explore, open up, or settle (a region). 2. To innovate or participate in the development of." *Webster's II New College Dictionary* 838 (1995). Commenting that Kimberlin participated in the development of "the art of 'swatting'" does not amount to an accusation that he committed a crime. At most, the phrase could be construed as crediting Kimberlin with fostering the *concept* or *idea* of the swatting tactic, as opposed to stating or implying that he was actually responsible for any specific swatting incident. *See* Restatement (Second) of Torts § 571, cmt. c (noting that "charg[ing] another with a criminal intention or design" does not amount to imputation of committing a crime, "if no criminal act is charged").

The non-factual nature of the statement becomes even clearer when paired with O'Keefe's comments that Kimberlin is a "scary dude" who has focused "demonic energy" on conservatives. Such language clearly constitutes "rhetorical hyperbole"—not fact-based assertions that could constitute imputation of actual criminal behavior. *See Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970). Ultimately, reading the passage in context with the entire chapter and the book as a whole, as the Court must, *see Piscatelli*, 35 A.3d at 1147, O'Keefe's single, brief commentary about Kimberlin—which is not further developed or otherwise referenced in the chapter or anywhere else in the book—does not amount to a provably false and defamatory statement of fact. *See Ollman*, 750 F.2d at 992 (recognizing that "the deep-seated constitutional values embodied in the Bill of Rights require that we not engage, without bearing clearly in mind the context before us, in a Talmudic parsing of a single sentence or two, as if we were occupied with a philosophical enterprise or linguistic analysis").

Even if these loose phrases—being a "scary dude" and "pioneer[ing]" an "art"—could be susceptible to factual interpretation, they do not suggest any materially false implication about Kimberlin.  As the Supreme Court reiterated just last month, only statements that are "materially false" can form the basis of a defamation action.  *See Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. ----, No. 12-315, slip op. at 11 (Jan. 27, 2014).  A statement is materially false only if it "would have a different effect on the mind of the reader . . . from that which the . . . truth would have produced."  *Id.*  (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).  In the instant case, the undisputed truth is that (1) Kimberlin is a convicted bomber, (2) he is engaged in a public dispute with conservative commentators and has attacked his critics in the court system and elsewhere, and (3) many commentators have noted a pattern of anonymous swatting attacks against individuals who criticize Kimberlin.  The "gist" or "sting" of these undisputed facts, *see id.* at 8 (quoting *Masson*, 501 U.S. at 517), would lead a reasonable person to conclude that some correlation or connection exists between "the art of swatting" and an individual who perpetrated violent and objectively "scary" acts.  In other words, the minor reference to Kimberlin in *Breakthrough* has the same "effect on the mind of the reader" as would a literal recitation of the undisputed facts surrounding Kimberlin, his history, and the swatting controversy.  *See id.* at 16 (noting that "minor imprecision" does not make a statement defamatory, even if "trained lawyers or judges might . . . have chosen more precise words").

The suggestion in the book of a loose connection between Kimberlin and the development of the concept of swatting is also best understood as a "fair comment"—based on undisputed facts—on a matter of "legitimate public interest."  *See Piscatelli*, 35 A.3d at 1152 (explaining that the "fair comment" privilege insulates authors from defamation liability).  O'Keefe was entitled to rely on the well-documented pattern of conservative bloggers falling

19

victim to swatting attacks shortly after writing about Kimberlin, and he was further entitled to express his fair commentary about a loose link between Kimberlin and the idea of swatting.

