UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2014 DEC -8  PM 3: 08

CLERK'S OFFICE
AT GREENBELT

BY ___*l*___ DEPUTY

BRETT KIMBERLIN,
Plaintiff,

v.                                                    No. GJH 13 3059

NATIONAL BLOGGERS CLUB, et al
Defendants.

### PLAINTIFF'S RESPONSE TO MOTIONS TO DISMISS BY DEFENDANTS AARON WALKER, WILLIAM HOGE, BREITBART HOLDINGS, DAN BACKER, DB CAPITOL STRATEGIES, PATRICK FREY, MANDY NAGY, MICHELLE MALKIN, TWITCHY, GLENN BECK, MERCURY RADIO ARTS, ACE OF SPADES, ERICK ERICKSON, REDSTATE, AND THE BLAZE

1.       Now comes Plaintiff and responds in opposition to the Motions to Dismiss filed by Defendants Aaron Walker, William Hoge, Breitbart.com/Holdings, Dan Backer, DB Capitol Strategies, Ace of Spades, Patrick Frey, Mandy Nagy, Michelle Malkin, Twitchy, Glenn Beck, Mercury Radio Arts, RedState, Erick Erickson, and The Blaze. Defendants Robert McCain, Ali Akbar, Lee Stranahan and National Bloggers Club have failed to file responses within the time set for by the Rules, and are therefore in default. Plaintiff has resolved this case with regard to five Defendants: American Spectator, The Franklin Center, Lynn Thomas, Simon & Schuster and James O'Keefe, and moved to dismiss them from the case.

The Court must deny the Motions to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure because Plaintiff can prove a "set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, (1957). "The question is whether in the light most favorable to the Plaintiff, and with every doubt resolved in his behalf, the Complaint states any valid claim for relief." 5A Wright &

Miller, Federal Practice and Procedure: Civil 2d § 1357, at 336. The Court, when deciding a motion to dismiss, must consider well-pled allegations in a complaint as true and must construe those allegations in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The Court must further disregard the contrary allegations of the opposing party. *Lujan v. National Wildlife Federation,* 497 U.S. 871 (l990) ("a complaint should not be dismissed for insufficiency *unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.*") (emphasis added). The office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence in support.

2.   None of the Defendants has presented a single meritorious legal argument or shred of evidence to counter the factual allegations and facts set forth in the SAC, and none has demonstrated that Plaintiff, as the Defendants stated and imputed, was involved with swattings in any way, shape or form.  Because there is no truth to their defamatory statements, they instead ask the Court to dismiss this case for many technical reasons, such as: 1) the three year statute of limitations should not apply to the false light claim, 2) defamation and false light cannot apply to Plaintiff because he is a public figure and 3) defamation proof, 4) the Defendants did not engage in a RICO enterprise, 5) the First Amendment allows fair comment, 6) Defendant Frey did not act under color of law, and 7) the SAC violates Maryland Anti-SLAPP statute.   Each of these and other arguments are without merit and belied by the facts and law.

3.   The Defendants' overarching response throughout their briefs is that they were merely engaging in First Amendment activity by writing, opining, commenting

and speaking about Plaintiff and his past.  If that were all that they did, they might have a colorable First Amendment argument.  However, that is not what they did. Instead, as alleged in the SAC, they infused tortious and criminal conduct in with their speech, which included stalking, harassment, fraud, extortion, obstruction of justice, intimidation, defamation, false light, battery, money laundering and interference with business relations.  They created a fraudulent 501c3 and websites and campaigns to further their criminal and tortious conduct.  They engaged in a relentless, multi-year barrage of defamatory posts and tweets directed at Plaintiff, his family, his daughters, his employer, judges, States Attorneys and reporters and others who did not accept their false narratives.  They filed malicious and vexatious lawsuits against Plaintiff that they then used to generate defamatory statements against Plaintiff as if they were true simply because they came from a legal filing.  They defrauded over $100,000 from innocent victims that they then used to finance their criminal activities.  They lied to FBI agents, the media and Members of Congress in order to use them to target Plaintiff.  They incited scores of threats against Plaintiff and his employer. Defendant Walker assaulted Plaintiff in the Montgomery Circuit Courthouse in order to intimidate and retaliate against him for exercising his rights.  This partial list of conduct outside of their First Amendment activity continued over a period of years and continues to this day.

   4.   The Supreme Court has made clear that where illegal or tortious conduct is intertwined with other First Amendment activity, the First Amendment protection is lost. See *United States v. Stevens*, 559 U.S. 460, 468 (2010); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

Although the union was engaged in peaceful picketing that "publicize[d] truthful facts about a labor dispute"—speech which, standing on its own, would have been fully protected under the First Amendment—the Court held that the union's speech could not be "treated in isolation." Id. at 498. The union's speech lost whatever First Amendment protection it might otherwise have enjoyed, the Court concluded, because it was "used as an integral part of conduct in violation of a valid criminal statute," and its "sole immediate object" was to facilitate the union's commission of that offense. Id. That the union's unlawful course of conduct "was in part initiated, evidenced, or carried out by means of language" mattered not for First Amendment purposes. Id. at 502. [*Giboney*, quoted from *United States v. Osinger*, June 4, 2014, 9th Cir. Concurring opinion by Judge Paul Watford]

In the instant case, the Defendants want this Court to consider their "speech" in isolation from their tortious and criminal conduct.1/ Fortunately, the Supreme Court and all the lower courts, including the Forth Circuit, reject this approach.  In a very instructive case, *Rice v. Paladin Enterprises, Inc.*, 128 F. 3d 233 (4th Cir. 1997), the court found civil liability against a media organization that published a book on how to commit a crime:

At the same time, it would not relieve from liability those who would, for profit or other motive, intentionally assist and encourage crime and then shamelessly seek refuge in the sanctuary of the First Amendment. Like our sister circuits, at the very least where a speaker — individual or media — acts with the purpose of assisting in the commission of crime, we do not believe that the First Amendment insulates that speaker from responsibility for his actions simply because he may have disseminated his message to a wide audience. [at 248]

---

1/During the December 1, 2014 oral argument before the Supreme Court in *Elonis v. United States*, an Internet defamation case, the defendant, like the defendants here, argued that he did not violate the statute because he was simply expressing his views under the First Amendment and that he had included a disclaimer in many of the statements.  This argument did not go over well with Justice Samuel Alito who commented, "This sounds like a road map for threatening a spouse and getting away with it. So you put it in a rhyme...and you say I'm an aspiring rap artist and so then you are free from prosecution."

## Factual Statement

5.   Plaintiff hereby adopts the factual statement and allegations made in his SAC, which of course, must be consider as true for the purposes of this motion.

6.   For the past ten years, Plaintiff has been the Director of a Maryland based non-profit called Justice Through Music that works with musicians and artists to inspire young people to get involved with civic participation and voting.  In 2010, far right extremists from the Tea Party took umbrage at Plaintiff's work and began investigating him personally, eventually learning that he had been convicted of a series of crimes during his youth.  In October 2010, Andrew Breitbart, the (now deceased) founder of the influential far right Defendant Breitbart.com blog gave an order on Twitter to a number of his soldiers, including Defendants Patrick Frey, Mandy Nagy and Lee Stranahan to target Plaintiff.

7.   A few days later, Defendants Nagy on Breitbart.com and Frey on his own Patterico blog wrote simultaneous articles defaming Plaintiff as a terrorist and a scoundrel.  At the time, Defendant Walker was writing for Defendant Frey on his Patterico blog using a pseudonym, Aaron Worthing.  Walker was also publishing a Muslim hate blog called "Everyone Draw Mohammed," which included more than 800 vile and pornographic depictions of the Prophet Mohammed.

8.   Another obsessive person from South Easton, Massachusetts named Seth Allen was also defaming Plaintiff online and so Plaintiff sued him in Montgomery County Circuit Court in 2010, eventually winning a defamation judgment in November 2011.  In August of 2011, Mr. Allen wrote an email to Andrew Breitbart, Aaron Walker, Mandy Nagy and Patrick Frey telling them that he was going to come to Maryland and

"MURDER" Plaintiff. Defendant Nagy called the police, and the police called Plaintiff while he was on a family vacation to warn him about the planned assassination. When Plaintiff returned to Maryland, he filed charges against Mr. Allen along with a Peace Order, and Mr. Allen was arrested and ordered to stay away from Plaintiff.

9. After the civil defamation judgment was issued against Mr. Allen in November 2011, Defendant Walker, still using his pseudonym, told Mr. Allen that he would represent him in post judgment proceedings using his alter ego, Aaron Worthing. He then prepared and filed pleadings in the state case demanding a new trial. After Plaintiff could not locate any attorney named Aaron Worthing, he learned that Mr. Worthing was actually Defendant Aaron Walker, and he advised the Montgomery County Circuit Court of that fact at a hearing on January 9, 2012. Defendant Walker came uninvited to that hearing, repeatedly interrupted it from the gallery, and then followed Plaintiff out into the court waiting area, committed a brutal battery against him, and took his iPad from him. Court personnel called courthouse security and deputies converged on the scene. They determined that Defendant Walker had attacked Plaintiff and took Plaintiff's iPad. They retrieved the iPad and advised Plaintiff to file charges and seek medical help. Plaintiff proceeded to a nearby emergency clinic, where the doctor immediately ordered Plaintiff to go to the Emergency Room at Suburban Hospital because of symptoms of a possible concussion. Plaintiff did so and was treated by doctors at the hospital, given medications, and ordered to stay home from work for the remainder of the week. Plaintiff was diagnosed with a contusion of the eye, headache and back pain.

10. Once Defendant Walker was identified in state court, he chose to tell his employer that he was in fact the publisher of the Muslim hate blog and that this could cause harm to his employer and its employees if they did not take security precautions. The employer, Professional Healthcare Resources, immediately searched Defendant Walker's office and found it filled with documents and depictions insulting the Prophet Mohammed. As a result, the employer hired outside counsel who promptly fired Defendant Walker and stated the reasons for doing so in a long email, none of which had anything to do with Plaintiff. Exhibit 1.

