## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

BRETT KIMBERLIN,                                    *

    **Plaintiff,**                              *

v.                                                          **Case No.: GJH-13-3059**
                                                    *

PATRICK FREY, *et al.*,
                                                    *

    **Defendants.**
                                                    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM OPINION

As the Court has previously stated, "this case is the latest in a protracted series of disputes between and among the parties here." ECF No. 263 at 1.[1] Plaintiff Brett Kimberlin originally brought suit against numerous Defendants, including Patrick Frey, for their alleged involvement in a criminal enterprise to spread false and defamatory stories about him and profit off these stories. *See generally* ECF No. 135. In a Memorandum Opinion dated March 26, 2015, the Court granted a total of fourteen Motions to Dismiss, but denied dismissal of one claim against Frey. ECF No. 263 at 37. Kimberlin and Frey have now filed cross-motions for Summary Judgment on Kimberlin's remaining 42 U.S.C. § 1983 claim against Frey, in which he claims that Frey retaliated against him for exercising his First Amendment rights. ECF Nos. 391 & 392. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Plaintiff's Cross-Motion for Summary Judgment is denied and Defendant's Cross-Motion for Summary Judgment is granted.

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

## I.    BACKGROUND

At all times relevant to the action, Frey worked as a Deputy District Attorney for Los Angeles County in the State of California. ECF No. 391 ¶ 4. In his capacity as a prosecutor, Frey had the power to initiate criminal investigations. *Id.* Frey also published, and continues to publish through the writing of this Opinion, a personal blog called *Patterico's Pontifications. Id.* ¶ 7.[2]

Beginning in 2010, Frey began writing what would become a series of blog posts about Kimberlin. *Id.* ¶ 9.[3] On October 11, 2010, the day of the first blog post mentioning Kimberlin, Frey received an email titled "Brett Kimberlin - CEASE AND DESIST/INTENT TO SUE - Patterico" from Kimberlin, alleging that Frey's post had "defamed and libeled" him. ECF No. 392-4 at 4. Kimberlin told Frey that "[m]ost of the things you write about in your post are false. If you have not removed the defamatory piece within 24 hours, I will proceed with legal action against you…" *Id.* at 5. Frey wrote back, stating "[i]f I have made any mistakes I am always happy to correct them. But I won't take down anything that is true." *Id*. at 4. Kimberlin responded stating, "I have no beef with you and I never even heard of you or your blog until today when I got the Google alert…" *Id.* However, Kimberlin warned that Frey's failure to pull the post could have consequences, stating "I have filed over a hundred lawsuits and another one will be no sweat for me." *Id.*

---

[2] PATTERICO'S PONTIFICATIONS, www.patterico.com (last visited June 19, 2017).
[3] Defendant declined to provide Plaintiff with copies of the blog posts in discovery, stating that such posts were easily accessible online. ECF No. 392-3 at 3. Thus, when necessary, the Court will cite directly to Frey's blog throughout this opinion. The October 11, 2010 blog post is viewable here: *Brad Friedman's Partner and "Buddy": A Convicted Bomber, Perjurer, and Drug Smuggler, Suspected Murderer . . . and Election Integrity HERO!!!,* PATTERICO'S PONTIFICATIONS, http://patterico.com/2010/10/11/brad-friedmans-partner-and-buddy-a-convicted-bomber-perjurer-and-drug-smuggler-suspected-murderer-and-election-integrity-hero/#comments (last visited June 19, 2017). In the blog post, Frey wrote about Kimberlin's criminal history, public statements, and reporting of "conspiracy theories" on VelvetRevolution.us, Kimberlin's co-run website.

On October 20, 2010, Kimberlin filed a complaint against Frey with the Los Angeles County District Attorney's Office ("LACDA" or the "Office"). ECF No. 405-2. In the complaint, he alleged that Frey had posted defamatory statements about him on his personal blog and that Frey had committed other ethical and professional violations. *Id.* On November 1, 2010, Kimberlin spoke with Anne Ingalls, Frey's direct supervisor, about his allegations and emailed her a copy of his complaint. ECF No. 405-4. That same day, Frey also emailed Ingalls, stating in part, that:

> I have reason to believe that you have heard from, or will soon be hearing from, a man named Brett Kimberlin. He apparently called the office here . . . complain[ing] that I am a racist, homophobe, etc. etc. Supposedly he plans to reveal all this through the media and make a big splash, etc.
>
> Briefly, Brett Kimberlin [was convicted of a violent crime in 1981]. He is now an online crusader for 'election integrity' issues and has alleged that Karl Rove had someone murdered as part of a plot to cover up Rove's alleged theft of the 2004 presidential election . . .
>
> I wrote about [Kimberlin's prior conviction] on my blog a few weeks ago . . . Kimberlin wrote me and threatened to sue me . . . and is apparently filing a complaint about me with the State Bar. . .
>
> Just wanted to give you a heads up.