Furthermore, Simon & Schuster has broad protection for the expression of authors in the works it publishes. It is well-established that book publishers are entitled to reasonably rely on statements made by authors and that, to establish actual malice, a defendant must show that the publisher had "actual, subjective doubts as to the accuracy of the story." *Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y. 2009) ("The law is clear . . . that a book publisher has no independent duty to investigate an author's story . . . ."); *see also Geiger v. Dell Pub. Co., Inc.*, 719 F.2d 515, 518 (1st Cir. 1983) ("To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man. This result would, we think, produce just such a chilling effect on the free flow of ideas as First Amendment jurisprudence has sought to avoid.").  Given the multitude of references to Kimberlin and swatting on the Internet—Kimberlin alleges that "more than 15,000 results come up on Google," Am. Compl. ¶97—there is nothing to suggest that Simon & Schuster had "actual, subjective doubts as to the accuracy" of O'Keefe's commentary, nor does Kimberlin even allege that Simon & Schuster had any such doubts.

### 3.      Plaintiff's Defamation Claim Is Barred Under the Libel-Proof Doctrine.

Recovery is also barred in this case under the well-established "libel-proof" doctrine:

The "libel proof" doctrine is based on the recognition that in order for a defamation plaintiff to recover damages, he must have a reputation that is capable of sustaining injury due to the publication at issue.  When the plaintiff has already engaged in conduct more damaging to his reputation than that described in the questioned publication, the plaintiff may well be "libel proof," as a matter of law, even if the publication is false.

Bruce W. Sanford, *Libel and Privacy*, at 7—118-119 (2d ed., 2002 Supp.); s*ee also Lamb v. Rizzo*, 391 F.3d 1133, 1137, n.4 (10th Cir. 2004) (noting that the libel-proof plaintiff doctrine "has been applied in a number of jurisdictions for more than two decades" and collecting cases from within five different federal circuits and five states). Where, like here, a plaintiff's prior criminal history has been widely-publicized, the doctrine is applicable. *See Cardillo v. Doubleday & Co, Inc.*, 518 F.2d 638, 639 (2d Cir. 1975) (finding that libel plaintiff who had been convicted of "assorted federal felonies" was "so unlikely by virtue of his life as a habitual criminal to be able to recover anything other than nominal damages as to warrant dismissal of the case, involving as it does First Amendment considerations").

Kimberlin does not dispute his long criminal history, which includes numerous felonies rooted in violence and deception, including, as one court described, the setting of a bomb that tore off the victim's lower right leg and two fingers. Moreover, his criminal exploits have been reported by national media for decades.[25] *Cf. Jackson v. Longcope*, 476 N.E.2d 617, 620-21 (Mass. 1985) (finding convicted murderer libel-proof where there had been "substantial publicity" of plaintiff's crimes, including "scores of newspaper articles" published over a four-year span). Kimberlin claims that he should not be required to wear a "Scarlet Letter" on his forehead for crimes that he was convicted of decades ago. That may be true, but under the libel-proof doctrine, the determining factor is whether "the plaintiff has already engaged in conduct more damaging to his reputation than that described in the questioned publication." Sanford, *Libel and Privacy*, at 7-119. His prior conviction for malicious damage by explosives with personal injury, among others, is certainly more damaging to his reputation than any allegations of "swatting," where, thankfully, no one has been harmed.

---

[25] *See* Background, Section A and Argument Section I.A.2.b, *supra* (discussing numerous newspaper articles, magazine articles, and even nationally-syndicated comic strips publicizing Kimberlin and his criminal history).

**B.**      **The False Light Invasion of Privacy Claim (Count VI) Fails As A Matter of Law.**

Kimberlin attempts to re-cast his allegations of defamation as a claim for false light invasion of privacy. However, "an allegation of false light must meet the same legal standards as an allegation of defamation." *Piscatelli*, 35 A.3d at 1146-47. The rejection of a defamation claim "render[s] superfluous a separate analysis of [a] false light claim." *Id.* at 1147; *see also Holt v. Camus*, 128 F. Supp. 2d 812, 816 (D. Md. 1999) ("[T]he Fourth Circuit, interpreting Maryland law, has refused to allow a claim for false light/invasion of privacy to go forward where the claim fails to meet the standards for defamation.") (citing *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.,* 903 F.2d 1000, 1004 n. 1 (4th Cir. 1990)). In addition, the Supreme Court held in *Time, Inc. v. Hill*, 385 U.S. 374, 388-89 (1967) that the actual malice standard applies in false light cases involving matters of public concern, regardless of whether the plaintiff is a public or private figure. For the reasons discussed above, Kimberlin has failed to plead sufficient facts to support a finding by clear and convincing evidence of actual malice. Indeed, for all of the reasons that the defamation claim is fatally flawed, the false light claim also fails as a matter of law. *Piscatelli*, 35 A.3d at 1146-47.[26]