11. Defendant Walker then, in consultation with Defendants Frey and others, created the false narrative that Plaintiff caused his termination. Defendant Walker then contacted other Defendants, including Defendant Ali Akbar who had just launched a new entity called The National Bloggers Club ("NBC") to pool the power of extremist bloggers to target Plaintiff with this false narrative. Defendant Akbar began falsely telling everyone publicly that NBC was a 501c3 non-profit that could accept tax-deductible donations. Exhibit 2. Over the next two years, NBC fraudulently raised tens of thousands of dollars from unsuspecting victims who believed that NBC was a 501c3 non-profit and that Plaintiff was a swatter who caused Defendant Walker's termination. In fact, NBC did not have 501c3 status during 2012 or 2013.

12. In March of 2012, Defendants Akbar, Walker and others conspired to use the fraudulent NBC to direct a campaign of destruction against Plaintiff. They created false narratives, such as that Plaintiff got Defendant Walker fired and committed swattings against conservative bloggers, to rile up the extremist far right base. They launched a campaign conceived by Defendant Lee Stranahan called "Everyone Blog

About Brett Kimberlin" that generated tens of thousands of tweets and blog posts falsely accusing Plaintiff of terrorism, swattings, attacks on conservatives, perjury and many other heinous crimes. All the while, Defendants raised large amounts of money from American citizens who believed their falsehoods.

13. These false narratives rose to such a crescendo that NBC and other Defendants were able to con 87 Congress Members and a number of Senators to write to the Attorney General demanding a criminal investigation of the swattings (i.e., Plaintiff). The Attorney General was even questioned at a hearing before Congress on what was being done to prosecute the swatter. As a result, the FBI questioned both Plaintiff and his wife.

14. Defendant Malkin, as a board member of NBC, was instrumental in multiplying the false narratives put out by NBC. She owned a Twitter amplification service called Twitchy, (also a Defendant), that she used to promote the false narratives to over a half million of her online followers.

15. Defendant Frey, an Assistant Los Angeles District Attorney, used his official position to give credibility to the false narratives. He initiated criminal investigations against Plaintiff by his own office and attempted to convince the FBI to arrest Plaintiff for the swattings. Exhibit 3. He wrote numerous emails to Defendant Walker and others stating that he was going to have Plaintiff arrested and sent to prison. In fact, he even proposed an FBI "sting" operation to arrest Plaintiff.

16. In order to propel these false narratives to an even greater audience, several of the Defendants in 2012 enlisted the help of three well-known far right media personalities – media mogul Glenn Beck, blogger and CNN commentator Eric

Erickson, and top conservative blogger Ace of Spades. These three joined the conspiracy by spreading the false narratives on their blogs, calling for Plaintiff's arrest and a bill of attainder against him, and spreading the swatting narrative to a national audience of millions. Glenn Beck even had Defendants Frey and Walker on his television/radio programs under the control of Defendant Mercury Radio Arts, alleging that Plaintiff was involved in the swattings. Defendant The Blaze, owned by Defendant Beck, published several articles defaming Plaintiff as a swatter. He also attacked Plaintiff's employer with these false narratives. Exhibit 4.

17. These same Defendants then enlisted the credibility of the Franklin Center, which portrays itself as a good government advocacy organization with a conservative slant. The Center obliged by putting out a press release stating that it was going to conduct a "webinar" to discuss Plaintiff's swattings and his one hundred lawsuits against conservative bloggers. It then held that webinar and had Defendants Stranahan, Walker and Frey speak to listeners and repeat these false allegations. (NOTE: Franklin Center has resolved this case with Plaintiff).

18. Not content to stop there, these Defendants then sought help from attorney Dan Baker and his law firm DB Capitol Strategies ("DBCS") to sue Plaintiff on behalf of Defendant Walker. Mr. Backer represented Defendant Walker in three suits, two in federal court and one in Virginia Circuit Court, alleging a host of false, meritless and malicious allegations/crimes. Defendants Walker, Backer and DBCS tried to use the suits to harass and intimidate Plaintiff, retaliate against him for exercising his right to redress, and harm him, his employer and his livelihood. The federal and state courts, two in scathing orders, dismissed all three suits. *See e.g.*, Exhibit 15.

19. In June 2012, conservatives and the media began demanding that Defendants Akbar and NBC present proof that NBC was a legitimate 501c3. When none was forthcoming, legitimate media outlets learned that Defendant Akbar himself was a convicted felon who was on probation from the State of Texas for theft and fraud at the time he launched NBC. This caused some victims of his fraud to demand their money back. Soon thereafter, Defendants Backer and DBCS took over the fundraising activities around the false narratives about Plaintiff. Defendants Backer and DBCS posted false information on their associated websites falsely accusing Plaintiff of swattings and other defamatory information, and they raised huge sums of money based on those false narratives and malicious lawsuits. Exhibit 5.

20. As a result of the conduct of the Defendants, Plaintiff has suffered emotional and economic harm. His emotional harm has been exacerbated by the harm done to his family from the bullying, harassment and threats caused by Defendants. Some of the Defendants and stalkers incited by the Defendants have come to Plaintiff's home, called his neighbors, harassed Plaintiff's daughter and wife, sent many death threats to Plaintiff, and caused his employer to lose institutional funding.

21. All told, Defendants generated literally tens of thousands of defamatory tweets, blog posts and articles based on their false narratives about Plaintiff over a period of years. Not a day goes by without one or more of the obsessive Defendants posting or tweeting negative, derogatory, defamatory, condescending and bullying content directed at Plaintiff. Together they have raised more than $100,000 based on these false narratives. They lied about Plaintiff to Members of Congress, the FBI, the media, and millions of readers, and defrauded money from countless victims of their crimes

and conduct.  These used the false narratives to raise their Google and search engine rankings and to drive traffic to their websites.

22. Incredibly, even after being sued and told that Plaintiff had nothing to do with Defendant Walker's termination and nothing to do with any swattings, the Defendants remaining in this case are trying to con(vince) this Court that the First Amendment protects their right to make their defamatory statements and defraud large amounts of money from fellow conservatives.  They are insulting the Court by arguing that the First Amendment gives them the right to say whatever they want about Plaintiff because he was convicted of a crime 35 years ago.  They are continuing in this very Court to perpetrate their fraud and defamatory statements, (and violate the Management Order) by engaging in ad hominem attacks such as falsely calling Plaintiff a terrorist, habitual criminal, vexatious litigant, and a person who won't pay a judgment (that does not exist).  Many of the Defendants, including Walker, Hoge, McCain, NBC, and Akbar, are continuing to raise money from gullible victims to supposedly protect them from Plaintiff, who they still to this day falsely call a swatter who caused Defendant Walker's termination.

23. Defendants attempt to mislead the Court by singling out Plaintiff as someone involved with "lawfare" who is picking on conservative bloggers for partisan purposes.  The Defendants fail to tell the Court that many of the Defendants have other suits pending against them for similar conduct in federal and state courts throughout the country.  For example, Shirley Sherrod is suing Defendant Breitbart Holdings and its employees for creating a false narrative about her that caused her to be fired from the Department of Agriculture.  Defendant Beck and his media entities

are being sued in several cases, one by a Muslim man named Abdulrahman Alharbi

who Beck called a "terrorist" and falsely accused of funding the Boston Marathon

bombers.  A federal judge on December 1, 2014, denied Defendant Beck's Motion to

Dismiss, which raised grounds similar to those he raised in the instant case, Exhibit 6.

Defendant Frey is being sued by a black female Harvard student named Nadia Naffe

after he published private information about her online and then defamed her

because she reported a sexual assault by (ex)-Defendant James O'Keefe. And O'Keefe,

has been sued many times in federal and state court.  Clearly, it is not lawfare to use

the courts, legal remedies and the First Amendment right to hold serial defamers and

bullies responsible for committing intentional torts and even crimes on a wholesale

basis.

24. However, legitimate reporters *do* follow ethical rules that none of the

Defendants in this case followed, for example, seeking comment from their subject,

publishing factual information and not engaging in personal attacks. Exhibit 7. 2/

---

2/ The Defendants in this case did not merely write about Plaintiff, as would a legitimate
reporter for the New York Times.  Instead, they engaged in defamation plus conduct, actively
using their false narratives to harm Plaintiff.  Legitimate reporters do not commit battery
against their subjects, or make up falsehoods about subjects that they tell to the FBI and
Congress, or file malicious suits against them, or create fraudulent 501c3s and campaigns to
incite a lynch mob, or conspire with others to falsely accuse them of crimes, or file motions to
dismiss attempting to mislead the court by sanitizing their conduct and demonizing their
opponent. The Defendants remaining in this case and their attorneys, rather than admitting
that Plaintiff had nothing to do with any swattings, are misleading the Court with their
Motions to Dismiss.  It is truly shameful and far beneath what is expected of well-respected
attorneys such as Ron Coleman, Michael Smith, Mark Bailen, and Eleanor Lackman.  They
know that their clients engaged in wholesale defamation plus abhorrent conduct meant to
destroy Plaintiff, which are indefensible, yet they threw all their ethical obligations to the
wind and personally attacked Plaintiff with even more defamation along with frivolous
arguments.

**Maryland's Three-Year Statute of Limitations Applies To The False Light Claim**

25. Numerous Defendants have argued that Plaintiff's false light claims are barred

by the statute of limitations, which they assert is one year, the same as defamation.

Defendants cite *Smith v. Esquire*, 494 F. Supp. 967 (D. Md. 1980), in support of their

argument. This is without merit.

26. In 1988, Maryland's highest Court rejected the reasoning of *Smith* in *Allen v.*

*Bethlehem Steel Corp.*, 314 Md. 458 (1988):

> We disagree with *Smith*. What the district court judge said in *Smith* may be
> true, but the Maryland statute of limitations is vividly clear. An action for libel
> and slander shall be filed within one year of the date it accrues. Courts Art. § 5-
> 105. Other tort actions shall be filed within three years of the date they accrue.
> Courts Art. § 5-101. Nowhere in § 5-101 does it provide an exception for "false
> light" cases. Even though we recognize the district court judge's view as to how
> the statute of limitations will be avoided, that "loophole" must be plugged by
> the Legislature.

In determining statutes of limitations, this Court is required to follow

interpretations of law by Maryland's appellate courts, especially where that Court

rejects a federal district court decision as it did above. Clearly, Maryland general

three-year statute of limitations applies to the tort of False Light Invasion of Privacy

Claims.