ECF No. 391-44 at 1.[4]

Kimberlin again contacted LACDA on November 8, 2010, reiterating his allegations that Frey had, through his blog, "acted in a manner unbecoming of a state employee." ECF No. 405-5. Julie Dixon Silva, Chief Legal Advisor at LACDA, replied a few days later, acknowledging that they had received his complaint and advising him that, "[t]his Office will review the allegations to determine if there are any department policy violations." *Id.*

---

[4] At all times relevant to the action, Frey used his work email account at LACDA to email his supervisors, unless otherwise noted.

On January 21, 2011, Kimberlin contacted LACDA for a fourth time, stating that Frey was "continuing to harass me," and attaching Frey's blog post from that morning, which discussed a political dispute between Glenn Beck and blogger Brad Friedman, who Frey previously alleged is Kimberlin's business partner.[5] ECF No. 405-6 at 1. Although Kimberlin stated that Frey's blog is "simple retaliation for me bringing to your attention his unethical behavior," Kimberlin's complaints to Frey's office are not mentioned in the blog post. *Id.*[6]

Kimberlin sent the LACDA a fifth complaint on February 15, 2011, again alleging that Frey's blog post contained references that attacked Kimberlin and were in retaliation for Kimberlin's protected complaint against him. ECF No. 405-8 at 1. Specifically, Kimberlin highlighted a portion of Frey's blog post where Frey states:

> As I revealed yesterday, Brett Kimberlin has written numerous e-mails to my bosses, complaining about me and calling me a stalker. In his latest, he said: 'I have already reported him to the Bar and to the ethics board and have motions in court addressing his reprehensible conduct. He is very close to getting sued and having a criminal complaint filed against him for harassment and stalking.' In addition, two secretaries in my office told me that Kimberlin called them ranting about me, calling me a racist, a stalker, and saying he was going to get a restraining order against me. There is more.

*Id.* at 3. Kimberlin states that he never talked to Frey's secretary and that he was scared that Frey was "gin[ing] up people against me to get me hurt." *Id.* at 1. However, the quote in the blog post is undisputedly Kimberlin's own words, taken from an email Kimberlin sent to the LACDA and Frey on January 21, 2011. ECF No. 405-6 at 1.

---

[5] *Brad Friedman, Partner of Convicted Bomber, Is Very Concerned about Glenn Beck's Rhetoric.* PATTERICO'S PONTIFICATIONS http://patterico.com/2011/01/21/brad-friedman-partner-of-convicted-bomber-is-very-concerned-about-glenn-becks-rhetoric/ (last visited June 20, 2017). Kimberlin's disputes this characterization of his relationship with Friedman. ECF No. 392-4 at 4.

[6] In fact, Kimberlin's name is not mentioned in the blog post. The post links to the prior post that Frey wrote about Kimberlin on October 11, 2010.

The LACDA responded to Kimberlin the next day, notifying him that his complaint had been looked into and they had determined that "Mr. Frey had not violated any [District Attorney] policies." ECF No. 405-8 at 1. The LACDA further stated that, "Mr. Frey's blog is not associated with the Los Angeles District Attorney's Office. Mr. Frey is speaking as a private citizen." *Id*. On February 23, 2011, Kimberlin sent another email to the LACDA, attaching an article about a deputy district attorney in Indiana who lost his job because of social media activity, and requested that the LACDA reconsider their decision, ECF No. 405-9 at 1.

On July 1, 2011, a prank call was made to the sheriff's office in Los Angeles County. ECF No. 392-3 at 2. In that call, an unknown caller stated that he shot his wife and gave the police Frey's address. *Id*. This call dispatched a team of sheriff's deputies to Frey's house, who, thinking they were responding to a potential homicide, pointed loaded guns at Frey and placed him in handcuffs before discovering the call was a hoax. *Id*. The parties have since referred to this incident as a "swatting" incident.[7]

On August 4, 2011, Frey sent an email to Ingalls, responding to her request for an update on the aftermath of the swatting incident. ECF No. 391-48 at 1. Frey informed Ingalls that he had met with the FBI, and they were "working on the case… and ha[d] issued subpoenas." *Id.* Frey stated that there were two actions that the FBI had not yet taken that he thought would be helpful to catching the perpetrators and requested the help of the LACDA. *Id.* First, he said he had obtained a recording of the prank phone call and wanted law enforcement to conduct a voice analysis of the recording. *Id.* He stated that

> [t]he voice sounds familiar to me. It resembles the voice of someone with whom I was speaking on the phone when the deputies came to my house. His name is Ron Brynaert. I have since discovered that Brynaert has connections to Brett

---

[7] A swatting attack is where a prank call is made to law enforcement in order to dispatch a large number of officers to a targeted individual.

> Kimberlin…who has threatened me with a lawsuit and called this office claiming
> that I am racist, homophobic and stalking him.