---

[26] At least one lower court in Maryland has applied the general, three-year statute of limitations for civil actions to false light claims, despite recognizing that it could, potentially, provide a "loophole" for plaintiffs to re-cast defamation claims after expiration of the one-year window for defamation actions. *See, e.g.*, *Allen v. Bethlehem Steel Corp.*, 547 A.2d 1105, 1108 (Md. Ct. Spec. App. 1988). Movants respectfully submit, however, that if the Maryland Court of Appeals were to review this issue, it would decide not to extend the limitations period in false light or intentional infliction of emotional distress claims in cases involving speech, in light of the Court of Appeals' holding in *Piscatelli* and the view from other jurisdictions that the limitations period for false light claims should be congruent with the period for defamation claims. *See Smith v. Esquire, Inc.*, 494 F. Supp. 967, 970 (D. Md. 1980) (stating that Maryland Court of Appeals would find the one-year statute to be applicable and "[t]o hold otherwise would severely undercut the policy considerations which led to the enactment of the one-year statute governing defamation cases."); *Swan v. Boardwalk Regency Corp.*, 969 A.2d 1145 (N.J. App. Div. 2009); *Gannett Co., Inc. v. Anderson*, 947 So. 2d 1, 7-11 (Fla. 2d DCA 2006).

C.    **The Intentional Infliction of Emotional Distress Claim (Count VII) Fails As A Matter of Law.**

To establish a cause of action for intentional infliction of emotional distress ("IIED"), a plaintiff must plead and prove four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." *Batson v. Shiflett*, 602 A.2d 1191, 1216 (M.D. 1992). In cases involving speech, such as this one, a public figure plaintiff cannot prevail on an IIED claim without establishing that the defendants acted with actual malice.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

Claims for IIED are reserved for those rare instances where the defendant's conduct is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Sirpal v. Fengrong Wang*, CIV. WDQ-12-0365, 2012 WL 2880565, at *4 (D. Md. July 12, 2012) (citing *Batson*, 602 A.2d at 1216). Because of this high standard, "[i]n the 30 years since the Maryland Court of Appeals first recognized IIED as a cognizable tort, it has upheld such claims only four times."  *Taylor v. Anne Arundel Cnty., Md.*, CIV. WDQ-12-2468, 2013 WL 4451221, at *5 (D. Md. Aug. 15, 2013). None of those cases involved alleged defamatory publications.

The sparse allegations concerning Movants do nothing to establish "extreme or outrageous" conduct. In conclusory fashion, Kimberlin alleges that Movants published defamatory statements about him. However, "[d]efamatory conduct 'in no way satisfies [the] exacting standard for extreme and outrageous conduct.'" *Colfield v. Safeway Inc.*, CIV. WDQ-12-3544, 2013 WL 5308278, at *8 (D. Md. Sept. 19, 2013); *see also Sirpal*, 2012 WL 2880565, at *4 (even speech "intended and calculated to harass the plaintiff by accusing him of crimes is

23

not extreme and outrageous"). Nor has Kimberlin adequately pled that any the Movants acted with actual malice.  The claim for IIED fails as a matter of law.