### Plaintiff Properly Pled A RICO Enterprise By The Named Defendants

27. The Racketeer Influenced and Corrupt Organizations Act ("RICO") was enacted

in 1970 with the goal of eliminating the infiltration of organized crime into legitimate

organizations. *See Benard v. Hoff,* 727 F. Supp. 211, 213 (D.Md.1989); *see*

*also International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987)(stating

that Congress intended "that RICO serve as a weapon against ongoing unlawful

activities whose scope and persistence pose a special threat to social well-being."). In the instant case, the named Defendants engaged in ongoing unlawful activities against Plaintiff that posed a threat to the social well-being.

28. The Defendants argue that Plaintiff has failed to allege a proper violation of RICO. This is without merit and attempts to sanitize the many predicate acts committed by those in the Enterprise, such as fraud, obstruction of justice, battery and extortion.

### Plaintiff Properly Alleged the Existence of a RICO Enterprise

29. Plaintiff has alleged in the Complaint that the National Bloggers Club is a fraudulent Enterprise because for more than two years it falsely portrayed itself as a 501(c)(3) non-profit when it was not.  It raised huge sums of money based on that fraudulent representation and it used false accusations of criminal activity by Plaintiff to fleece people out of money to run its fraudulent, criminal activities.  It engaged in wire and mail fraud, as well as money laundering.

30. Most of the Defendants are members of, paid by, conspirators with, or otherwise involved with the National Bloggers Club in some fashion. Defendant and felon Ali Akbar is the boss, Patrick Frey is the consigliore, Dan Backer and DB Capitol Strategies is the legal muscle, Michelle Malkin is the activist board member, and various other Defendants are the lynch mob, taking orders from Defendants Akbar and Frey to harass Plaintiff through various means such as physical assault, stalking, malicious legal filings, and false allegations online.

31. Most of the Defendants have been or are involved with a common scheme to harm Plaintiff with false narratives of crimes in order to raise funds, increase their

ranking on Internet search engines, and incite their readers to act in some harmful way against Plaintiff and his employer.

32. The Defendants have conspired with one another in their common purpose through a course of conduct, which has lasted for more than two years, involving scores of criminal predicate acts and intent to violate the laws of the United States and the rights of Plaintiff.   The SAC sets forth in great detail that the Defendants have both a formal and informal framework, with daily and sometimes hourly contact through various networks, mainly through the Internet, for carrying out their objectives.  The Defendants function as a continuing unit to achieve the common purpose of harming Plaintiff in any way possible.  This clearly satisfies the RICO Enterprise requirement. *Boyle v. United States*, 556 U.S. 938 (2009).

33. 18 U.S.C. § 1961(1) defines "racketeering activity" to include "any act or threat involving ... extortion ... [or] any act which is indictable under any of the following provisions of Title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)...." The SAC clearly alleges more than two acts in furtherance of the conspiracy that may be in violation of the mail and wire fraud statutes. Additionally, the SAC alleges acts of extortion and money laundering which are "acts" included in the definition of "racketeering activity." The SAC alleges other predicate acts including obstruction acts.  These acts were done in order to injure Plaintiff, his property, his livelihood and his employer.

34. In order for a plaintiff to have standing to bring a RICO claim, he must allege an "injury in his business or property" by reason of a violation of RICO. 18 U.S.C. § 1964(c).  In *Wang Laboratories v. Burt*, 612 F.Supp. 441 (1984), this Court found that

"Wang's allegations of injury to its business reputation and customer goodwill in addition to its loss of revenues satisfied the injury requirement of 18 U.S.C. § 1964(c)." *See Kimmel v. Peterson,* 565 F.Supp. 476, 495 (E.D.PA 1983) (Plaintiff's allegations of monetary losses as a result of defendant's fraud sufficiently allege "injury" under 18 U.S.C.§1964(c)). *Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 248 (S.D.N.Y. 1981) (the corporation was injured for purposes of RICO if, as alleged, it sustained monetary damages).

35. Defendants joined the Enterprise and committed predicate acts in order to cause maximum harm to Plaintiff, his livelihood, his property, and his employer.  In fact, one their main goals of the Defendant's RICO Enterprise was to drive Plaintiff out of business and intimidate him from exercising his First Amendment right to redress. In *Northeast Women's Health Center v. McMonagle*, 868 F.2d 1342 (3rd Cir. 1989), the Court addressed a similar fact situation where activists used threats, intimidation, violence and extortion in an attempt to drive a health clinic out of business.

> The "right" on which the Center's case was predicated was the right to continue to operate its business. The Center's extortion claim was that Defendants used force, threats of force, fear and violence in their efforts to force the Center out of business. The court told the jury that, "[s]pecifically, defendants are charged with attempting and conspiring to extort from the Center its property interest in continuing to provide abortion services[;] from its employees, their property interest in continuing their employment with the Center[;] and from patients, their property interest in entering into a contractual relationship with the Center."
> Rights involving the conduct of business are property rights. As we pointed out in *United States v. Local 560*, 780 F.2d 267, 281 (3d Cir. 1985), ... other circuits which have considered this question are unanimous in extending the Hobbs Act to protect intangible, as well as tangible, property. *(Citations omitted).* It is, of course, no defense to extortion that Defendants did not succeed in their ultimate goal, although, as McMonagle's own letter admitted, Defendants' activities did contribute to the Center's loss of its lease at the Roosevelt Boulevard location. ... Attempted extortion and conspiracy to commit extortion are crimes under the Hobbs Act, *see* 18 U.S.C. § 1951(a), and

"any act which is indictable under [the Hobbs Act]" is a predicate offense under RICO. 18 U.S.C. § 1961(1)(B).

36. Plaintiff had a "property interest" in continuing his employment as the director of a non-profit that he has worked at for ten years.  He had a "property interest" in being able to raise funds for that business to pay his salary and the other salaries and expenses of the business.  Yet, Defendants conspired with each other, and attempted and engaged in conduct intended to deprive Plaintiff of those property interests. Many of the Defendants such as Beck, Frey, Hoge, Walker, Ace of Spades, and McCain have stated many times that they want to destroy the non-profits by stopping their funding, hurting their business reputation, customer good will, getting Plaintiff fired, and they urged others to demand the same.

37. Defendants Walker, Backer and DBCS participated in this RICO Enterprise by obstructing justice by filing pleadings in three patently frivolous and *malicious* lawsuits in two different jurisdictions to intimidate Plaintiff from seeking redress and retaliate against him for exercising that right.  In fact, the second federal lawsuit specifically asked the Court to prohibit Plaintiff from filing any pleadings without first seeking approval from a federal administrative law judge.  And that federal lawsuit included as defendants two non-profits (with which Plaintiff is involved) solely for the purpose of causing economic harm to them, and to use the suit to extort them into firing Plaintiff in exchange for dismissing them from the lawsuit.  These malicious lawsuits were not filed to redress any wrong but rather to harass, intimidate and extort.

38. And when counsel for the non-profits rejected that attempted extortion by Defendants Walker, Backer and DBCS, they retaliated by sending a highly defamatory

document hold letter to the non-profits' largest institutional funder falsely stating that Plaintiff and the non-profits were engaged in *criminal* conduct. Exhibit 8.  Although that funder had provided grants of more than $300,000 during its multi-year relationship with Plaintiff and the non-profits, the defamatory document hold letter caused that institutional funder to cease its relationship with Plaintiff and the non-profits thereby depriving them of substantial future funding. See affidavit of Plaintiff, Exhibit 7.

39. The conduct of Defendants also violates 18 USC 1513(e) because it was meant to retaliate against Plaintiff for providing information to state and federal law enforcement about the illegal conduct of the Defendants. Indeed, both Defendants Walker and Frey complained bitterly that Plaintiff was "fucking" with them, Exhibit 3, when all Plaintiff did was provide information to law enforcement officials and the Courts about their illegal and unethical conduct. Section 1513(e) provides as follows:

> **(e)** Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, *including interference with the lawful employment or livelihood of any person,* for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both. (emphasis added).

40. Defendants are correct that "RICO is concerned about eradicating organized, long-term, habitual criminal activity….." And that is precisely why Plaintiff filed this RICO Complaint—The National Bloggers Club is an organized, long-term, habitual criminal enterprise that has been engaged in massive mail fraud, wire fraud and money laundering for more than two years.  It is not an "ordinary commercial" operation but rather an enterprise created and/or joined by the various Defendants in order to defraud, extort and harm people, including Plaintiff.  This case does not

involve "ordinary business contract or fraud disputes" but rather massive, extended, widespread and intentional ongoing fraud directed by a felon convicted of fraud, and joined by the other Defendants, and given credibility and gravitas by Defendant Malkin who joined its Board and signed off on the fraud. The pattern of racketeering was and is dangerous because the Enterprise created and creates false narratives and then tells unsuspecting victims to donate to a fake 501(c)(3) in order to protect them from the supposed harm portrayed in the false narratives.

41. Defendants argue that Plaintiff has alleged nothing but "routine" activities by the Defendants that do not rise to the level of RICO. To the contrary, one would be hard pressed to find another instance in recent history where an online mob engaged in a multi-year defamation campaign which falsely accused a person of a horrible crime combined with continued criminal activity and massive fraud of thousands of victims. That is what happened in this case.

42. Defendants argue that Plaintiff has not alleged harm to his business or property. However, Plaintiff has alleged that his business and property interests were harmed. Indeed, he has alleged that Defendants attempted to get him fired from his employment, and tried to destroy his employer and its funding. It is well established a RICO claim is properly pleaded where the Defendants conspired to deprive a person of his livelihood and his liberty, as Plaintiff has alleged in the instant case. The Ninth Circuit, in an *en banc* decision, analyzed the RICO statute and found that where a Plaintiff alleges "any property interest valid under state law," he meets the business and property requirement of RICO. *Diaz v. Gates*, 420 F3d 897 (en banc) (9th Cir. 2005). The SAC includes two state law claims alleging harm to Plaintiff's business

relations. The tort of interference with contract is well established under Maryland law and it includes "maliciously or wrongfully infring[ing] upon an economic relationship." *Macklin v. Logan*, 639 A. 2d 112 (1994). *See also K&K Management Inc. v Lee*, 557 A.2d 965 (Md. 1989) (there are two general types of actions for interference with business relationships including "inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract.").