*Id.* Frey also stated that he "would like someone in local law enforcement to speak with New

Jersey authorities about a New Jersey incident" that he believed was related to his own based on

the fact that both he and the New Jersey victim had written blog posts about a Democratic

Congressman. *Id.* Frey concluded by stating that "[m]y bottom line is that I would appreciate it if

our Bureau of Investigation could become involved, at least to help accomplish these two

important objectives (the voice comparison and the phone call to New Jersey)." *Id.* at 2. Frey

signed the email as "Patrick Frey, Deputy District Attorney, Los Angeles County District

Attorney's Office." *Id.* Ingalls then forwarded this message to her supervisor stating "I hope we

can encourage our Bureau to follow up on Patrick's requests." ECF No. 403-1 at 35.

Frey wrote again to Ingalls on August 16, 2011. He asked whether she "had heard

anything more on the request to have investigators look into a couple of areas on the situation

where the police showed up to my house . . . As you may recall, I have a possible suspect who

sounds like the caller and has ties to Brett Kimberlin." ECF No. 391-43 at 1. Frey further stated

that:

> I talked to a sound expert who sometimes does contract work for
> [the Los Angeles Sheriff's Department], and he said a basic
> analysis . . . would take about 2 hours and cost about $500 . . .
> $500 doesn't seem like a huge expense under the circumstances,
> and maybe this guy would do it cheaper for the Sheriff's
> Department. Frankly if law enforcement never does the analysis, I
> will pay the money myself. (But don't tell anyone I said that or
> they won't do it!) Thanks for backing me on all this.

*Id.* Ingalls forwarded the email to her supervisor at the LACDA, stating that "I agree under the

circumstances, $500 does not seem like a huge expense. Thanks." *Id.* It does not appear that

LACDA paid for this analysis as Frey later discusses hiring and paying for his own audio expert. ECF No. 391-39 at 1.

On November 29, 2011, Frey emailed Ingalls regarding a request from Ingalls' supervisor to discuss Kimberlin's complaints about Frey to the LACDA, including a new complaint filed on November 28, 2011. ECF No. 403-1 at 47-50. Frey stated:

> Although I am extremely busy, I will of course make time if that is what is required. (I hope everyone in the meeting will remember that the complainant is a convicted perjurer and a convicted bomber . . . In other words: Brett Kimberlin is a dangerous and dishonest criminal.)

> However I have a question: does this mean we are now at the point where the office is willing to do an investigation of whether Kimberlin and his associates are behind the police showing up at my house, pointing guns at me and my wife, and handcuffing and detaining me in front of my neighbors?

> To date, I have received no help from the office towards solving that crime because I was told it related to a private matter. If we're now at the point where a convicted bomber/perjurer's blatant fabrications and lies . . . are going to take time out of our busy schedules to meet about this, then can I presume this is now an official office matter? Meaning we can have the Bureau pay for voice comparisons, issue subpoenas on relevant leads, and help me ty to figure out who out there hates me enough to create a situation where my wife, my children, or I could have been killed?

> . . .

> The M.O. of Kimberlin's complaints to this office . . . all fits neatly with the July 1 police visit to my home – it is a coordinated effort to harass, defame and intimidate. . . Neither the FBI, the Sheriff's Department, or (to date) this office has yet thrown itself fully into this investigation and tried to connect the dots. That has been left to me and the other people who have been harassed by Kimberlin.

> . . .

> I would welcome the office's help on this. If this is truly going to become an office matter, I think it should become an office matter all the way.

ECF No. 391-29.

During December 2011 and into the following year, Frey exchanged a series of emails with his personal associates, using his personal email, reiterating his belief that Kimberlin was behind the swatting, expressing his eagerness to pursue the case and have Kimberlin prosecuted, and updating them on the status of the investigation. For example, on December 19, 2011, Frey sent an email to "A.W." and "Liberty Chick,"[8] stating, "I can't give you everything that connects Ron [Brynaert] to Brett [Kimberlin] because there is an ongoing investigation . . . But for that, I would be shouting all this from the hilltops, but I still think we can put these guys in prison, so I have to stay quiet." ECF No. 391-9 at 1.

On December 22, 2011, Frey sent an email to a larger group of his personal associates following a meeting with the FBI. He stated:

> Met with the Dallas FBI today in person, as well as a cybercrimes Assistant U.S. Attorney. One of the agents reads my blog . . . He was already familiar with Kimberlin...They totally understand the swatting phenomenon. . . They can't take over the case but can give advice to the L.A. office.
>
> . . .
>
> I asked what I can personally do to ensure these people go to prison. The answer is: if you have a blog, set your settings to gather the maximum amount of information possible.
>
> . . .
>
> Let's keep our chins up. Soon high tech investigators from my office will be on it, and they might be more motivated. Don't give up. We'll get them. We'll get them.