### D.      The RICO Claim (Count I) Fails As A Matter of Law.

The federal RICO Act "is concerned with eradicating organized, long-term, habitual criminal activity, not all instances of wrongdoing." *Bhari Info. Tech. Sys. Private, Ltd. v. Sriram*, No. PWG-13-1480, 2013 WL 6231389, at *2 (D. Md. Dec. 2, 2013). Kimberlin has brought his claim under 18 U.S.C. §§ 1962(c) and (d), which make it unlawful for a person "employed by or associated with . . . [an] enterprise. . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," or to conspire to do the same. Civil RICO actions are, of course, subject to the *Iqbal*/*Twombly* pleading standard; to avoid dismissal, a plaintiff must assert enough factual content to allow the court to "'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *EE Mart FC, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 1:11-CV-03351-JKB, 2012 WL 1331869, at *3 (D. Md. Apr. 17, 2012) (quoting *Iqbal*, 556 U.S. at 678).

The Amended Complaint fails to contain factual allegations linking Movants to the elements of RICO claim, which include: "(1) conduct [causing injury to business or property], (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Hickman v. Obama*, CIV. A. No. JKB-13-1284, 2013 WL 2390869, at *1 (D. Md. May 29, 2013) (alteration in original) (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1995)).  As a threshold matter, Kimberlin fails to specifically allege a single act by any of the Movants that could possibly support any of the elements of a RICO claim. He alleges, generally, that all Defendants were engaged in a "RICO Enterprise" that had the "common purpose of creating false narratives, publishing false narratives, using threats, extortion, intimidation, harassment, assault, fraud, and

misuse of government agencies to smear and harm Plaintiff." Am. Compl. ¶115. However, the allegations of the various predicate acts—including mail fraud, wire fraud, obstruction of justice, retaliation of a witness and victim, extortion, and money laundering—repeatedly names only eight Defendants: National Bloggers Club, DB Capitol Strategies, Akbar, McCain, Walker, Frey, Stranahan, and Hoge. *Id.* ¶¶110-53. Movants are notably absent from any of these specific RICO allegations.[27]

There are also no factual allegations supporting a finding that Movants participated or conspired to participate in "an enterprise" in violation of either subsection (c) or (d) of 18 U.S.C. § 1962. For a defendant to be liable for a violation of subsection (c), he must have "participate[d] in the operation or management of the enterprise itself," meaning that the defendant must have had "*some* part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 183, 179 (1993) (emphasis in original). There are no factual allegations:

- tying Movants to the alleged enterprise—let alone any allegation that Movants "participated in the operation or management" of the alleged enterprise;

- that Movants engaged in a conspiracy in violation of 18 U.S.C. § 1962(d), which requires showing that a defendant "knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and . . . that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012); or

---

[27] Kimberlin's allegation that Defendants committed the predicate act of obstructing justice "by providing false evidence and information about [Kimberlin] to United States Senators and Congress Members . . . .", (Am. Compl. ¶132), does not provide a factual basis for violation of any of the statutes cited by Kimberlin:  Title 18 U.S.C. § 1511 forbids obstructing state and local law enforcement efforts against gambling businesses; § 1510 concerns bribery and certain disclosures regarding subpoenas; § 1503 addresses attempts to "influence, intimidate, or impede" grand or petit jurors, judicial officers, and ongoing judicial proceedings. *See United States v. Aguilar*, 515 U.S. 593, 597 (1995) (noting that "uttering false statements to an investigating agent" is not sufficient to make out a violation of § 1503).

- that Movants ever intentionally agreed with others to commit any racketeering acts.

The general assertion that all Defendants "conspired to conduct or participate in . . . numerous acts of racketeering," Am. Compl. ¶118, is a mere "legal conclusion," which is plainly insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678.