43. But a business does not have to be a formal business. Plaintiff's business is not simply as an employee of Justice Through Music, but he is also in the music business as a composer, producer, and activist. Plaintiff has composed songs and produced videos to promote several award winning documentaries, including "The Devil Came on Horseback," "Countdown to Zero," and "Gasland." The conduct of the Defendants has harmed this "business" too by attacking his reputation so that he cannot work in this arena any longer. Exhibit 7.

44. Defendants Hoge and Walker assert that the obstruction of justice claims cannot be predicate acts because there was no "official proceeding" pending involving Plaintiff. However, there were official proceedings as well as federal involvement. First, the swattings occurred across state lines, which therefore brought them under the jurisdiction of federal law enforcement. Second, the FBI was investigating the swattings and in fact came unannounced to Plaintiff's home to interview him about the swattings. Third, 87 Congress Members and at least one US Senator wrote letters to the Attorney General requesting a federal criminal investigation. And fourth, Congress Members raised the issue of swatting on the floor of the House on at least

one occasion and questioned Attorney General Holder at a congressional hearing. Therefore, the Defendants' actions are also prohibited by 18 USC 1512(b), which includes engaging "in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding, which includes "a proceeding before Congress." They also violated section 1512(d) by harassing Plaintiff for years so he would not seek redress in federal courts or talk to federal law enforcement officials.

45. The Defendants falsely told the FBI, Senators and Congress Members that Plaintiff was involved with the swattings and then intimidated Plaintiff by engaging in conduct that resulted in him being repeatedly threatened not to appear in court or talk to law enforcement officials. *See e.g.,* Exhibits 9 and 11. They sued, harassed, stalked, threatened him with prison and job loss, and caused death threats against him for seeking redress. Defendant Walker assaulted him in the *Montgomery County Circuit Courthouse* so severely that he had to go to the Emergency Room at Suburban Hospital, where he was treated and given medication for contusion to the eye, pain and dizziness. And when Plaintiff contacted the police about the assault, Defendant Walker created the false narratives and launched the National Bloggers Campaign against Plaintiff in retaliation for seeking redress and the administration of justice. All of this constitutes obstruction of justice and retaliation under the "Omnibus Clause" of 18 USC 1503, which states:

> Whoever ... *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice,* shall be fined not more than $5,000 or imprisoned not more than five years, or both." (emphasis added).

46. The Defendants also engaged in a conspiracy to threaten, assault and intimidate Plaintiff and therefore their conduct is prohibited by 18 USC 1512(k).

47. Respondent superior is applicable to hold a corporation liable for RICO violations of its employees. *Mylan Labs v. Akzo*, 770 E. Supp. 1053, 1070 (D. Md. 1991) ("Thus, a corporation or partnership can be held liable under RICO for the acts of its agents and/or representatives committed within the scope of their authority."). In the instant case, Defendant DBCS is controlled and represented by Defendant Backer and therefore DBCS is responsible for his acts.

48. Moreover, this Court has held that law firms can be held liable under RICO where, as here, "the professional services provided strike at the very core of the enterprise and therefore the lawyer or accountant providing the services is managing or operating the firm." *Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 554 (D. Md. 1998).

49. In addition, the Enterprise engaged in fraud and money laundering because it solicited and received tens of thousands of dollars from unsuspecting citizens based on the fraudulent representation that Defendant National Bloggers Club was a 501c3 non-profit. Defendants knew of this fraud and in fact Defendants Backer and DBCS took over the fundraising activities after Defendant Akbar was exposed as a felon and Defendant National Bloggers Club was exposed for never even filing for 501c3 status or any 990 IRS returns or other required business filings. When DBCS took over the fundraising, it continued the false narrative that Plaintiff was a swatter engaged in "lawfare" against conservative bloggers. And then, after the three lawsuits were summarily dismissed by Judge Potter and Judge Motz, Defendants Walker, DBCS and Backer continued with their false narratives and their misleading fundraising by not

only failing to update their website to reflect both of the dismissals, but by actually refusing to correct them and telling Plaintiff not to contact them when Plaintiff requested the corrections. They used this income from a pattern of racketeering to continue their racketeering activities.

50. Incredibly, several of the Defendants now ask this Court to grant the very relief denied by Judge Motz when he dismissed Defendant Walkers malicious lawsuit: "An Order for injunctive relief to enjoin Plaintiff Brett Kimberlin from initiating any further frivolous and meretricious litigation without the prior approval by a court appointed master or the posting of a bond in accordance with such order to be paid as fees for the dismissal of such claims."   Not only did Judge Motz rule that he had no authority to grant such relief, but such relief is barred here by res judicata with regard to Defendant Walker.  This request is so patently without merit that it does not even warrant a response, and clearly it is included in the Defendants' motions in order to continue their intimidation and obstruction of justice.

51. Clearly, from the above, the Enterprise and acts of the named Defendants "have the same or similar purposes, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." *Anderson . Foundation for Advancement, Education and Employment of American Indians*, 155 F.3d 500, 505-06 (4th Cir 1998).

52. A RICO Enterprise can be an association of individuals and corporations. *Superior Bank, FSB v. Tandem Nat. Mortg. Inc*, 197 F. Supp2d 298, 324 (D. Md. 2000). The named Defendants, including Defendants DBCS and its director Dan Backer were integral parts of the Enterprise.  They engaged in predicate acts of extortion, fraud

and obstruction, stepped in to take over functions of other Defendants once they were
exposed as fraudulent, and used their legal muscle in an attempt to intimidate
Plaintiff, drive him out of business and injure his business and property.  Moreover,
the broad damages to Plaintiff support liability for civil RICO.  *Potomac Electric Power
v. Electric Motor and Supply*, 262 F3d 260 (4th Cir. 2001) (even nominal amount of
damages sufficient to support liability in civil RICO case).

53. Defendant Michelle Malkin is a firebrand conservative commentator, blogger,
and journalist who regularly appears on FOX News and other Tea Party affiliated
websites.  Her popularity among the far right has garnered her more than 660,000
Twitter followers and led to her launching Twitchy two years ago.  Defendant Twitchy
is a Twitter platform that allows users to spread their tweets to a much greater
audience. Twitchy is so effective for spreading the conservative message that it was
just sold to Salem Communications, the largest Evangelical media conglomerate in the
country.

54. Defendant Malkin is a key figure in the RICO charge alleged by Plaintiff in this
case due to her close involvement with Defendant National Bloggers Club and its
President, Ali Akbar.  Defendant Malkin is not merely close friends with Defendant
Akbar, but admits that she is in fact on the board of his fraudulent National Bloggers
Club. Exhibit 10. She used her reputation and contacts to provide gravitas and
credibility to that fraudulent enterprise. 3/

3/ Defendants argue that Plaintiff has failed to show that Defendant Malkin is connected to
the operation of the RICO Enterprise. This argument is without merit.  The SAC alleges a
relationship and a conspiracy between Defendant Malkin and Defendant National Bloggers
Club. That relationship is not merely informal or friendly, but rather as stated above, she is
formally on the Board of The National Bloggers Club.  In fact, on February 25, 2013,
(footnote continued on next page)

55. Specifically, Defendant Malkin and her Twitchy platform propelled to the

national media and more than a half million followers the defamatory narrative that

Plaintiff was a swatter who targeted conservative bloggers. 4/ She published articles

stating falsely that Defendant Walker was fired for blogging about Plaintiff. This led to

(footnote continued from previous page)
Defendant Akbar sent a notice to his Google Group stating both that The National Bloggers
Club is a 501(c)(3) and that Michelle Malkin is on its Board of Directors. ("Board members
include myself, Dennis Pedrie, Andrew Langer, Bruce Carroll, Michelle Malkin, Glenn
Reynolds, John Hawkins, and Matt Margolis. We are a Texas filed non-profit and have ourc3
status pending.")  The National Bloggers Club has spent years engaged in mail fraud, wire
fraud and money laundering by defrauding thousands of victims with is false narratives and
false and public portrayals that it is a 501(c)(3) non profit.  This conduct of the Enterprise
affected interstate commerce because the fraud took place nationwide, with victims in almost
every state, and wire and mail sent across state lines.
     Clearly, the SAC alleges that Defendant Malkin knew of the fraud, false narratives, and
money laundering and agreed with other Defendants, including Defendant Akbar to
participate in the affairs of the conspiracy.  In this case, there were not merely two predicate
acts but rather thousands since each money transaction with or by The National Bloggers
Club constituted a separate act of mail fraud, wire fraud or money laundering.
Defendant Malkin was an integral part of the fraud because she gave a relatively unknown
convicted felon and fraudster, Ali Akbar, media exposure, credibility and gravitas as President
of The National Bloggers Club to commit his wholesale fraud without question upon
thousands of victims of that fraud.  In other words, without the backing of Defendant Malkin,
Defendant Akbar would not have been known to Defendant Malkin's 660,000 Twitter
followers or her millions of readers.  Moreover, once Defendant Akbar was exposed as a
convicted felon and fraudster on probation in the State of Texas, Defendant Malkin hid that
fact from her readers and helped him cover it up.  To this day, she has continued to back him
and has never once said a word publicly about his status a felon and fraudster.  This kind of
behavior demonstrates guilty knowledge and involvement.
      The criminal activity that has occurred in this case, with fraud on a wholesale level,
money laundering, extortion, assault, obstruction of justice, is truly mind boggling, especially
because it involves so many people and organizations that portray themselves as law abiding.
Why would these supposed upstanding people and organizations partner with convicted
felon and fraudster Ali Akbar and falsely tell their conservative friends to donate to a fake and
fraudulent non-profit in order to attack and harm Plaintiff?  Why did Defendant Malkin cover
up for Defendant Akbar when he was exposed as a convicted felon and fraudster?  Clearly, the
answers to these questions are, because the Defendants were part of the fraud, they were
getting enriched in some fashion, and they were afraid to admit that they were part of the
fraud.  This massive criminal Enterprise constitutes a "threat to social well-being."