---

[8] Viewed in the context of the record, the Court assumes that "A.W." shown on the email is Aaron Walker, and "Liberty Chick" is blogger Mandy Nagy.

ECF No. 391-15 at 1-2.[9]

On January 31, 2012, Frey requested an update from his office on the Kimberlin investigation, writing to Ingalls,

> I hired my own audio expert. . . I didn't want to wait for law enforcement to do it. He is court-certified and has done contract work for the FBI, LASD and others. He says the New Jersey swatting call and my swatting call were placed by the same person. . . . It's costing me $750-1000, and I am not rich and can't really afford it . . . Anyway, if you hear anything let me know. I could use some help with this. The FBI has closed the case, they tell me, so right now I'm on my own.

ECF No. 391-39 at 1. On February 24, 2012, Frey again wrote to a personal associate of his, expressing his desire to tell the "truth" about Kimberlin through his blog, which he hoped would result in Kimberlin "never get[ing] another donation [for his non-profit]. . . To paraphrase Ronald Reagan, you guys stop harassing us, and we'll stop telling the truth about how you harass us." ECF No. 391-18 at 1.

In March 2012, Frey again wrote to Ingalls, asking whether he would "ever get any help from the Bureau of Investigation, since it's been 3 ½ months and I never even got the security review from High Tech Investigators that [Ingalls's supervisor] had promised…" ECF No. 391-23 at 2.

By May 15, 2012, almost a year after the swatting, Frey had been informed by his office that they would not be investigating the incident. ECF No. 392-4 at 1. Nonetheless, he inquired if the office would be able to do a "high-tech specific safety review." *Id.* It is unclear if this review was ever completed.

On May 22, 2012, the LACDA sent Kimberlin a "Letter of Determination" regarding their investigation into his complaint of comments posted by Frey on his personal blog. ECF No.

---

[9] Prior to this meeting with the FBI, Frey wrote to an associate suggesting that he would talk with the FBI about whether or not they would be willing to do a sting operation related to Kimberlin. ECF No. 391-11. There is no evidence presented to demonstrate that Frey actually conveyed this request to the FBI.

391-60. The letter briefly stated that the department had completed its investigation but further stated that they were precluded by a need for confidentiality from making further disclosure of additional information regarding the investigation. *Id.* The next day, Plaintiff received a threat from an AOL account with an IP address traced back to the Los Angeles County Sherriff's Department. ECF No. 391-22. The brief message had as the subject line "[l]eave him alone" and stated simply, "[d]on't go there." *Id.*[10]

Kimberlin states that he was interviewed twice by FBI agents with respect to the swattings, once on or about July 1, 2012 and again in 2016. ECF No. 391 ¶ 14. The FBI agents told him that Frey accused him of involvement in the crime. *Id.* Kimberlin also states that his wife was interviewed by agents on or about August 20, 2013. *Id.* These statements are included in Plaintiff's Motion for Summary Judgment but Plaintiff does not submit a sworn affidavit regarding these claims and provides no additional evidence to support these statements.

Plaintiff claims that Frey's efforts to launch an investigation into him were in retaliation for the complaints he filed with Frey's office, and, thus, violated the First Amendment's protection of free speech. Both parties have now moved for Summary Judgment. ECF Nos. 391 and 392. On April 20, 2017, the Court ordered supplemental briefing on the issue of causation pursuant to Federal Rule of Civil Procedure 56(f)(2). ECF No. 402. Both parties filed their supplement briefs on May 4, 2017 and May 18, 2017 respectively. ECF Nos. 403 and 405.[11]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . ,

---

[10] Although Kimberlin was apparently savvy enough to determine the message came from a Sherriff's Department IP address, the email on the surface appeared to have been sent from a non-descript personal account.

[11] Accompanying his supplemental briefing, Plaintiff filed a consent motion for leave to file excess pages. ECF No. 404. This motion will be granted.

admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986). The

party moving for summary judgment bears the burden of demonstrating that no genuine dispute

exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.

1987). If the moving party demonstrates that there is no evidence to support the nonmoving

party's case, the burden shifts to the nonmoving party to identify specific facts showing that

there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322-23. A material fact is one that

"might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*,

242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). A dispute of material fact is only genuine if sufficient evidence favoring the nonmoving

party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248.

However, the nonmoving party "cannot create a genuine issue of material fact through mere

speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214

(4th Cir. 1986). When ruling on a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*,

477 U.S. at 255.

    Cross-motions for summary judgment require that the Court consider "each motion

separately on its own merits to determine whether either of the parties deserves judgment as a

matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation and citation

omitted). "The Court must deny both motions if it finds there is a genuine issue of material fact,

'but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law,

the court will render judgment.'" *Wallace v. Paulos*, No. DKC 2008-0251, 2009 U.S. Dist. LEXIS 89700, at *13, 2009 WL 3216622, at *4 (D. Md. Sept. 29, 2009) (citation omitted).