Similarly, there are no allegations that connect any of the Movants to the alleged "pattern of racketeering activity." A complaint "must include an allegation of . . . at least two related predicate acts that amount to or pose a threat of continued criminal activity." *EE Mart FC, LLC*, 2012 WL 1331869, at *3 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). The only "acts" Movants are alleged to have committed include: (1) writing and publishing blog posts; (2) giving an interview on a national cable news network, (3) writing letters to public officials on matters of public concern, and (4) publishing a book. These are examples of constitutionally-protected speech—not predicate acts under RICO. And they certainly do not establish that Movants were associated with any "pattern" of racketeering activity. The Amended Complaint contains no well-pled factual allegations tying Movants to any of the "predicate acts"—mail fraud, wire fraud, obstruction of justice, retaliation of a witness and victim, extortion, or money laundering—upon which Kimberlin bases his RICO claim.[28] He has failed to state a RICO claim as a matter of law as to the Movants.

---

[28] Kimberlin also fails to properly plead any injury "to business or property," as required for a RICO violation. Ultimately, Kimberlin is really seeking relief for personal injuries, namely "injury to his name." Am. Compl. ¶152. However, "RICO is not available for the redress of purely personal injuries." *Hickman*, 2013 WL 2390869, at *1. And Kimberlin's conclusory allegations of having suffered injury to "property and businesses" and "pecuniary losses to real or personal property" are mere legal conclusions that are plainly insufficient to meet federal pleading standards. *See Iqbal*, 555 U.S. 678.

**E.**      **The Claim Under 42 U.S.C. § 1985 (Count III) Fails As A Matter of Law.**

Kimberlin attempts to allege violations of two different subsections of the Civil Rights Act of 1871, 42 U.S.C. § 1985(2) and § 1985(3), insisting that Defendants conspired "for the purpose of depriving Plaintiff of his constitutional and civil rights," including "his overarching right [to] be safe in his everyday activities." Am. Compl. ¶163. Kimberlin fails to differentiate between the two subsections or explain how either subsection applies to any Defendant. He offers only a one-page recitation of boilerplate allegations. Am. Compl. ¶¶161-67. Fatal to his claim, however, is his failure to include a fact-based allegation that the defendant was motivated by "some racial or perhaps otherwise class-based invidiously discriminatory animus." *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

"To plead a violation of § 1985, the plaintiffs must demonstrate with specific facts that the defendants were motivated by a specific class-based, invidiously discriminatory animus to . . . deprive the plaintiff[ ] of the equal enjoyment of rights secured by the law to all." *Francis v. Giancomelli*, 588 F.3d 186, 196-97 (4th Cir. 2009) (Internal quotation marks omitted); *see also Mills v. Meadows*, 1 F. Supp. 2d 548, 552 (D. Md. 1998) (similar). Because there is no allegation that Movants were motivated by racial or other class-based animus, the claim under § 1985(3) cannot stand. *Id.* (dismissing § 1985(3) claim where the case was "devoid of any allegation" of any racial or class-based discriminatory animus).[29]

Subsection 1985(2) contains two distinct clauses, neither of which is applicable to Movants. The first provides a cause of action against anyone who conspires to deter any person

---

[29] Although Kimberlin does not expressly allege that he was targeted because of his political ideologies, even if he were to make such an allegation, it could not give rise to a claim under § 1985(3). As the Fourth Circuit has recognized, political affiliation is not a "class" for purposes of the statute. *See Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 156, 163 (4th Cir. 1985) (concluding that "Republicans" did not constitute a protected class for purposes of § 1985(3)).

from appearing in federal court or who conspires to influence a jury's verdict. *See Sellner v. Panagoulis*, 565 F. Supp. 238, 245-46 (D. Md. 1982). Kimberlin makes no allegation that Movants deterred him, or anyone else, from appearing in court or that Movants attempted to influence any jury. The second clause provides a broader cause of action against anyone who conspires to deny any citizen the equal protection of the laws. *Id.* As with a § 1985(3) claim, however, this subsection requires the existence of invidious racial or other class-based animus on the defendant's part. *Id.* at 246 (noting that claim under § 1985(2) requires same showing of animus as § 1985(3) claim). Because Kimberlin fails to plead any factual allegations of invidious racial or other class-based animus against him, his claim under § 1985 must be dismissed. *See Francis*, 588 F.3d at 197 (affirming dismissal of § 1985 claim that amounted to "no more than a legal conclusion") (citing *Iqbal*).