4/In a *Politico* article dated February 8, 2014, entitled "Michelle Malkin Girds for 2014 GOP
Civil War," the reporter states: "Twitter is Malkin's weapon of choice. Battles with her almost
always devolve into wars...Taunting quips from foes bring out the full force of her Twitter
arsenal, with snappy replies, catchy hashtags and the mobilization of a legion of energized
(footnote continued on next page)

calls by Senators and Congress Members to have the Attorney General investigate Plaintiff for swatting.   It led to death threats and other threats to Plaintiff and his family.  It led to loss of funding opportunities to his employer.

### Making Money And Destroying Plaintiff

56. Defendant Malkin befriended Defendant, convicted felon and fraudster Ali Akbar, and joined his criminal National Bloggers Club Enterprise as a board member to destroy the reputation and property of Plaintiff.  She used Defendant Twitchy to magnify the harm of the publications and blog posts she wrote and linked to. Defendant Malkin knew that Defendant National Bloggers Club was not a 501(c)(3) non-profit when she asked her "legion" of followers to donate money to it in order to "protect conservative bloggers" from Plaintiff's criminal swatting.  Yet she was perfectly content to defraud those conservatives nonetheless.

57. Defendant Akbar as President of Defendant National Bloggers Club has not only defrauded many people out of tens of thousands of dollars based on the false narratives about Plaintiff, but he has also never filed any 2012 or 2013 990 tax returns or normal business filings or provided any financial accounting to the public. Incredibly, Defendant Malikin and every single one of the Defendants who have filed responses to the Complaint have ignored the elephant in the room – that the fraudulent National Bloggers Club is a key part of the RICO Enterprise by committing

(footnote continued from previous page)
followers." Defendant Malkin states in the article: "I see the practically unlimited power that social media has to help push the issues and cause and people I care about.  I know what I am good at."  The article goes on to state: "She has turned her online savvy into the thing most traditional news organizations have been struggling with: making money."

mail fraud, wire fraud and money laundering on a massive scale. The Defendants have acted as though this essential fact does not exist because it undermines all their arguments against the RICO case.

The Defendants have not produced any evidence that The National Bloggers Club was a 501(c)(3) in 2012 or 2013, because they cannot. They have not produced any evidence that the Defendants did not defraud people when they asked them to make tax-deductible donations to the National Bloggers Club. They have not produced any evidence that they did not share in proceeds and glory of the massive fraud perpetrated by Ali Akbar and The National Bloggers Club. They have not even attempted to justify their behavior. Instead, all of the Defendants argue technicalities in the hope that the Court will dismiss this case without ever asking why supposedly legitimate people, companies and organizations joined and conspired with a convicted felon named Ali Akbar who was on probation for fraud and theft to harm Plaintiff. These Defendants became part and parcel of and gave credibility to a fraudulent Enterprise called The National Bloggers Club and did so in order to harm Plaintiff and his property.

In conclusion, Plaintiff has met the pleading requirements for his RICO claim. 5/

5/ In the United States, there are more than seven million people in prison, on probation or on parole, and there are tens of millions more who, like Plaintiff, have served their sentences and are no longer under supervision. In the United States, there is a presumption that once a person serves his sentence and moves on to a legitimate lifestyle that the person should be able to so unmolested by other members of society.

There are many examples of how profoundly sinister and harmful the Defendants' conduct has been. But here is one that will drive this home: For many years, since the 2004 Orange Revolution in Ukraine (Plaintiff's wife is Ukrainian), Justice Through Music has given voice to activists and musicians worldwide who have opposed oppressive governments. During the Green Revolution in Iran, Justice Through Music was the leading organization in the United States supporting the Iranian Youth Movement. This important work was noticed by the State Department, which for years thereafter brought scores of young activists from around the (footnote continues on next page)

### Defendants Malkin and Twitchy

58. Defendants Malkin and Twitchy state that they have only made a few

defamatory references about Plaintiff and swattings as if that justifies the tort.

Multiply those two by 660,000 Twitter followers and millions of readers, and that

shows the devastating toll of these defamatory mentions.  Tweets can be as damaging

than blog posts or articles as rock star Courtney Love found out when she was sued

for defamation over a single tweet, which resulted in a $430,000 settlement judgment.

### Defendant Frey Acted Under Color Of State Law, And Other Named Defendants Conspired With Him In Violation of 42 USC 1983 and 1985

To state a claim under 42 U.S.C. § 1985, a plaintiff must show that the Defendants

conspired with a state actor who acted under color of law under 42 USC 1983 by

(footnote continued from previous page)
world to the United States as part of its *International Visitor Leadership Program* to learn how to use social media and the arts to effectuate change in their respective countries.  And every year, those activists from Iran, Turkey, Kazakhstan, Egypt, Yemen, Libya, Saudi Arabia, Tunisia, Bahrain, Jordan and elsewhere came to the offices of Justice Through Music to meet with Plaintiff and other staffers to learn, experience and ask questions. Some of those activists went back to their countries and kept in touch and provided videos of their ongoing struggles so Justice Through Music could post them for the world to see.  Some of those videos could not be posted from their home countries because of reprisals from their governments.
    When the Defendants decided to destroy Plaintiff and Justice Through Music, they contacted the State Department and posted articles complaining that the Department was sending activists to Justice Through Music for training and educational purposes.  They told the Department that Plaintiff was a criminal, a swatter and a terrorist. See e.g., the May 25, 2012 article by Defendant The Blaze entitled, "Why is the State Department Partnering with Speedway Bomber Brett Kimberlin."Exhibit 4.  And as a result, the State Department no longer brings these activists to Justice Through Music, and the activists no longer know that they have an advocate for their cause of freedom and democracy, and they do not know that they can rely on Justice Through Music to post their videos when their own governments target them.  In the case of Plaintiff, he does not wear a Scarlett Letter on his forehead.  He has served his sentence, was released from parole, and got a job as director of a non-profit dedicated to using music and artists to inspire young people to engage in civic participation. He is a father, husband, and productive member of society and the community.  His reputation as the Director of Justice Through Music is impeccable.  The Defendants have no right under law or otherwise to pillory, harass, stalk, defame or otherwise to pillory, harass, stalk, defame, assault or otherwise ostracize Plaintiff for any reason, including that he was convicted of dubious crimes 35 plus years ago.

violating a victim's Constitutional right. *West v. Atkins*, 487 U.S. 42, 48 (1988). "The
traditional definition of acting under color of state law requires that the defendant in
a § 1983 action have exercised power 'possessed by virtue of state law and made
possible only because the wrongdoer is clothed with the authority of state law.'" Id. at
49, quoting *United States v. Classic*, 313 U.S. 299, 326 (1941). Generally, "a public
employee acts under color of state law while acting in his official capacity or while
exercising his responsibilities pursuant to state law." *Atkins*, 487 U.S. at 50. See also
*Griffin v. Maryland*, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state
authority and purports to act under that authority, his action is state action. It is
irrelevant that he might have taken the same action had he acted in a purely private
capacity or that the particular action which he took was not authorized by state law").
Defendant Frey acted under color of state law when he relied on the authority of his
State role as a prosecutor to threaten to and actively criminally investigate Plaintiff.  A
nexus exists between the wrongful act (the issuance of the threats and the attempts to
investigate and imprison Plaintiff for swattings and other supposed crimes) and
Defendant Frey's abuse of his authority as a prosecutor for Los Angeles County.

   59. Defendant Frey is a Los Angeles District Attorney who has used his position
under color of law to harass, retaliate against, intimidate, threaten and attempt to
imprison Plaintiff, and incite others to do the same.  He is the person all the
Defendants rely on to give their false narratives legal credibility.  He is the equivalent
of the Alabama Sheriff or Prosecutor by day and the Klan leader by night directing his
hooded followers to destroy his perceived enemies, including Plaintiff.  He regularly

contacts the other Defendants through email, phone, direct messages and other means of communication to facilitate his tortious destruction campaigns.

60. When Plaintiff complained to Defendant Frey's supervisors about his conduct, Defendant Frey retaliated against Plaintiff by concocting the false swatting narrative. He wrote an email to Defendant Walker telling him that he had contacted and met with the FBI in Texas and elsewhere, and provided (false) information about Plaintiff. Exhibit 3.  He contacted Barrett Brown, the head of the hacking group Anonymous and tried to interest him in targeting Plaintiff. There was an implicit quid pro quo in that request because Brown was facing legal problems of his own.  Frey counseled Defendant Walker on how to file and prepare legal filings against Plaintiff to make him appear odious: "No, You have to start with ten seconds of labeling him a convicted bomber and convicted perjurer, and say this is established by major media stories and by published court decisions.  Then say he obtained the injunction by repeatedly perjuring himself and that you can prove it. ... Ethos first. Then logos. Then pathos." Frey threatened to criminally investigate Nadia Naffe after she gave Plaintiff evidence about (ex)-Defendant O'Keefe targeting Plaintiff.

61. In an email from Defendant Frey to Defendant Walker on December 22, 2011, Frey complimented Walker on a pleading and then said, "This kicks ass. They are going to go apeshit.  When you blog it, *I'll send it to Glenn Reynolds and tell him that I think this is the guy who swatted me*...." Exhibit 3. (emphasis added). Mr. Reynolds is a well-known conservative author, professor, blogger and board member of Defendant NBC. This email clearly shows that Frey was conspiring with Defendant Walker to create a situation Frey could use to falsely accuse Plaintiff of swatting.

62. In another email exchange with Defendant Walker, Walker tells Frey, "Now he [Kimberlin] is going to learn not to fuck with me either." To which Frey replied: "Yeah, but he is 'fucking' with me. Just not in court. He sends bullshit interrogatories that he has to know will never get answered. But mostly he is trying to make me miserable, publishing my address, *hiring people to swat me,* Google bombing me, defaming me, mocking me and so on. .... I just want you to understand that Kimberlin is behind all the things that have happened to me, and that he is truly dangerous and a psychopath." Exhibit 3. (emphasis added). Of course, Plaintiff never hired anyone to swat Defendant Frey, wasn't behind anything, and never even published online a single word or tweet about Frey.

63. In other emails to Walker and some of the other Defendants such as Nagy, Frey states that his office at the LA County District Attorney is "investigating" Plaintiff and had asked Defendant Walker to keep quiet while the investigation proceeded. Exhibit 3.