## III.  DISCUSSION

Plaintiff's sole remaining claim is a 42 U.S.C. § 1983 action based on an allegation of First Amendment retaliation. To establish an action under § 1983, Plaintiff must show proof of conduct "committed by a person acting under color of state law" that "deprived [him] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Avery v. Burke Cty.*, 660 F.2d 111, 115 (4th Cir. 1981) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Defendant contends that he was not acting under color of state law when he took the steps alleged to be taken in retaliation for Kimberlin's protected First Amendment speech. Additionally, he argues that if he took any actions under color of state law they were not done in retaliation for protected speech. The Court will address both arguments.

### A.  Under Color of State Law

The "under color of state law" requirement is synonymous with state action. *See Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). "'[M]erely private conduct, no matter how discriminatory or wrongful, 'fails to qualify as state action.'" *Id.* at 181 (internal citations omitted). However, "[w]hile it certainly is true that '[a]cts of [government employees] in the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983,' the lack of the outward indicia suggestive of state authority . . . are not alone determinative of whether a [government employee] is acting under color of state law." *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989) (quoting *Robinson v. Davis*, 447 F.2d 753, 759 (4th Cir. 1971) (internal citations omitted)). Rather, in determining whether a government employee is acting under color of state law, the Court must examine "the nature and circumstances of the defendant's conduct to

determine whether it is 'fairly attributable to the state.'" *Rossignol v. Voorhaar*, 199 F. Supp. 2d

279, 286 (D. Md. 2002), *rev'd on other grounds*, 316 F.3d 516 (4th Cir. 2003) (citing *Revene*,

882 F.2d at 872 (when determining whether a defendant acted under color of state law "the

nature of the act performed is controlling")). "Although [certain factual] allegations can be read

as consistent with a purely personal pursuit, outside the scope of § 1983, when read with a

slightly different cast, they can also be viewed as consistent with an officer's '[m]isuse of power

. . . possessed by virtue of state law,' and thus within the ambit of acting under color of law."

*Mathis v. McDonough*, No. CIV.A. ELH-13-2597, 2015 WL 3853087, at \*24 (D. Md. June 19,

2015) (quoting *Revene,* 882 F.2d at 873-74) (alterations in the original).

An individual acts under color of state law when he or she exercises power "possessed by

virtue of state law and made possible only because the wrongdoer is clothed with the authority of

state law." *United States v. Classic,* 313 U.S. 299, 326 (1941). This test is generally satisfied

when a state employee, like a deputy district attorney, wrongs someone "while acting in his

official capacity or while exercising his responsibilities pursuant to state law." *Naffe v. Frey*, 789

F.3d 1030, 1036 (9th Cir. 2015) (citation omitted). When the state employee is off duty,

however, whether he "is acting under color of state law turns on the nature and circumstances of

the [employee's]. . . conduct and the relationship of that conduct to the performance of his

official duties." *Id.* (quoting *Anderson v. Warner,* 451 F.3d 1063, 1068 (9th Cir. 2006) (alteration

in the original)).

Here, Kimberlin argues that Frey was acting under color of state law when he wrote

defamatory blog posts about him, and later, when he encouraged law enforcement to investigate

Kimberlin for the swatting incident.[12] With respect to Kimberlin's claims regarding Frey's blog,

---

[12] Kimberlin also argues Frey's email to his supervisor at the District Attorney's office, warning her that she might
hear from Kimberlin, constituted state action. Irrespective of whether or not this would constitute state action,

Frey's expression of his opinions in his personal blog, including any of his views regarding individuals on the opposite side of the political spectrum, is not an exercise of power "made possible only because the wrongdoer is clothed with the authority of state law." *Classic,* 313 U.S. at 326. Indeed, Frey's blog includes a specific disclaimer noting that "[t]he statements made on this website …are not made in any official capacity, and do not represent the opinion of [the LACDA],"[13] and the LACDA has explicitly denied any affiliation with the blog. *See* ECF No. 405-8 at 1. ("Mr. Frey's blog is not associated with the Los Angeles District Attorney's Office. Mr. Frey is speaking as a private citizen."). Further, while Frey's blog may contain commentary informed by his job as a prosecutor, Kimberlin has not demonstrated that Frey claimed to be posting in his official capacity.

The Court agrees with the reasoning of the United States Court of Appeals for the Ninth Circuit which, in a related case, held that Frey's blog posts about a different individual did not constitute state action because they were not authorized or encouraged by the LACDA, they were not sufficiently related to his work as a prosecutor and Frey did not claim to be posting in his official capacity. *See Naffe*, 789 F.3d at 1037-38. Indeed, as the Ninth Circuit noted, government employees' own First Amendment rights would be chilled if courts "were to consider every comment by a state employee to be state action," which in turn, would be "detriment[al]" to the "marketplace of ideas." *Id.* (internal citation omitted). Thus, Frey's comments regarding Kimberlin on his personal blog do not constitute state action.[14]

---

Kimberlin does not allege that Frey asked his supervisor, or anyone else, to do anything to Kimberlin in that communication. Thus, Frey's conduct in that email did not chill speech and could not serve as the basis for a § 1983 claim.