## II.  KIMBERLIN'S CLAIMS SHOULD BE DISMISSED PURSUANT TO MARYLAND'S ANTI-SLAPP STATUTE.

When faced with a SLAPP suit, a court must dismiss the case "as soon as practicable." Md. Code Ann., Cts. & Jud. Proc. § 5-807(d)(1).[30] A lawsuit is a SLAPP if it is:

1. "Brought in bad faith against a party who has communicated with . . . the public at large . . . to report on, comment on . . . or in any other way exercise rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights regarding . . . any issue of public concern";

2. "Materially related to the defendant's communication"; and

---

[30]  In one of the few rulings addressing Maryland's anti-SLAPP statute, this Court has noted that the statute "describes a type of defense, such as privilege or immunity," and therefore can apply in federal proceedings. *See Russell v. Krowne*, Civ. A. No. DKC 2008-2468, 2010 WL 2765268, at *3 (D. Md. July 12, 2010). It is well-established by federal courts interpreting other state anti-SLAPP acts that the statutes constitute substantive law, not merely procedural rules, and thus can be used to dispose of state law claims being addressed in federal court. *See, e.g.*, *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999).

3. "Intended to inhibit or inhibits the exercise of rights under the First
Amendment…"

*Id.* § 5-807(b). The statute was amended in 2010 to immunize defendants from liability for

commentary on "any issue of public concern" where a suit is brought against them in bad faith.

A suit is brought "in bad faith" if it is filed "vexatiously, for the purpose of harassment or

unreasonable delay, or for other improper reasons." *Inlet Assoc. v. Harrison Inn Inlet, Inc.*, 596

A.2d 1049, 1056 (Md. 1991). The evidence that this suit was brought in bad faith is manifest

from the Amended Complaint itself, a shotgun-style pleading that indiscriminately hurls various,

unrelated claims against a slew of defendants without stating supporting facts or even identifying

which defendants are liable for which charges. The "vexatious" and "improper" allegations

include defamation claims that are plainly barred by the statute of limitations, a meritless fraud

claim that Kimberlin already has voluntarily dismissed, a RICO claim against journalists, news

websites, and a book publisher for whom the alleged racketeering acts involve exercise of their

First Amendment rights, and a claim under the Civil Rights Act of 1871, despite no allegation

whatsoever of any invidious racial or class based animus. This lawsuit is an obvious attempt to

bully commentators and "inhibit the exercise" of First Amendment rights.  It is a classic SLAPP.

It is also clear that the suit is "materially related" to Movants' communications to the

public on "issue[s] of public concern." To the extent Movants even mentioned Kimberlin, their

comments were made in connection with his political connections to progressive organizations

and his confrontations with conservative commentators. And to the extent any of the Movants

discussed the issue of swatting, they were commenting on a public controversy—one of such

grave importance that even the FBI has tried to raise public awareness of it.[31] *See Piscatelli,* 35

---

[31] *See, e.g.*, Federal Bureau of Investigation, *The Crime of 'Swatting'; Fake 9-1-1 Calls Have
Real Consequences* (Sept. 3, 2013), *available at*
http://www.fbi.gov/news/stories/2013/september/the-crime-of-swatting-fake-9-1-1-calls-have-

A.3d at 1152 (noting that the "occurrence or prosecution of crimes" constitutes an "obvious" example of a matter of legitimate public interest).