64. In another email dated December 19, 2011, he states: "Don't volunteer where you got this stuff. Just because of the investigation. But for that, I would be shouting all this from the hilltops, *but I still think we can put these guys in prison*, so I have to stay quiet." (emphasis added). Id. Exhibit 3.

65. In an email dated January 25, 2012, Defendant Frey told Defendant Walker while waiting for a jury in a case he was trying. "I'm having fun. This is what I do: prove things. I have a jury out so I have a little time tonight [to review the pleading Walker prepared regarding Plaintiff]. " Exhibit 3.

66. In several emails on December 21, 2011, Defendant Frey discussed his planned meeting with the FBI the following day and setting up a sting operation with law enforcement to arrest Plaintiff. "I don't suggest lying unless it's done under supervision of law enforcement as part of a sting. ... But it only makes sense as part of a monitored sting." Exhibit 3.

67. On January 5, 2012, Defendant Frey asked Defendant Walker to send him a letter about Plaintiff to share with his supervisors at the LA County Prosecutors Office and other law enforcement officials. Exhibit 3.

68. In a 2012 letter to Defendant Walker's attorney, Defendant Frey repeatedly relied on his official position as an Assistant District Attorney to argue that Plaintiff committed crimes including swattings and should be in prison. At the end of the letter, he asks the lawyer to call him at work *at the Los Angeles District Attorney Office*.  He says that he has investigated Plaintiff and concluded that Plaintiff committed crimes. Exhibit 11.

"I ... am currently a Deputy District Attorney with the Los Angeles County District Attorney's Office, where I have worked since 1997.  I am currently a member of the Hardcore Gang Unit of the District Attorney's Office, prosecuting gang murder cases in Long Beach.  I am writing this letter, not as a member of the District Attorney's Office, but as a private citizen who has witnessed months of harassment, dishonest, and indeed criminal conduct by the violent criminal Brett Kimberlin. ....

I suspect that ... Kimberlin {and others} are responsible for a hoax call to police made on July 2011, falsely claiming that there had been a shooting at my home.....  This, crime, by the way, is called 'swatting'....

The pattern of harassment I have suffered at the hands of Kimberlin...is further circumstantial evidence that they were involved in the 'swatting' incident....

In short, I believe that Brett Kimberlin ... engaged in actions that could have gotten me killed....

It was around this time that Aaron {Walker} contacted me asking for me to provide him with evidence of Kimberlin's perjury. .... I agreed, and forwarded the evidence to Aaron, including audio clips ... and transcripts I personally prepared from those audio clips....

Kimberlin blatantly lied under oath...."

Kimberlin lied about this under oath....

I am confident that Kimberlin lied about this as well, again under oath....

After I sent these examples of Kimberlin's perjury to Aaron, he incorporated the information in alengthy court filing which he also published on his web site. His post received a link from one of the most heavily trafficked bloggers in the Internet, and thousands of people read Aaron's post which set fort the evidence of Kimberlin's perjury....

I am happy to discuss this letter further with you, your investigator, or any prosecutor who is considering whether to pursue these charges against Aaron....

If anyone deserves prosecution, it is Brett Kimberliin, for perjury, for a false police report against Aaron – and, (if we can prove it) his entire crew for swatting and related cyberstalking crimes.

I can be reached at 310-266-7549, which is my cell phone, or 562-491-5967, which is my direct line at work.

> Yours truly,
> Patrick Frey

69. The above emails and documents clearly demonstrate that Defendant Frey directly communicated and conspired with several Defendants in this case, falsely accused Plaintiff of swattings, and tried to have him arrested by the FBI or other law enforcement officers based on his accusations and a sting operation. He discussed criminal investigations with his supervisors at the LA County District Attorney's Office and communicated with Defendant Walker while waiting for a jury. He falsely stated that Plaintiff hired people to swat him. He stated that he investigated alleged crimes by Plaintiff and presented that information to the FBI, and even flew to Texas to meet with an FBI agent. These actions are not those of a private citizen but rather a person acting under color of law.

70. Indeed, Defendant Walker testified at a trial under oath on August 12, 2014, that Defendant Frey in his *official capacity as "an assistant district attorney"* bought into Defendant Walker's false narratives:

Q [By Plaintiff Kimberlin] Whatever, nobody, my point is has anybody in an official position anywhere bought into your whole narrative,

you know, that I got you fired. That I'm a pedophile. That
I'm a murderer. That I'm a perjurer or any of the other things
that you've tried to get me arrested for and charged with? Has
anybody ever bought into that?
A [By Defendant Aaron Walker] Anyone believed that that's what occurred?
Q Has anybody ever bought into that? Have you ever --
MR. OSTRONIC: Objection, Your Honor.
THE COURT: Overruled.
BY MR. KIMBERLIN:
Q Have you ever gotten a federal judge, a state judge,
a state's attorney in Howard County, in Carroll County, in
Montgomery County anywhere to say yes, Brett Kimberlin is what
you profess I am?
A Yes, Patrick Frye for example -- ...
A No, he is an assistant district attorney. [Exhibit 12]

71.  Not only did Defendant Frey act as a prosecutor in his private emails with co-

defendants and others, but he also repeatedly imputed on his blog that Plaintiff

swatted him. And this false accusation signaled his co-defendants to write articles

and blog posts stating that Plaintiff swatted "Deputy District Attorney" Patrick Frey.

72. On May 23, 2012, Plaintiff received a threat on his non-profit website contact

page saying: "LEAVE HIM ALONE. DON'T GO THERE." Plaintiff interpreted this as a

threat to leave Mr. Frey alone and not to contact his supervisors. When Plaintiff

checked the website contact logs for the sender's information, he discovered that the

email came from the "Los Angeles County Sheriff's Department," at IP Address

146.233.0.202 in Whittier, California. Exhibit 13.  Only a person acting under color of

law could convince an employee of the LA County Sheriff's Office to write a threat like

that. The person who wrote it would have to feel that he would be "protected" by

Defendant and Deputy District Attorney Frey against any blowback.

73. In *Donnelly v. DeChristoforo*, 416 U.S. 637,648 n.23 (1974), the Supreme Court

cited Chief Justice Tauro of the Supreme Judicial Court of Massachusetts:

"Unlike a newspaper, the prosecutor ostensibly speaks with the authority of his office. The prosecutor's' personal status and his role as a spokesman for the government tend(ed) to give to what he . . . (said) the ring of authenticity . . . tend(ing) to impart an implicit stamp of believability.'" *Hall v. United States*, 419 F.2d 582,583-584 (5th Cir.).

Defendant Frey's threats were not made by a private individual in his personal capacity who happened to also work as a prosecutor during normal business hours. Rather, "Patterico," the blogger and Internet persona, had a long, active online history and presence as the alter ego of Deputy District Attorney John Patrick Frey who used that presence to violate Plaintiff's rights.

74. Defendant Frey exploited the authority given him by virtue of his state office when he threatened to investigate and imprison Plaintiff for possible criminal violations. "[A]ction under color of law is always identified by reference to the relationship between defendant's alleged misconduct and his state-created duties and powers, rather than the status of the parties." *Anthony v. Sacramento Sheriff's Dept* , 845 F. Supp. 1036, 1401 ED Calif. 1994.See *McDade v. West*, 223 F.3d 1135, 1140 (9th Cir. 2000) (a public officer is acting under color of state law if he or she "is acting, purporting, or pretending to act in the performance of his or her official duties"); *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir.1991) ("For conduct to relate to state authority, it must bear some similarity to the nature of the powers and duties assigned to the defendants," quoting *Murphy v. Chicago Transit Authority*, 638 F. Supp. 464, 468 (N.D. Ill. 1986)). By threatening to conduct and conducting a criminal investigation into Plaintiff, Defendant Frey spoke and acted with the authority of his office on a subject that uniquely related to his exclusive, state-authorized duties: criminal investigation and prosecution of criminal complaints. His

threats of criminal investigation, prosecution and imprisonment were made in context of extensive efforts to intimidate and silence Plaintiff from exercising his First Amendment rights to free speech and access to the court.

75. Defendant Frey clearly intended to prosecute and imprison Plaintiff even though he was not successful.  Therefore, the "color of law" analysis applies because the wrongful act was completed when "Patterico" began his investigations and issued his threats to imprison Plaintiff for swattings, perjury and and other crimes. For purpose of the § 1983 "color of law" analysis, Plaintiff need only show that the wrongful act alleged is related to the performance of the state actor's duties. *Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006) ("the challenged conduct must be related in some meaningful way either to the officer's governmental status or to the performance of his duties"); *Anthony, supra,* 845 F. Supp. at 1401 ("[w]hether a state employee acts under color of law turns on the relationship of the wrongful act to the performance of the defendant's state duties"). The acts to investigate and imprison Plaintiff for false criminal violations were intended to retaliate against and silence Plaintiff. That misconduct, which led to Plaintiff's constitutional deprivation, was directly related to Defendant Frey's state-conferred authority as a Deputy District Attorney to investigate and prosecute violations of law. Because Defendant Frey abused the authority of his public position when he tried to imprison Plaintiff for a false crime, he acted under "color of law" for purposes of 42 U.S.C. §1983.

76. It is settled law that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out or exercising the right to redress. Cf., *Hartman v. Moore*, 547 U.S. 250,

256 (2006).  To show a First Amendment violation, Plaintiff must plead facts that demonstrate that Frey's actions "deterred or chilled" his speech or right to redress, and that such deterrence "was a substantial or motivating factor" in Defendant Frey's conduct. *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012).  Plaintiff need not show that his speech or redress was "'actually inhibited or suppressed.'" Id., citing *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9thCir.1999). The relevant inquiry is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Lacey*, 693F.3d at 916-17. Plaintiff must allege facts ultimately enabling him to "'prove the elements of retaliatory animus as the cause of injury,' with causation being 'understood to be but-for causation.' Id. at 917, citing *Hartman*, 547 U.S. at 260.

77. In the instant case, Defendant Frey, because he is prosecutor, became a leader of the conspiracy to violate Plaintiff's constitutional rights.  The co-defendants looked to him for leadership and followed his direction and advice, both private and public, to falsely accuse Plaintiff of swattings in order to imprison Plaintiff. What greater violation of constitutional rights could occur to a living person than being imprisoned based on a false criminal charge? Defendant Frey called and met with the FBI and urged them to arrest Plaintiff for the swattings, and Frey *had his supervisors at the LA County District Attorney's Office criminally investigate* Plaintiff in the hope that they would find something on which to imprison him.