[13] PATTERICO'S PONTIFICATIONS http://patterico.com (last visited June 20, 2017).

[14] Allegations involving the email sent from the Sheriff's Department IP address fail for a similar reason, in that the email was sent using a personal email account, which did not identify the sender as a government official, and thus was not done under color of state law. Additionally, there is no evidence that Frey was responsible for or aware of the email.

However, the Court reaches a different conclusion with respect to Frey's efforts to have Kimberlin investigated for swatting. After he was swatted, Frey emailed Ingalls, his supervisor, using his professional email address, and requested that the LACDA take two specific investigative steps: 1) conduct a voice analysis of the recording of the prank phone call and 2) speak with New Jersey officials regarding what he believed was a related incident. ECF No. 391-48 at 1. Frey followed up with another email a few weeks later, reminding Ingalls that he "has a possible suspect who sounds like the caller and has ties to Brett Kimberlin…" and suggests a sound expert that the LACDA could use. ECF No. 391-43. Ingalls approves of the idea and forwards the email to her supervisor within the LACDA. *Id.* Several months later, on November 28, 2011, Frey emails Ingalls again, this time specifically asking if the office "is willing to do an investigation of whether Kimberlin and his associates are behind the [swatting incident]," which would include "hav[ing] the Bureau pay for voice comparisons, issue subpoenas on relevant leads, and help me ty to figure out who out there hates me enough to create a situation where my wife, my children, or I could have been killed?" ECF No. 391-29. On December 22, 2011, Frey has an in-person meeting with the Dallas FBI where he discusses the swatting incident with relevant officials. ECF No. 391-15. Later, in February 2012, after getting word that the FBI planned to close his case, Frey emails the FBI agent in charge of his case, this time from his personal email address, "reiterate[ing] my request that the FBI issue a subpoena" for phone records he believed were related to the swatting. ECF No. 403-5 at 60.

Ultimately, Frey's efforts were unsuccessful. Frey decided to hire his own audio expert to analyze the voice recordings. ECF No. 391-39. He was informed by the FBI that they planned to close their investigation, ECF No. 403-5 at 60, and his own office, the LACDA, declined to even launch an investigation. ECF No. 392-4 at 1. However, the fact that Frey's ultimate goal, to "put

these guys in prison," ECF No. 391-9 at 1, was stymied, does not negate the fact that the

significant progress he did make can fairly be attributed to his status as a Deputy District

Attorney. As the Court stated in ruling on Frey's Motion to Dismiss, an average citizen who was

not a Deputy District Attorney "would not so easily be able to obtain this type of access to scarce

government resources." ECF No. 263 at 28. Here, the evidence demonstrates that law

enforcement officials communicated regularly with Frey and took Frey's suggestions under

serious consideration. For example, after Frey wrote an email to his supervisor regarding the

swatting, she forwarded it to her own supervisor stating "I hope we can encourage our Bureau to

follow up on Patrick's requests." ECF No. 403-1 at 35. Drawing all inferences in the favor of the

non-movant, Kimberlin, Frey was able to pursue the investigation into alleged swatting by

Kimberlin through the use of his role as Deputy District Attorney. Thus, the Court holds that the

actions Frey took to encourage law enforcement to investigate the swatting incident were taken

under color of state law.

### B.  Deprivation of Constitutional Rights

Having established that Frey was acting under color of state law, the Court next considers

whether or not Kimberlin can establish that Frey's conduct "deprived [him] of rights, privileges,

or immunities secured by the Constitution or laws of the United States." *Avery v. Burke Cty.*, 660

F.2d 111, 115 (4th Cir. 1981) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Here,

Kimberlin argues that Plaintiff chilled his First Amendment rights by using the power of his

office to launch investigations against him, creating a realistic threat of arrest and retribution

following Kimberlin's decision to contact Frey's supervisors to complain about Frey's conduct.

The Fourth Circuit has held that a First Amendment retaliation claim brought under 42

U.S.C. § 1983 must include the following three elements: (1) plaintiff's speech was protected;

(2) defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) a causal relationship exists between the speech and the defendant's retaliatory action. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) (internal citations omitted).

In this case, there is no dispute regarding the first element. A private citizen filing internal complaints against law enforcement is unquestionably protected activity. *See Garcia v. Montgomery Cty., Maryland*, 145 F. Supp. 3d 492, 514 (D. Md. 2015) (filing an internal affairs complaint against police officer is an activity protected by the First Amendment).