Under the Maryland Anti-SLAPP Statute, a defendant is "not civilly liable" for public communications, so long as the communication was made "without constitutional malice." Cts. & Jud. Proc. § 5-807(c). As discussed above, the Amended Complaint does not contain a single factual allegation supporting a finding that Movants made any of their communications with "constitutional" or "actual" malice. In sum, Kimberlin's lawsuit is nothing more than an attempt to stifle the constitutionally-protected speech rights of those with different political views, and it should be dismissed pursuant to Maryland's Anti-SLAPP Statute.

## III.   MOVANTS ARE ENTITLED TO THEIR COSTS AND ATTORNEYS' FEES.

Federal law provides for prevailing party attorneys' fees in civil rights actions, including those brought pursuant to 42 U.S.C. § 1985. *See* 42 U.S.C. § 1988(b). Prevailing defendants are allowed to recover attorneys' fees where the court finds that "plaintiff's claim was 'frivolous, unreasonable, or groundless,'" *Hutchinson v. Staton*, 994 F.2d 1076, 1080 (4th Cir. 1993) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)). A plaintiff may be liable for fees, even if he did not act with bad faith. *See id.* (The Supreme Court "made clear that a plaintiff need not have acted in bad faith in order to be liable for fees, although if he did, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense.") Attorneys' fees are appropriate here because Kimberlin's § 1985 claim as to Movants is clearly groundless.  *Cf. Patton v. County of Kings*, 857 F.2d 1379, 1381-82 (9th Cir. 1988) (finding

---

real-consequences/the-crime-of-swatting-fake-9-1-1-calls-have-real-consequences [last accessed on February 3, 2014.]; Federal Bureau of Investigation, *Don't Make the Call: The New Phenomenon of "Swatting,"* (Feb. 4, 2008), *available at* http://www.fbi.gov/news/stories/2008/february/swatting020408 [last accessed on February 3, 2014.]

plaintiff's defamation action brought under 42 U.S.C. § 1983 was sufficiently "groundless" to support award of attorneys' fees where plaintiff did not show damage to a "tangible interest" beyond mere harm to reputation, as required by controlling case law).[32]

## CONCLUSION

For the foregoing reasons, Movants respectfully request that this Court dismiss all counts of the Amended Complaint against them, award Movants their reasonable attorneys' fees and costs incurred in defending against Kimberlin's meritless claims, and grant any other such relief as the Court deems proper.

Dated: February 21, 2014

Respectfully submitted,

BAKER & HOSTETLER LLP

By:_____*/s/ Mark I. Bailen*_____
     Mark I. Bailen (13805)
     Washington Square, Suite 1100
     1050 Connecticut Avenue, N.W.
     Washington, DC 20036
     Tel:202-861-1500
     Fax:202-861-1783
     mbailen@bakerlaw.com

*Counsel for Defendants RedState, Erick Erickson, Simon & Schuster, and James O'Keefe.*

---

[32] Attorneys' fees would also be proper under the Court's inherent power to sanction those who litigate "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Moreno v. PF Hurley, Inc.*, Civ. No. RWT-07-1515, 2009 WL 3208324, at *2 (D. Md. Sept. 29, 2009) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). Kimberlin's claims against Movants are sufficiently meritless to suggest bad-faith or vexatious conduct, justifying an award of attorneys' fees as a sanction. *Cf. Byrd v. Hopson*, 108 Fed. App'x 749 (4th Cir. 2004) (per curiam) (affirming award of attorneys' fees against plaintiff pursuant to, *inter alia*, trial court's inherent power and 42 U.S.C. § 1988(b) in conjunction with dismissal of plaintiff's "baseless" claims, which alleged a "wide-ranging conspiracy against her" that was guilty of civil rights violations, RICO violations, and state law claims, some of which were barred by the statute of limitations).

Benjamin D. Light
Callagy Law, LLC
Mack-Cali Center II
650 From Road - Suite 565
Paramus, New Jersey 07652
Telephone: (201) 261-1700 x 117
blight@callagylaw.com

*Counsel to Defendant James O'Keefe*