78. Clearly Defendants Hoge, Walker, Ace of Spades, Backer and the other Defendants named in the 1985 claim conspired with Frey to violate Plaintiff's civil rights by publicly and privately pushing the false narrative concocted by Frey that

Plaintiff was involved with swattings.  Frey along with other Defendants are members and associates of the National Bloggers Club, which made the false swatting meme its first and only campaign.  On March 7, 2013, Defendant Akbar, as President of NBC, tweeted the following: "#Brett Kimberlin picked a fight with Andrew Breibart that we're going to finish. *He'll go to jail this time* #BlogBash." (emphasis added). Exhibit 14.  This demonstrates that The National Bloggers Club was being used to deprive Plaintiff of his liberty based on false criminal charges. Defendants Frey, Hoge, Walker and Akbar have made Plaintiff's imprisonment their life's work over the past three years with thousands of tweets and blog posts smearing Plaintiff, their letters to Congress Members stating that Plaintiff was the swatter and should be imprisoned, and their false criminal charges against Plaintiff.  This call for imprisonment was started by Defendant Frey who stated in his December 11, 2011 email that he would phone a well-known reporter and say that Plaintiff was the person who swatted him. Exhibit 3. 6/ He also stated that he would meet with the FBI and set up a sting operation. Private citizens cannot set up sting operations to have someone arrested.

79. Plaintiff alleges in his SAC that Defendant Frey, acting under color of law, conspired with many of the other Defendants, including Defendant Malkin, to deprive Plaintiff of his liberty, his right to redress and speech, and his right to due process. They did this through various means, including threats, intimidation, extortion, false narratives, and false statements to law enforcement and Members of Congress.

6/ Defendant Frey told Defendant Walker in an email dated December 22, 2011, that he would call journalist "Glenn Reynolds" to tell him that Plaintiff was "the guy who swatted me."  And Glenn Reynolds is on the Board of National Bloggers Club, and is also the person who posted a photo of himself with a shotgun addressed to "Dear Brett Kimberlin." This demonstrates conspiracy, intimidation, threats, obstruction of justice, and vigilante action.

80. Like the Mississippi sheriff in 1960 who wore a gun by day and a white robe by night, Defendant Frey used his position as an LA County Deputy District Attorney to violate Plaintiff's civil rights and conspired with other Defendants to attack Plaintiff, to wear him down, to discredit him, to ostracize him, to retaliate against him, and to create a favorable environment so he could be arrested and not allowed to file for redress or to speak out against these unlawful actions.  This meets the standards under 42 USC 1985.

## The Defamation and False Light Claims

81. Defendants state that Plaintiff has not alleged defamation or false light.  This is without merit.  Defendants repeatedly stated and imputed that Plaintiff was involved with swatting conservative bloggers, which is a horrible crime.  False statements of criminal activity constitute per se defamation in Maryland. *Shapiro v. Massengill*, 105 Md. App. 743 (Md 1995) ("In the case of words or conduct actionable per se their injurious character is a self-evident fact of common knowledge of which the court takes judicial and need not be pleaded or proved.") Harm does not have to be proved in cases of per se defamation.

82. In *Hearst Corp. v. Hughes,* 297 Md. 112, 118, 466 A.2d 486 (1983), the court stated: "[I]t is defamatory 'to utter any slander or false tale of another ... which may impair or hurt his trade or livelyhood.' 3 W. Blackstone,*Commentaries on the Laws of England* 123 (special ed. 1983). Thus, a statement 'that adversely affects [an employee's] fitness for the proper conduct of his business ... [is] actionable per se at common law."

83. In the instant case, Defendants repeatedly published defamatory statements that Plaintiff was involved with swattings and this impaired his trade and his livelihood. Not a single one of the Defendants has ever disavowed these statements even after the Complaint was filed in this case. Not a single Defendant has ever provided any proof that Defendant was involved with the swattings. Instead, they falsely say that all the persons swatted were critics of Plaintiff. However, Plaintiff did not even know Eric Erickson were when he was swatted and he certainly had no idea of his phone numbers or addresses. Exhibit 7. And to follow the Defendants' logic for accusing Plaintiff, these same Defendants criticized President Obama, Hillary Clinton, Congressman Anthony Weiner and virtually every mainstream Democrat, yet those people were not accused of swatting. No, only Plaintiff was accused because the Defendants knew they could use the false equivalency of a 35-year old conviction to create a semblance of believability to gullible readers. They knew they could victimize Plaintiff by doing the same thing they are doing with their Motions to Dismiss, make prejudicial statements about Plaintiff's past and then justify their false statements as warranted.

84. The Defendants invaded Plaintiff's privacy by knowingly, recklessly and publicly placing him in a false light that was highly offensive to a reasonable person. *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 318 (Md. Ct. Spec. App. 1995).

85. The Defendants, through their various frivolous lawsuits, Peace Orders and criminal charges against Plaintiff, have been trying to get a judge, any judge, to rule that Plaintiff is a public figure. On each and every occasion, this argument has failed. In fact, when Defendant Walker prepared a motion for such a finding in another

defamation case brought by Plaintiff, *Kimberlin v. Allen*, Montgomery County Circuit

Court #339254, which resulted in a favorable judgment for Plaintiff, Judge Quirk

denied the motion on February 9, 2012.

| | |
|---|---|
| Docket Date: | **02/09/2012** Docket Number: **140** |
| Docket Description: | **ORDER, FOR APPROPRIATE RELIEF** |
| Docket Type: | **Ruling** Filed By: **Court** Status: **Denied** |
| Ruling Judge: | **QUIRK, JOSEPH M** |
| Reference Docket(s): | **Motion: 119** |
| Docket Text: | **ORDER OF COURT (QUIRK, J.) THAT DEFENDANT'S MOTION TO DECLARE BRETT KIMBERLIN AS A PUBLIC FIGURE RATHER THAT PRIVATE CITIZEN (D.E. #119) IS DENIED, ENTERED. (COPIES MAILED)** |

86. Defendant Walker made the same argument in a civil case in Prince William

County Virginia but the judge implicitly rejected it when he excoriated Walker for

filing a frivolous and malicious suit against Plaintiff. Exhibit 15.  The judge dismissed

that case on December 4, 2012. Now Defendants are making the same argument that

has been repeatedly rejected by other courts.

87. According to Defendants, the felon class, consisting of tens of millions of

Americans who have served their sentences, has no right under the law to sue for

defamation or false light.  According to Defendants, the rest of society has the right

under the First Amendment to defame, smear, trash, harass, stalk, bully and torment

those felons with impunity simply because they are felons.

88. According to the Defendants, if a felon fights back in a court of law, he is a

vexatious litigant in violation of Anti-SLAPP statutes. Fortunately, our system of laws

protects everyone equally and Maryland tort laws do not discriminate against or

make exceptions for certain classes of people. As former Justice Potter Stewart once

wrote, the essence of a defamation claim "reflects no more than our basic concept of

the essential dignity and worth of every human being — a concept at the root of any

decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75 (1966)(concurring opinion).

89. Plaintiff is not trying to silence anyone as the Defendants assert.  Instead, he is suing the Defendants for engaging in a massive fraud, using false narratives about him to enrich themselves and harm Plaintiff.  Plaintiff is suing to seek redress for the Defendants' multi-year defamation campaign.  It is well established that the First Amendment does not protect defamation, *Gertz v. Robert Welch, Inc.*, 418 US 323 (1974), and all the chest pounding by counsel will not change that.

90. Defendants were not engaged in "commentary" or fair comment.  Instead, they were members and associates and conspirators of the fraudulent National Bloggers Club and used their posts and tweets to close to a million followers to harm Plaintiff and incite a vigilante mob against him. There is no pubic interest in a citizen falsely accusing another citizen of a horrible crime and then enriching himself or herself based on those defamatory statements.  Fair comment does not mean publishing tens of thousands of tweets, posts, campaigns, radio shows, lies to the FBI and Congress, all with an intent to falsely imprison Plaintiff for a false crime.

## This Court Has Personal Jurisdiction Over Defendant Malkin

91. Personal jurisdiction is appropriate in this case under Maryland's long-arm statute. *Carefirst of Maryland v. Carefirst Pregnancy Ctrs*, 334 F.3d 390 (4th Cir. 2003). Specifically, out-of-state Defendant Malkin has acted in a manner that injured Plaintiff by directing her tortious conduct toward Plaintiff and Maryland with the knowledge and intent to cause Plaintiff maximum harm.

92. In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court found personal

jurisdiction over Florida reporters who had written defamatory articles about a

California actress, because "California [was] the focal point both of the story and of the

harm suffered." Id. At 789-90. The writers' "actions were expressly aimed at

California ... and they knew that the brunt of injury would be felt by [the actress] in

the State in which she lies and works...."

93. *In ALS Scan v. Digital Service Consultants,* 293 F.3d 707 (4th Cir. 2002), the court

held that, as a general matter, "[a] State may, consistent with due process, exercise

judicial power over a person outside of the State when that person (1) directs

electronic activity into the State, (2) with the manifested intent of engaging in

business or other interactions within the State, and (3) that activity creates, in a

person within the State, a potential cause of action cognizable in the State's

courts." *Id.* at 714.

94.   Moreover, Plaintiff has charged the defendants with civil and RICO

conspiracy, alleging that the Defendant co-conspirators are subject to civil tort

liability based on acts taken in furtherance of the conspiracy by members of the

conspiracy. In *Mackey v. Compass Marketing, Inc.,* 391 Md. 117, 892 A.2d 479 (2006),

the Maryland Court of Appeals held that co-conspirators are "agents" under

Maryland's long arm statute:

> "As noted above, we have long recognized that the intent of the General
> Assembly in enacting § 6-103(b) was to permit all exercises of personal
> jurisdiction that are consistent with due process.   Therefore, given our
> conclusion above that the conspiracy theory of jurisdiction is consistent with
> due process, and the support in Maryland law for the proposition that co-
> conspirators act as agents of one another when they act in furtherance of a
> conspiracy, we conclude that the General Assembly intended a broad
> construction of the term "agent" and did not intend to require a showing that

> one exercises control over the other.    We hold that when the requirements of
> the conspiracy theory are met, one co-conspirator may be the "agent" of another
> co-conspirator within the meaning of § 6-103(b)."