Concerning the second element, the key inquiry is "whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) (citation omitted). This determination is an objective one, and a plaintiff "need not actually be deprived of…First Amendment rights in order to establish First Amendment retaliation." *Garcia,* 145 F. Supp. 3d at 515 (quoting *Constantine v. Rectors & Visitors of George Mason Univ*, 411 F.3d 474, 500 (4th Cir. 2005)). The Fourth Circuit has described this process as a "fact intensive inquiry," instructing district courts to focus on four factors: "[1] the status of the speaker,[2] the status of the retaliator, [3] the relationship between the speaker and the retaliator, and [4] the nature of the retaliatory acts." *Suarez*, 202 F.3d at 686.

Here, Kimberlin argues that a similarly situated person of "ordinary firmness" would be chilled by Frey's efforts to galvanize law enforcement to open criminal investigations into him and the consequences thereof, which allegedly included multiple visits from FBI agents.

Frey's efforts to have Kimberlin investigated were conveyed in a blog post mentioning his in-person meeting with "the national experts on swatting…: the FBI office in Dallas,

Texas,"[15] and resulted in the alleged visits from FBI agents.[16] Considering Frey's status as a

Deputy District Attorney and Kimberlin's status as a private citizen, Kimberlin has sufficiently

demonstrated that these efforts could create a reasonable fear of investigation and arrest that

would chill an ordinary person from lodging similar complaints. *See e.g. Garcia*, 145 F. Supp. 3d

492, 515 (police cars often parked by plaintiff's house were the type of "uninvited law

enforcement interest" sufficient to chill speech.); *Hodgkins ex rel. Hodgkins v. Peterson*, 355

F.3d 1048, 1056 (7th Cir. 2004) ("The Supreme Court has often noted that a realistic threat

of arrest is enough to chill First Amendment rights.") (citation omitted); *Gardner v. Long*, No.

09-2563, 2010 WL 5691645, at *3 (D. S.C. Nov. 3, 2010) ("The initiation of criminal charges

and subsequent arrest constitute conduct that would deter a person of ordinary firmness from

exercising his constitutional rights."), *report and recommendation adopted*, No. 09- 2563, 2011

WL 379757 (D. S.C. Feb. 2, 2011).

In addition, the fact that Kimberlin has continued to file complaints with Frey's office

and filed this lawsuit does not mean that Frey's conduct would not chill a similarly situated

person with "ordinary firmness." *See Blankenship v. Manchin*, 471 F.3d 523, 532 (4th Cir. 2006)

("A chilling effect need not result in a total freeze of the targeted party's speech."); *see also*

*Garcia*, 145 F. Supp. 3d at 515 (fact that plaintiff filed complaint and subsequent lawsuit does

not negate chilling effect). Although Kimberlin has continued to engage in protected speech,

Frey has not demonstrated that, "as a matter of law, [Kimberlin has] not been chilled in *any*

---

[15] *Convicted Bomber Brett Kimberlin, Neal Rauhauser, Ron Bryneart and Their Campaign of Political Terrorism* PATTERICO'S PONTIFICATIONS http://patterico.com/2012/05/25/convicted-bomber-brett-kimberlin-neal-rauhauser-ron-brynaert-and-their-campaign-of-political-terrorism(last visited June 20, 2017). As discussed above, the blog posts are not in and of themselves state action. However, discussing the state action via the blog would communicate the state action – thus potentially chilling the speech.

[16] Notably, Kimberlin provides no evidence that these visits actually occurred.

respect." *Blankenship*, 471 F.3d at 533 (4th Cir. 2006) (emphasis added). Thus, the Court finds

that Kimberlin has established the second element of his claim.

Nonetheless, Plaintiff's claim ultimately fails because he is unable to establish the final

element, causation. To establish causation, the plaintiff must demonstrate a "but-for" connection

between the speech and the retaliatory conduct. The Fourth Circuit has repeatedly described this

requirement as a "rigorous" one, holding that "it is not enough that the protected expression

played a role or was a motivating factor in the retaliation; claimant must show that but for the

protected expression the [government official] would not have taken the alleged retaliatory

action." *See Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990));

*see also Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) ("Of note, our causal requirement

is 'rigorous.'") (quoting *Huang*, 902 F.2d at 1140)).[19]

Here, Frey became aware of Kimberlin's protected speech as early as November 1, 2010,

a few weeks after Kimberlin filed his initial complaint, when he emailed Ingalls, warning her

that Kimberlin may be in contact. *See* ECF No. 391-44 at 1. Shortly thereafter, on November 3,

2010, Ingalls confirmed that Kimberlin had indeed filed a complaint with their office and with

the state bar. ECF No. 403-1 at 56. By February 15, 2011, Frey was aware that Kimberlin had

filed multiple complaints with his office, and wrote on his blog that "Brett Kimberlin has written