Put differently, Plaintiff's conspiracy claim permits certain actions done in

furtherance of a conspiracy by one co-conspirator to be attributed to other co-

conspirators for jurisdictional purposes.  Defendant Hoge lives in Westminster,

Maryland, and is a co-conspirator within the meaning of the long arm statute.  The

other Defendants have all committed tortious acts in Maryland and conspired with

Malkin.  Under *Mackey*, this alone is enough to establish personal jurisdiction.

## Defendant Malkin Focused On Plaintiff And Maryland

Applying *Carefirst*, *ALS, Mackey* and *Calder*, it is clear that Defendant Malkin did

not merely post information on a passive website located in another state directed at

another audience.  Instead, she actively, knowingly and intentionally focused and

directed her blogs and Twitter accounts on Plaintiff, Plaintiff's business, Plaintiff's

associates, and Plaintiff's activities, all of which are located in Maryland. Defendant

Malkin targeted Plaintiff, and her audience included Marylanders because that is

where she could cause the greatest harm to Plaintiff.  Defendant Malkin used the

other Defendants as her agents by having them gather information to defame Plaintiff,

create material that she posted on her blogs, physically harass and stalk Plaintiff, and

cross post the same tweets and the same information.  7/

7/This issue has been addressed recently n this Court in the case of *Hare v. Richie,*
(Aug. 29, 2012) Civil Action No. ELH-11-3488. In *Hare*, the Court held that it had
personal jurisdiction since the defendant not only published the defamatory
information online but also allowed people to comment and urged them on.  Similarly,
Defendant Malkin not only published her defamatory posts and tweets, but she asked
people to get involved, to post comments and tweets, demanded that Plaintiff be
investigated, and incited her followers to engage in vigilante action against Plaintiff.
Clearly, the Court has personal jurisdiction over Defendant Malkin.

### Defendant Ace of Spades' Meritless Arguments

95. Ace of Spades is a blogger and a blog and "has won 'Webbies' for 'Best
Conservative Blog' (2005 and 2007), Blog of the Year at the 2013 CPAC, and,
according to Wikipedia, has also won accolades as the 'Most Obscene Conservative
Ace of Spades' Blog.'"  When he speaks, people listen and follow.  His argument about
the First Amendment is specious and wholly without merit.  The First Amendment
does not protect defamation or cyberbullying.  Ace of Spades chose to create his
"obscene" blog and defame people.  Defamation is an actionable tort under Maryland
law.  Anonymous bloggers do not get a grant of civil immunity simply by virtue of
their anonymity.  As noted, Plaintiff is not a public figure or even a limited public
figure but even if he were, the malice of Ace of Spades and the others Defendants is
clear with their calls for imprisonment and loss of his job for a false crime.

96. Contrary to counsel's argument, Ace of Spades engaged in wholesale and per se
defamation against Plaintiff, not once, but multiple times.  See SAC at 30-32.  For
example, he falsely stated, imputed and published in five articles that Plaintiff
committed the crime of "swattings," that he was involved with terrorism" and
"murder," that he was trying to "kill" people, that he is a "thug" and "nefarious,"
 that he is running "scams," that he is engaged in "lawless vigilantism," that he is
involved with "ongoing crimes," that he is engaged in "alarming harassments," that he
is a "menace," that he is a "one-man crime wave," that he is "escalating" his criminal
activities, that he is engaged in a "crime in progress," that he is "abusing and
corrupting" the justice system, that his life is one of "escalat[ing] risk taking," that he
is "a dangerous man," that he is engaged in "digital" and "real life terrorism,"  that he

is a "malicious threat to society," and that he is engaged in "lawfare." Not only did Ace

of Spades make these defamatory statements and publications, he demanded action

by others, including Congress, to stop Plaintiff through various actions including

imprisonment and passing a bill of attainder. His publications were a call to arms

against Plaintiff based on defamatory hysteria—either stop Plaintiff or terrible things

will happen. Ace of Spades was using his defamatory statements to destroy Plaintiff

by any means. 8/

### Defendants Backer And DBCS' Frivolous Arguments

Defendants Backer and DBCS make several frivolous arguments that do not deserve

an extended response. They assert that this suit is barred by res judicata and

collateral estoppel because of prior rulings by Judge Motz and by the Circuit Court of

Montgomery County. The short answer to this is that neither Defendant Backer nor

DBCS were parties to those suits, and the issues in the various suits are completely

different. Therefore, collateral estoppel and res judicata are inapplicable to

Defendants Backer and DBCS.

### Plaintiff Has Properly Alleged Intentional Infliction of Emotional Distress

97. Defendants Hoge, Walker and others callously argue that Plaintiff has not made

any allegation to demonstrate infliction of emotional distress.

---

8/ Ace of Spades argues that Plaintiff did not differentiate between Ace of Spades the blog
from Ace of Spades the blogger and therefore Plaintiff's case against Ace of Spades the blogger
must be dismissed. However, it is clear from the pleadings that the blog and the blogger are
one and the same. As the Supreme Court has repeatedly stated, the plaintiff need not
necessarily plead a particular fact if that fact is a reasonable inference from facts properly
alleged. *Wheeldin v. Wheeler*, 373 U.S.647, 648 (963).

98. The Restatement (Second) of Torts, 46 at 71, provides: {"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." In comment (i) to the Restatement it is expressly stated that this rule also covers a situation where the actor knows that distress is certain, or substantially certain, to result from his conduct. In order to satisfy the element of extreme and outrageous conduct, the conduct "must be `so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Batson v. Shiflett*, 325 Md. 684, 733 (Md. 1992). 9/

99. In the instant case, Plaintiff has alleged that the Defendants engaged in outrageous and extreme conduct by falsely publishing defamatory statements accusing him of crimes and nefarious conduct, demanding that he be investigated, arrested and imprisoned for swattings, publishing tens of thousands of tweets and

---

9/ Illustrative of the cases which hold that a cause of action will lie for intentional infliction of emotional distress, unaccompanied by physical injury, is *Womack v. Eldridge*, 215 Va. 338 (1974). There, the defendant was engaged in the business of investigating cases for attorneys. She deceitfully obtained the plaintiff's photograph for the purpose of permitting a criminal defense lawyer to show it to the victims in several child molesting cases in an effort to have them identify the plaintiff as the perpetrator of the offenses, even though he was in no way involved in the crimes. While the victims did not identify the plaintiff, he was nevertheless questioned by the police, called repeatedly as a witness and required to explain the circumstances under which the defendant had obtained his photograph. As a result, plaintiff suffered shock, mental depression, nervousness and great anxiety as to what people would think of him and he feared that he would be accused of molesting the boys. The court, in concluding that a cause of action had been made out, said: "Most of the courts which have been presented with the question in recent years have held that there may be a recovery against one who by his extreme and outrageous conduct intentionally or recklessly causes another severe emotional distress...."

blog posts smearing Plaintiff and accusing him of crimes, filing three frivolous and malicious lawsuits against him, sending a defamatory letter to an institutional funder falsely accusing him of crimes, attempting to extort his employer into firing him, rallying extremists with false narratives to attack him, filing for sanctions in the amount of tens of thousands of dollars and imprisonment, and asking a federal court to deny him access to the courts. This abhorrent conduct has kept Plaintiff under siege for years, and incited extremists to come to his home, take pictures of him and his daughter, and make threatening calls to him, his family and his neighbors. No person in a civilized society should be made to endure such conduct.

100.     Moreover, Defendants conspired with the other Defendants to imprison Plaintiff based on their false narratives that Plaintiff was involved with swattings. This constitutes extremely outrageous conduct that intentionally inflicted emotional distress on Plaintiff. There are not many things in this country worse than being falsely accused of crimes and then having those false accusations incite a lynch mob to attack relentlessly and daily with tens of thousands of tweets and posts and articles, and stalkers over a period of years. This is atrocious and has absolutely no place in a civilized society.

101.     Not a day goes by where Plaintiff is not attacked, online or in person, by one or more of the Defendants. Defendant Walker came to a court hearing in Montgomery County Circuit Court and, after the proceeding to which he was not a party, followed Plaintiff out of the courtroom and assaulted him so severely he ended up in the Emergency Room at Suburban Hospital. This resulted in days off of work and a fear that

Defendants will again assault Plaintiff or his family.  Defendants Walker, Hoge, McCain and Akbar have stalked Plaintiff in public places.  Defendants Walker, Hoge and DB Capitol Strategies have filed numerous false criminal and civil actions against Plaintiff over a two-year period, all which have been dismissed or denied.  Defendants Hoge, Walker and some of the other Defendants publish daily taunts against Plaintiff and mock this suit with daily posts on their blogs, and continually assert that they are going to get Plaintiff imprisoned.  They have attacked Plaintiff's employer and those who donate to that non-profit.  The Defendants have tried to get Plaintiff fired.  They have attacked Plaintiff's wife and teenage daughter and even reporters who have written favorably about Plaintiff. They have even attacked prosecutors who have refused their frivolous charges, Defendant Walker has even imputed in a recent blog post that Plaintiff's daughter is fair game for destruction because of "corruption of blood."

102.       All of this has been intended to inflict maximum emotional distress on Plaintiff.  Plaintiff has had to install robust security devices and video cameras at his home and office, and take precautions for his family that no young child should have to be subjected to, all because the Defendants have created a lynch mob based on false narratives to terrorize Plaintiff and his family on a continuous multi-year basis. Clearly, Defendants inflicted intentionally emotional distress on Plaintiff.

## Conclusion

Wherefore, for all these reasons, all the Motions to Dismiss should be denied.

Respectfully submitted,

Brett Kimberlin

## Certificate of Service

I certify that I emailed copies of this motion and exhibits to attorneys for the named

defendants and Defendants Akbar, National Bloggers Club, and Stranahan, and mailed

copies to Michael Smith, and Defendants Hoge, Walker and McCain this 8th day of

December, 2014.

Brett Kimberlin
8100 Beech Tree Rd
Bethesda, MD 20817
justicejtmp@comcast.net
(301) 320 5921