---

[19] In his supplemental briefing, Plaintiff rejects this framework, arguing that the Court should apply the burden-shifting formula first developed by the Supreme Court in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle* in the context of First Amendment retaliation claims brought by government employees. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Under this formula, the plaintiff must show that retaliation played a "substantial" or "motivating role" in the employer's decision making, with the burden then shifting to the defendant to show, by a preponderance of the evidence, that it would have reached the same decision even in the absence of the protected conduct. *Id.* While there is some confusion on this issue, *see Swick v. Wilde*, No. 1:10-CV-303, 2012 WL 3780350, at *18 (M.D.N.C. Aug. 31, 2012), *appeal dismissed and remanded on other grounds*, 529 F. App'x 353 (4th Cir. 2013) (discussing distinctions between standards), courts within the Fourth Circuit appear to use the "substantial factor" analysis in the employment context, and do not apply it more broadly to First Amendment retaliation claims. *Compare Bland v. Roberts*, 730 F.3d 368, 375 (4th Cir. 2013), as amended (Sept. 23, 2013) with *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015). Notably, the *Mt. Healthy* burden shifting model mirrors the more commonly known *McDonnell-Douglas* burden shifting analysis found in employment discrimination cases. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, the Court will evaluate Plaintiff's claims under the "but-for" causation standard.

numerous e-mails to my bosses, complaining about me and calling me a stalker." ECF No. 405-8 at 3. By this date, Frey also knew that Kimberlin had threated to report him to the Bar, the ethics board, and file lawsuits. *Id.*

As the Court has discussed above, Frey's personal blog posts are not state action. Thus, Frey's first conduct acting under color of state law occurred on August 4, 2011, when Frey sent an email to Ingalls, requesting that their office take certain investigative steps with respect to the swatting. ECF No. 391-48 at 1. This action was nine months after Frey became aware of Kimberlin's complaint, but just one month after the actual swatting. Such an extended time frame between the initial complaint and the swatting investigation breaks the casual link between the protected activity and the alleged retaliatory act and Kimberlin has put forward no evidence to suggest that this was Frey's "first available opportunity" to take retaliatory action. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (abrogated on other grounds) (holding that a nine-ten month time period was a "very close question" but finding that the claim survived the motion to dismiss stage since it was the first opportunity for the defendant to act).

Kimberlin's best evidence of retaliation, where Frey explicitly connects the complaints and the swatting investigation, occurred several months later, on November 29, 2011, when Frey emailed Ingalls in response to a request to meet and discuss Kimberlin's most recent complaint and stated: "does this mean we are now at the point where the office is willing to do an investigation of whether Kimberlin and his associates are behind [the swatting]?" ECF No. 391-29 at 1.

Notwithstanding this email, however, the record demonstrates that Frey's efforts to have Kimberlin investigated for swatting were overwhelmingly motivated by his genuine belief that Kimberlin was responsible for, or at least involved with, the swatting incident. By the time of the

November email, Frey had already been pursuing the investigation for months. Additionally, it is worth nothing that even if Frey is responding in part to Kimberlin's complaints in the November email, Frey is not responding to a single constitutionally protected statement of complaint by a citizen. He is responding to what has by then become a lengthy campaign of complaints that continued even after they had been rejected by the LACDA. More specifically, however, in the November email to his supervisors, Frey places the complaints into the context of a number of other activities that cause him to suspect Kimberlin of being involved in the swatting event of July 2011. Thus, even in the light most favorable to the Plaintiff, the repeated complaints, even following rejection from the LACDA office, merely furthered Defendant's concern that Kimberlin was responsible for the swatting. ECF No. 391-29 ("The M.O. of Kimberlin's complaints to this office . . . all fits neatly with the July 1 police visit to my home."). His actions were therefore not motivated by protected conduct but by concern that Kimberlin had committed a crime against him that had not been investigated. Thus, the Court concludes that Kimberlin has failed to demonstrate that but-for his protected activity, i.e. the complaints to his office, Frey would not have taken the steps he did to encourage law enforcement to investigate the swatting incident.

Although, Kimberlin must, as discussed above, meet the higher "but-for" causation standard, the Court further holds that Kimberlin has failed to satisfy the lower, "substantial factor" standard. While Frey clearly is motivated to pursue Kimberlin, *see e.g.* ("We'll get them. We'll get them."), ECF No. 391-15 at 2, Kimberlin has failed to submit *evidence*, rather than his own strongly held convictions, that Frey's actions were motivated by an improper, retaliatory purpose, rather than his desire to spur law enforcement to investigate a crime of which he was

the victim. Thus, the Court holds that Frey is entitled to Summary Judgment with respect to Kimberlin's claim of First Amendment retaliation.[20]

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Cross-Motion for Summary Judgment is denied and Defendant's Cross-Motion for Summary Judgment is granted. A separate Order shall issue.

Dated: July 2 , 2017

GEORGE J. HAZEL
United States District Judge

---

[20] Because the Court holds that Kimberlin has failed to establish his prima facie case, the Court need not address Frey's defenses of privilege, absolute immunity and qualified immunity.